Matthew K. Bishop (Mont. Bar No. 9968)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 324-8011
bishop@westernlaw.org

Kelly E. Nokes (Mont. Bar No. 39465862)
Western Environmental Law Center
P.O. Box 218
Buena Vista, CO 81211
(575) 613-8051
nokes@westernlaw.org

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, a non-profit organization, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service, *et al.*, <br><br> Federal-Defendants. | CV 22-149-M-DLC-KLD <br><br><br> BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................ii

LIST OF ATTACHMENTS ........................................................................ v

INTODUCTION ....................................................................................... 1

BACKGROUND ....................................................................................... 2

    I.    Grizzly bears in the GYE............................................................ 2

    II.   The East Paradise grazing decision ........................................... 5

STANDARD OF REVIEW.......................................................................... 8

ARGUMENT ............................................................................................ 9

    I.    The Forest Service violated NEPA.............................................. 9

        A. Escalating grizzly bear mortalities .......................................... 10

        B. Earlier stocking dates with younger calves  ........................... 21

        C. Connectivity............................................................................ 26

        D. Cumulative effects .................................................................. 31

        E. An EIS is required ................................................................... 39

    II.   This Court should vacate and remand  ...................................... 44

CONCLUSION ........................................................................................ 46

CERTIFICATE OF COMPLIANCE............................................................ 46

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Gassmann,*
 2023 WL 4172930 (D. Mont. June 26, 2023)....................................39–40, 44

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council,*
 462 U.S. 87 (1983)............................................................................... 9

*Blue Mountains Biodiversity Project v. Blackwood,*
 161 F.3d 1208 (9th Cir. 1998)..........................................................24, 26

*Cal. Cmties. Against Toxics v. Env't Prot. Agency,*
 688 F.3d 989 (9th Cir. 2012)................................................................ 45

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
 401 U.S. 402 (1971)............................................................................ 8

*Crow Indian Tribe v. United States,*
 965 F.3d 662 (9th Cir. 2020)................................................................ 27

*Grand Canyon Trust v. Fed. Aviation Admin.*
 290 F.3d 339 (D.C. Cir. 2002) ............................................................. 36

*Great Basin Res. Watch v. Bureau of Land Mgmt.,*
 844 F.3d 1095 (9th Cir. 2016)..........................................................10–11

*Greater Yellowstone Coal., Inc. v. Servheen,*
 665 F.3d 1015 (9th Cir. 2011)..........................................................8, 13

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,*
 857 F.2d 505 (9th Cir. 1988)..........................................................11, 20

*Helena Hunter & Anglers Ass'n v. Tidwell,*
 841 F. Supp. 2d 1129 (D. Mont. 2009).................................................. 41

*Helena Hunters & Anglers Ass'n v. Marten,*
    470 F. Supp. 3d 1151 (D. Mont. 2020) ........................................................ 45

*Kern v. U.S. Bureau of Land Mgmt.,*
    284 F.3d 1062 (9th Cir. 2002) ........................................................ 31, 33, 37

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.,*
    387 F.3d 989 (9th Cir. 2004) ........................................................ 33, 36

*Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2005)........................................................ 17

*Marsh v. Oregon Nat. Res. Council,*
    490 U.S. 360 (1989)........................................................ 9

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) ........................................................ 8

*Ocean Advocates. v. U.S. Army Corps of Eng'rs,*
    402 F.3d 846 (9th Cir. 2005)........................................................ 9, 39, 42, 44

*Or. Nat. Desert Ass'n v. Jewell,*
    840 F.3d 562 (9th Cir. 2016)........................................................ 11

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989)........................................................ 9

*Te-Moak Tribe v. U.S. Dep't of Interior,*
    608 F.3d 592 (9th Cir. 2010)........................................................ 31–33

*W. Watersheds Project v. Kraayenbrink,*
    632 F.3d 472 (9th Cir. 2011) ........................................................ 23

## STATUTES

5 U.S.C. § 701 ........................................................ 8
5 U.S.C. § 706(2)(A)........................................................ 8

## REGULATIONS

36 C.F.R. § 220.7(a) ................................................................. 9
40 C.F.R. § 1500.1(c) ............................................................. 9
40 C.F.R. § 1502.14 ............................................................. 10
40 C.F.R. § 1508.7 ......................................................... 10, 31
40 C.F.R. § 1508.8(a) ......................................................... 10
40 C.F.R. § 1508.8(b) ......................................................... 10
40 C.F.R. §§ 1508.27(b) ................................................. 39–44

## FEDERAL REGISTER

40 Fed. Reg. 31,734 (July 28, 1975) ................................... 3, 5
82 Fed. Reg. 30,502 (June 30, 2017) ............................... 27, 40

## LIST OF ATTACHMENTS[1]

Declaration of Adam Bronstein

Declaration of Michele Dieterich

Declaration of Bruce Jodar

Declaration of Sara Johnson

Declaration of Steve Kelly

Declaration of Phil Knight

Declaration of Jeffrey Lonn

Declaration of George Wuerthner

---

[1] These declarations are properly before this Court because they are submitted solely to demonstrate Plaintiffs satisfy the minimum requirements for Article III standing.

## INTRODUCTION

This case challenges the Forest Service's decision to authorize and expand cattle grazing on public lands in the Custer-Gallatin National Forest's Absaroka Mountains, just north of Yellowstone National Park, without complying with the National Environmental Policy Act ("NEPA").

The East Paradise decision allows grazing and related developments on six allotments, totaling roughly 20,900 acres. EP-AR-0002235. The six allotments are in portions of the Absaroka-Beartooth Wilderness, North Absaroka Roadless Area, and the Greater Yellowstone Ecosystem ("GYE") recovery zone for grizzly bears. EP-AR-0002244; EP-AR-0002426. The decision authorizes continued grazing on three allotments and expands the acreage available for cows by 1,356 acres. EP-AR-0002236-37. The season of use will also be extended, with stocking dates now starting as early as June 1 with young calves. *Id*. Three other allotments will remain vacant for now, but available at the agency's discretion for future grazing. EP-AR-0002236.

The Forest Service prepared an environmental assessment ("EA") for the East Paradise decision that fails to take a hard look at the effects to grizzly bears. Instead of considering the actual baseline conditions in 2021, including a significant escalation in grizzly bear mortalities from livestock conflicts in the GYE, the Forest

Service relied on an outdated "1998 baseline" standard that considers only the number of allotments (and acreage available) in the GYE. The EA also ignores the effects of allowing young calves on the allotments as early as June 1. The best available science reveals this will likely result in more grizzly bear conflicts. The EA also fails to analyze how grazing may adversely affect grizzly bear connectivity in the Absaroka Mountains – an important pathway to other ecosystems, including the Northern Continental Divide Ecosystem ("NCDE"). The EA also lacks an adequate cumulative effects analysis because it fails to analyze the combined impacts from private land grazing and residential development in the same area. Finally, substantial questions exist that require the Forest Service to prepare an environmental impact statement ("EIS").[1]

## BACKGROUND[2]

### I.    Grizzly Bears in the GYE.

Historically, there were an estimated 50,000 grizzly bears in the western United States. EP-AR-0021148. With the arrival of Europeans, however, grizzly bears were seen as a threat to livestock and human safety and subject to government funded bounty programs aimed at eradication. EP-AR-0021149. Grizzly bears were

---

[1] Plaintiffs also challenged the biological opinion for the East Paradise decision but it was subsequently revised. Plaintiffs have elected not to pursue these claims.

[2] In lieu of filing a statement of facts, the Parties requested additional words in its summary judgment briefing, (Doc. 8 at 8–9), which the Court allowed. (Doc. 10).

2

shot, poisoned, and trapped wherever they were found and the resulting declines in range and population were dramatic: grizzly bears were reduced to roughly two percent of their former range by the 1930s. *Id.*

In 1975, the Fish and Wildlife Service ("FWS") listed grizzly bears as a threatened species in the lower 48 states under the Endangered Species Act ("ESA"). 40 Fed. Reg. 31,734 (July 28, 1975). At the time, only a few isolated subpopulations remained. EP-AR-0021151. The isolated nature of these subpopulations was identified as an on-going threat to the species. 40 Fed. Reg. at 31,734. So too were management removals and mortalities from conflicts with livestock. *Id.*

In 1993, FWS designated six recovery zones in the lower 48 states where efforts to conserve the species would be focused. *Id.* One area is the GYE. *Id.* FWS also recognized the need to facilitate connectivity between the isolated recovery zones, to recover grizzlies. EP-AR-0021152; *see also* EP-AR-0021273-75 (describing the importance of establishing connectivity).

3



Conserving grizzly bears requires ensuring there are sufficient areas that provide adequate food sources, as well as security from human development and activities. EP-AR-0021151. Grizzly bears use a variety of habitats and their daily movements are largely driven by "the search for food, water, mates, cover, security, or den sites." EP-AR-0021141.

In the GYE, grizzly bears historically consumed primarily four food sources: seeds from whitebark pine trees; army cutworm moths, meat from ungulates (elk, deer, and bison), and spawning cutthroat trout. FWS-003768. For GYE grizzly bears, human activities are the "primary factor impacting habitat security and the ability of

4

bears to find and access foods, mates, cover, and den sites." EP-AR-0021106. The main threat is "excessive human-caused mortality and human activity that reduces the quality and quantity of habitats" and "increases the potential for human-caused mortality." EP-AR-0021106.

A primary source of this human-caused mortality is "management removals" of grizzlies in response to conflicts with livestock. EP-AR-0021244. Grizzly bears are most often killed after livestock depredations, because of conflicts with big game hunters, or as a result of actions to "control" grizzlies after they have habituated to or learned to use attractants, including livestock carcasses or feed. EP-AR-0021219. Livestock grazing also increases the chances of conflict, displaces bears from specific areas (due to livestock and related management activities), and results in direct competition for preferred forage species. *Id.* FWS has noted that livestock use in national forests surrounding Yellowstone National Park, in particular, exerts "increasing detrimental pressures on grizzly bears unless management measures favoring the species are enacted." 40 Fed. Reg. at 31,734.

## II.    The East Paradise Grazing Decision.

In 2013, the Forest Service announced plans to prepare an EA to evaluate the effects of allowing continued and expanded livestock grazing on six allotments: Suce Creek, Pine Creek, Elbow, Mill Creek, Sixmile North, and Sixmile South. EP-

AR-0018160. All six allotments are located on the eastern side of the Paradise

Valley, in the Absaroka Mountains. EP-AR-0018159.



EP-AR-002273. In response, the Forest Service received public comments raising

concerns about effects to grizzly bears, which were increasingly occupying the same

areas. EP-AR-0018183; EP-AR-0018155.

In 2020, the Forest Service released a draft EA for public comment. EP-AR-0017891. The public again raised concerns about the decision and how it would negatively affect grizzly bears. EP-AR-0024689; EP-AR-0020431; EP-AR-0020359. The Forest Service was asked why it would "actively seek out grazing expansion within the [grizzly bear] recovery zone in an area that has been vacant of active livestock grazing." EP-AR-0020371.

In April, 2021 the Forest Service released a final EA and in December, 2021 issued a decision approving the decision. EP-AR-002235. The decision authorizes grazing and related improvements on roughly 20,900 acres, EP-AR-0002235, including expanded grazing in the GYE recovery zone. EP-AR-0002244; EP-AR-0002426. The decision authorizes immediate grazing on three allotments (Pine Creek, Elbow, and Sixmile North), and expands by 1,356 acres the acreage available for cows. EP-AR-0002236–37. It also expands the grazing season with stocking dates starting as early as June 1 (with young calves). *Id.* The three active allotments are authorized for roughly 141 cows/calves. EP-AR-002236. Fencing, water developments, and related infrastructure are also allowed. EP-AR-002236–38.

The other three allotments (Suce Creek, Mill Creek, and Sixmile South) will remain vacant for now but are not "closed," meaning they can be opened for grazing at the agency's discretion (and without further NEPA). EP-AR-0002236. The Suce

Creek allotment area has experienced significant increases in recreational use and impacts from new residential subdivisions. EP-AR-002241; EP-AR-002274. The Mill Creek allotment is being treated for noxious weeds. EP-AR-002241. Grazing in the Sixmile South allotment is also on-hold pending recovery from the 2013 Emigrant Fire. *Id.*

## STANDARD OF REVIEW

NEPA claims are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et. seq., Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). The APA directs courts to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts must not substitute their judgment for that of the agency but must nonetheless engage in a "thorough, probing, in depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). Courts must "ensure the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011). An agency's action is arbitrary if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is

so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## ARGUMENT

### I.     The Forest Service violated NEPA.

NEPA seeks to "prevent or eliminate damage to the environment" by "focusing Government and public attention on the environmental effects of proposed agency action." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). "Ultimately, of course, it is not better documents but better decisions that count." 40 C.F.R. § 1500.1(c). Central to NEPA's purpose is ensuring adequate public participation. NEPA ensures "the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983).

Under NEPA, the Forest Service is required to prepare an EIS if the proposed action causes or may cause significant effects. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864–65 (9th Cir. 2005). The Forest Service typically prepares an EA for all other proposed actions "for which the need for an EIS has not been determined." 36 C.F.R. § 220.7(a).

Analyses required by NEPA must establish baseline conditions which existed prior to the proposed project. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844

9

F.3d 1095, 1101 (9th Cir. 2016). The Forest Service must then analyze the direct, indirect, and cumulative effects of the project to those baseline conditions. 40 C.F.R. § 1502.14. Direct effects are caused by the action. *Id.* at § 1508.8(a). Indirect effects are caused by the action but are "later in time or farther removed in distance, but still reasonably foreseeable." *Id.* at § 1508.8(b). Cumulative effects result from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* at § 1508.7

Here, the Forest Service's EA violates NEPA by: (1) failing to account for the actual baseline conditions, including the escalation in grizzly bear mortalities from livestock conflicts; (2) failing to analyze the effects of earlier stocking dates with younger calves; (3) failing to analyze the effects to connectivity; (4) failing to analyze cumulative effects; and (5) failing to prepare an EIS.

### A.    Escalating grizzly bear mortalities.

The EA fails to account for the actual baseline conditions for grizzly bears in the GYE, including a significant escalation in grizzly bear mortalities from conflicts with livestock (and other human interactions) following the loss of important food sources that started in 2000 and peaked in 2010.

Establishing appropriate baseline conditions "is critical to any NEPA analysis." *Great Basin Res. Watch*, 844 F.3d at 1101. "Without establishing the

baseline conditions which exist ... before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,* 857 F.2d 505, 510 (9th Cir. 1988). To establish a proper baseline, an agency "may estimate" the likely conditions and use modeling or other information from the area or even other similar areas. *Or. Nat. Desert Ass'n v. Jewell,* 840 F.3d 562, 570 (9th Cir. 2016). But it "must be based on accurate information and defensible reasoning." *Great Basin Res. Watch*, 844 F.3d at 1101.

Here, the Forest Service relied on a 1998 baseline to evaluate the East Paradise allotments. The agency monitored and tracked baseline conditions for livestock grazing in the GYE against what existed in 1998, namely how many allotments and how many acres of land were available for grazing in the GYE in that year. EP-AR-002321. This 1998 baseline approach was adopted from the 2016 Grizzly Bear Conservation Strategy. EP-AR-002322–23.

The problem with this approach is that baseline conditions for grizzly bears in the GYE have undergone significant changes since 1998 – especially over the last two decades, following steep declines in available food sources and expansion of grizzly bears into peripheral areas, including the Absaroka Mountains where the East Paradise allotments are located. EP-AR-0024689.

11

As noted, grizzly bears in the GYE historically relied primarily on four main food items: seeds from whitebark pine; army cutworm moths, meat from ungulates, and cutthroat trout. FWS-003768. Each of these four foods "exert a positive influence on grizzly bear fecundity and survival and are some of the highest sources of digestible energy available to grizzly bears in the Yellowstone area." FWS-003768. During years "when these food sources are abundant, there are very few grizzly bear/human conflicts." *Id.* In contrast, during years of shortages, "grizzly bear/human conflicts are more frequent and there are generally higher numbers of human-caused grizzly bear known and probable mortalities." *Id.*

Currently, three of the grizzly bear's four important food sources in the GYE are experiencing declines, some significant. The loss of cutthroat trout in the tributaries to Yellowstone Lake has been severe. EP-AR-0016491. The cutthroat trout population is estimated to be less than 10 percent of historic numbers and the biomass consumed by bears "declined by 70% and 95% respectively, between 1997 and 2007." *Id.* There has also been a decline in ungulates. EP-AR-0019815. "Elk have declined, in places precipitously. Moose have declined as well, largely synchronous with declines in elk." *Id.* The most dramatic declines have occurred in the northern GYE, where East Paradise is located. EP-AR-0019815; *see also* EP-AR-0019816 (map showing decline).

Most alarming is the drastic decline in whitebark pine seeds that peaked in 2010. EP-AR-0024723; EP-AR-0016489. The whitebark pine losses across the GYE have amounted to nearly 70% and have been rated as "severe" in the Absaroka Mountains. EP-AR-0024689.

In *Greater Yellowstone Coal.*, the Ninth Circuit recognized that such losses would likely be problematic for grizzly bears in the GYE. 665 F.3d at 1025. The Court thus raised concerns about future losses and the threat it posed to grizzly bears that must adapt to the seed shortage "by seeking substitute foods." *Id.* at 1026. The "threat from decreases in whitebark pine cones is not one of starvation, but one of larger home range size and movements," which "may result in increased conflicts with humans and increased mortality ...." *Id.* The Court's concerns were prophetic.

"By all indications, loss of this critically important food source for bears resulted in increasing reliance by grizzlies on meat from large ungulates" which, in the northern range, also happened to be in decline. EP-AR-0024689. Combined with the expansion of grizzly bears into the peripheral areas, this increased reliance on meat "has resulted in an exponential increase in conflicts resulting from grizzly bear depredation on cattle." *Id.*

Mattson (2017) explains there "is little doubt that Yellowstone grizzly bears have turned to eating more meat under circumstances that bring them into conflict

with humans, especially since 2007 in the wake of major losses of whitebark pine to bark beetles." EP-AR-0019820. "Yellowstone grizzly bears have been involved in mounting numbers of conflicts with humans over contested meat – principally livestock and actual or potential remains of hunter-killed elk. Numbers of bear mortalities consequently have sky-rocketed, especially since 2007." *Id.* These "increases have occurred, not because there are greater numbers of hunters or livestock in the ecosystem, but rather because grizzly bears are almost certainly eating more human-associated meat to compensate for losses of whitebark pine seeds, cutthroat trout, and free-ranging elk." *Id.* Virtually all of the livestock-related conflicts have occurred on the periphery of the GYE, in areas colonized by grizzlies over the last 15–20 years (when the population "increased very little if at all"). *Id.*

During a nine-year period from 1992 to 2000, for instance, there were 74 incidents of human-caused grizzly bear mortality in the GYE, or an average of eight per year. EP-AR-0014891. Of these mortalities, only 21 were related to management removals associated with livestock, or roughly two per year (despite there being more allotments and more acreage available to livestock during this period). *Id.*; *see also* EP-AR-002322 (Table 20); EP-AR-0019820 (noting the same). This changed with the loss of whitebark pine seeds which began in the early 2000s and peaked in 2010.

14

During this time, grizzly bears increased their reliance on meat, and grizzly bear mortalities from meat-based conflicts – including those involving hunters and livestock – spiked to unprecedented levels.



EP-AR-0019820.

In 2009, there were 24 human-caused grizzly mortalities in the GYE, four of which were attributed to livestock conflicts. EP-AR-0019992–93. The next year, in 2010, there were twice as many (48) human-caused grizzly mortalities, 21 of which were attributed to livestock conflicts. EP-AR-0018932–33. This single year number is nearly the same number of *all* grizzly bear removals from livestock that occurred over

the entire nine-year period from 1992–2000. The numbers continue to fluctuate but generally follow an upward trend.

In 2015, for example, there were 53 human-caused mortalities, 29 of which were attributed to livestock conflicts. EP-AR-0019481. Similar numbers and additional losses of grizzly were reported in 2016. EP-AR-0019627. In fact, during this period, grizzly bear mortalities from livestock reached a magnitude sufficient to impact the population in the GYE and push the agency's estimates for the population *into decline* over the three-year period from 2014–2016. *See* EP-AR-0019341 (757 bears in 2014); ER-AP-0019469 (723 bears in 2015); and EP-AR-0019616 (695 bears in 2016).

In 2021, the year the agency approved the East Paradise allotments, the number escalated even further. There were an unprecedented 85 grizzly bear mortalities in the GYE in 2021. EP-AR-0017789. Seven of these likely occurred prior to 2021, *see id.*, but that still leaves 78 grizzly mortalities, 59 of which were related to human causes and 20 of those were due to livestock. EP-AR-0017789.

This evidence in the record is corroborated by Dr. Mattson's extra-record declaration (Doc. 26-1).[3] There, Mattson explains that significant losses in whitebark

---

[3] Plaintiffs' motion to supplement the record with Dr. Mattson's declaration (Doc. 25) is pending before this Court and as per this Court's order (Doc. 18), summary judgment briefing was not suspended pending resolution of that motion. Plaintiffs

pine seeds – as well as native cutthroat trout – since 2000 has, in fact, forced grizzly

bears to shift their diets and compensate for such losses "by eating more meat,"

including from bison, elk, remains of hunter kills, and notably, livestock. Doc. 26-1

at ¶ 33. The "marked increase in exploitation of ungulates by bears that began in the

early to mid-2000s and accelerated after the terminal demise of whitebark pine

around 2010 is irrefutable." *Id*. Much of "this increase in meat consumption by

bears after 2010 had involved exploitation of cattle using public-land grazing

allotments located on the periphery of grizzly bear distribution ... where grizzly bears

and cattle had been sympatric since well before 2000." *Id*. at ¶ 34.



cite Dr. Mattson's declaration to corroborate the evidence in the record which – by
itself – is sufficient to demonstrate the EA violates NEPA. The Mattson declaration
is admissible, however, because it fills gaps and explains how the Forest Service failed
to consider relevant factors when attempting to analyze the effects in the EA and
why it matters. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

*Id.* at ¶33.

Indeed, the levels of "depredation-related conflicts have been orders-of-magnitude greater in the GYE during the last two compared to previous three decades despite a long history of sympatry." Doc. 26-1 at ¶ 34. This increase led to "a dramatic escalation in numbers of bears killed because of livestock-related conflicts since around 2008." *Id.* at ¶ 35; FWS-002773 (Wells (2019) noting that the proportion of grazing allotments experiencing grizzly depredations increased from 1% in 1992 to 12% in 2014). This increase, together with an increase in the number of bears killed during conflicts with hunters, has "resulted in mortalities resulting from meat-related conflicts with humans proportionately more than doubling since 2000." Doc. 26-1 at ¶ 35.



*Id.* at ¶ 36 (Figure 5A). This has "fueled a near four-fold increase in numbers of grizzly bears annually known to die in the GYE, leading, in turn, to a 2.5-fold increase in numbers of known bear deaths as a proportion of total estimated population size." *Id.* at ¶ 36.; EP-AR-0020161 (comment from Dr. Gilbert noting similar increases). And once depredations start to occur, the trend is exponential, "leaving managers and permittees scrambling to find solutions." EP-AR-0024689; Doc. 26-1 at ¶ 38 (explaining how high levels of depredation can rapidly emerge).

One disturbing trend is the rise in female grizzly bear mortality. During this period of escalation, conflicts changed from being among predominantly adult males before 2018 to predominantly other sex and age classes after that date. *Id.* at ¶ 47. The large rise in female deaths, which "doubled from around 20% prior to 2016 to nearer to 40% after 2020" is particularly harmful to the species. *Id.* Of these deaths, roughly half were reproductive-aged females. *Id.*; *see also* EP-AR-0024689 (noting that increasingly, adult female bears are among those killed). The increase in female mortality compromises prospects for the entire GYE grizzly population, since growth depends on survival rates for reproductive-aged females. *Id.* at ¶ 48. This growth rate "substantially declined towards stasis around 2008, concurrent with terminal declines of whitebark pine and marked increases in consumption of meat from anthropocentric sources." *Id.*

For these reasons, past histories of livestock conflicts in the GYE and the Forest Service's reliance on a 1998 baseline are a "poor basis for predicting a rapidly changing future." Doc. 26-1 at ¶¶ 38-39, 58-60. "The main point here is that the past offer[s] no clues regarding what the future might hold in all of these areas [of the GYE], at least insofar as grizzly bear depredation on cattle [is] … concerned." EP-AR-0024689; EP-AR-0020431 (noting that given the current situation, conflicts with grizzlies in this area of the Paradise Valley will be "inevitable"). In other words, the past is not necessarily prologue when it comes to grizzly bear mortalities related to livestock grazing in the GYE. Baseline conditions have dramatically changed since 1998 given the loss of important foods sources, the bears' increased reliance on meat, and expanded colonization of areas on the periphery of the GYE. Yet, *none* of this relevant information on the existing baseline conditions is addressed or discussed in the EA as required by NEPA. *Half Moon Bay Fishermans' Mktg. Ass'n*, 857 F.2d at 510. Nor is it captured in the Forest Service's 1998 baseline.

Instead, in the EA, the Forest Service simply explains that the overall objective is to not exceed the "number and acreage of active commercial livestock grazing allotments" in the recovery zone for the GYE beyond what existed in 1998 and how it has and continues to meet this objective. EP-AR-002321–22. The agency then emphasizes that the number and acreage of allotments is "below the 1998 baseline

20

level. *Id.* For this reason, the Forest Service then downplays the likely effects on grizzlies. EP-AR-002323.

As noted above, however, a static "1998 baseline" approach for livestock grazing that looks only at total number of allotments and acreage available provides no insight into the *actual* baseline conditions at the time the decision was made and the changes that have occurred to grizzly bears in the GYE *since* 1998. As Dr. Mattson explained, even "with somewhat fewer stocked allotments in the GYE compared to the baseline of 1998, two to three times as many grizzly bears are being killed because of cattle-related conflicts, including proportionally more females [which is] synchronous with plateauing of the GYE grizzly bear population." Doc. 26-1 at ¶ 50. Merely tallying the total acreage available for grazing and number of allotments as they existed in 1998 provides "little basis for assessing risks posed by cattle on Forest Service lands." *Id.*

B.    **Earlier stocking dates with younger calves.**

The EA fails to consider and analyze the effects of now allowing younger calves on the allotments as early as June 1st. EP-AR-002236. This is a change that may have serious ramifications for grizzly bear conflicts and mortality.

As explained by Dr. Mattson in the record, the "earlier stocking with cow-calves virtually guarantees increased depredation." EP-AR-0024683. "Calves account

21

for almost all victims of grizzly bear ... depredation on cattle. And, the younger the calf, the greater odds of falling victim to these predators – with peak vulnerability of calves lasting up to 5 months of age." *Id*. Dr. Mattson elaborated on this point in his extra-record declaration: "In many respects, cow-calves are ideal prey for brown and grizzly bears, especially prior to mid-July" because the optimal size prey for grizzly bears is the "approximate weight of June cow-calves born during February." Doc. 26-1 at ¶ 19. "Cow-calves are also likely to be much more vulnerable than even 1-month-old native ungulates simply because they are less agile and, in the case of Angus cows, bred to be docile." *Id*. This explains "the pervasive tendency of bears to kill many more calves than adults on public, as well as private, rangelands." *Id.* at ¶ 20.

In the GYE, "calves comprised over 70% of total cattle losses to grizzly bear predation during 2012–2021 – nearly 15-fold more than losses of adult cows present in comparable numbers." *Id*.; *see also id*. at ¶19 (Figure 2) (showing the composition of grizzly bear depredations from 2012–2021 and the high percentage of calves taken). The odds of depredation increase even further "if young calves are released into areas where topographic and vegetative cover facilitates ambush predation. Depredation is virtually guaranteed if livestock are then left unattended for weeks on end." EP-AR-0024683. For these reasons Dr. Mattson explains that "stocking the

East Paradise allotments with cow-calves in June virtually guarantees a depredation problem, even in allotments that have historically not had one." EP-AR-0024683. Similar concerns were shared by other members of the public and local conservation groups. *See* EP-AR-0020359 (noting increased vulnerability of young calves in early June); EP-AR-0020384 (same); EP-AR-0020371 (same); EP-AR-0018203 (same).

Yet, despite such concerns, the EA largely ignores this aspect of continued and prospective grazing. The increased risk of depredation and conflict arising from earlier stocking dates with younger and more vulnerable calves (and a longer grazing season), is not discussed, addressed, or analyzed in the EA. On the contrary, the EA touts that there would "no change" to the number of active allotments and only increases to the total acreage allowed for grazing. EP-AR-0002429.

There is thus no mention of earlier stocking dates with young calves and how that affects grizzly bears. This is an important aspect of the problem that was overlooked in violation of NEPA. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011).

In fact, only after completing the EA, did the Forest Service briefly address the concerns about early stocking in its final decision and it did so by summarily concluding it to be a non-issue. EP-AR-0002247. A similar sentiment was discussed in the biological opinion. EP-AR-002581. The agency explained that extending the

grazing season to June 1 would have "little effect" on livestock depredations based

on the findings in Wells (2019) and Gunther (2004). *Id.* The problem, however, is

that none of this information was included or analyzed in the EA released for public

review and comment where it "must be found." *Blue Mountains Biodiversity Project v.*

*Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998). Nor was it incorporated by

reference in the EA.

Further, as explained by Dr. Mattson, the agency's reliance on Wells (2019)

and Gunther (2004) to downplay the effects of having young calves on the

allotments by June 1 is misleading. This is because the data used in the papers relied

on by the agencies came from allotments stocked *after* June 1. Doc. 26-1 at ¶44. In

fact, over 90 percent of all the allotments in the GYE were stocked after July 1st:



*Id.* at ¶ 18 (Figure 1). The Forest Service's dismissive conclusion, therefore, arbitrarily conflates absolute numbers with risk. Doc. 26-1 at. ¶ 40. Absolute numbers "do not provide a basis for judging time-specific risks for livestock and grizzly bears on grazing allotments because absolute numbers do not account for total predation opportunities, *i.e.*, the number of cow-calves and number of allotments that were stocked during the given month and available for bears to depredate on." *Id.* at ¶ 42. The numbers, rather, need to be pro-rated to properly understand the risks to grizzly bears, much like crime rates are based on per capita rather than absolute numbers. *Id.* For example, the risk of crime in large cities like New York which have high absolute number of crimes committed are, in reality, "three to four times safer than places like Birmingham, Alabama that have much lower absolute number of crimes." *Id.* The same principle applies here: when pro-rated, rates of depredation in June are comparable (if not slightly higher than) they are for July–September, as the following figure illustrates:



*Id.* at ¶ 40 (Figure 6). As such, the risks to grizzly bears in June are not lower than during July to September. Doc. 26-1 at ¶ 43. But again, none of this relevant information or analysis on earlier stocking dates and younger calves was analyzed (or even incorporated by reference) in the EA, where it must be found. *Blue Mountains*, 161 F.3d at 1214.

## C.    Connectivity.

The EA fails to consider and analyze the importance of the project area in the Absaroka Mountains for grizzly bear dispersal, movement, and connectivity to the NCDE, which is something needed to ensure the long-term viability and recovery of the species. *See* FWS-000667–73.

26

Currently, the lack of connectivity and genetic exchange between grizzly bear subpopulations has been and remains a threat to grizzly bear recovery in the Lower 48. EP-AR-0021199–200; *see Crow Indian Tribe v. United States*, 965 F.3d 662, 678 (9th Cir. 2020) (discussing science on need for connectivity between ecosystems to maintain long-term viability of grizzly bears). This is because subpopulations of grizzly bears in the Lower 48– including in the GYE – remain largely isolated from one another, 82 Fed. Reg. at 30,518, even though the distance between them continues to decline. EP-AR-0021154. The "likelihood of genetic connectivity through natural bear movement is better now than at any other time since listing in 1975." FWS-00672.

The East Paradise project area is strategically located in the Absaroka Mountains, which is an important "feeder" pathway for grizzly bear movement and connectivity north, out of the GYE. As Peck (2017) explains, there are many potential paths out of the GYE that eventually form movement corridors for northerly movement:



EP-AR-0017616. One of those feeder pathways is in the "Absaroka and Gallatin ranges" which eventually form "a corridor along the Bridger and Big Belt Mountains or branch at the southern portion of the Big Belt Mountains to the Elkhorn and Boulder Mountains. Several alternative routes interconnecting these areas were evidenced as well." EP-AR-0017619.

These findings are consistent with comments from scientific experts. Dr. Gilbert explained that the East Paradise allotments are in an area that has been or will be used by "expanding populations of GYE grizzly bears" and is within and adjacent to the Absaroka Beartooth Wilderness, which is "an important zone of

linkage for grizzly bears to move to the north, thus avoiding genetic isolation of the

current population." EP-AR-0020161. Dr. Mattson submitted similar comments and

noted that the location of the East Paradise allotments in this area of the Absaroka

Mountains "lends even greater weight to the significance of any grizzly bear losses

from depredation-related conflicts ... [this area has] repeatedly been identified as a

key part of connective habitat potentially linking grizzly bears in the [GYE] to grizzly

bears in the [NCDE]." EP-AR-0024690; *see also* EP-AR-0020177 (map identifying

corridors).

 In his extra-record declaration, Dr. Mattson corroborates this information

from the record. Doc. 26-1 at ¶72. Dr. Mattson explains that the project area is

within a narrow and important pathway for grizzly bear movement north, out of the

GYE where bears have and continue to disperse. *Id.* at ¶¶73–76. Dispersal along this

East Paradise route "has advanced considerably farther than along the presumably

dominant connectivity pathway between the Gallatin and Bridger Ranges." *Id.* at

¶73. The feeder pathway that "figuratively collects grizzly bears dispersing north ...

runs directly through all the focal East Paradise allotments, entailing risks for

involved grizzly bears ...." Id. at ¶75; *see also id.* at ¶72 (Figure 12) (noting that the

main pathway skirts the east edge of Paradise Valley and western flanks of the

Absaroka Mountains where the project is located).



*Id.* at ¶72 (Figure 12). In this area, grizzly bears are "hemmed in by relatively

unproductive albeit remote highlands to the east and bottomlands heavily impacted

by humans to the west, with the East Paradise grazing allotments sitting squarely

astride a relatively narrow strip of attractive mid-elevation habitats likely to be used

by grizzly bears, not only *in situ* but also in transit north." *Id.* at ¶94. "This

superimposition maximizes odds of livestock-related conflicts and resulting grizzly

bear deaths – as if by design." *Id.*

  The EA, however, fails to address this important aspect of its decision. There

is *no discussion or analysis* on how grizzly bears – including females with cubs – may be

using the East Paradise area for movement, dispersal, and re-colonization north to

eventually connect with grizzly bears from the NCDE. There is also no discussion on

the importance of helping facilitate connectivity in the region for recovery of grizzly

bears in the Lower 48. Nor is there any analysis about how the East Paradise

decision may directly, indirectly, or cumulatively impede connectivity. This issue is

simply absent from the EA even though expanded grazing in this area may adversely

affect "meaningful recovery" for grizzly bears, primarily "by impairing prospects for

[re]-colonization of additional habitat within the GYE and connectivity between

GYE and NCDE populations." Doc. 26-1 at ¶92.

### D.    Cumulative effects.

The EA fails to adequately analyze cumulative effects to grizzly bears. In the

Ninth Circuit, adequate consideration of cumulative effects requires the Forest

Service to take "a 'hard look' at all actions." *Te-Moak Tribe v. U.S. Dep't of Interior*,

608 F. 3d 592, 603 (9th Cir. 2010). The purpose of analyzing cumulative effects is to

avoid "the tyranny of small decisions." *Kern v. Bureau of Land Mgmt.*, 284 F. 3d 1062,

1078 (9th Cir. 2002). The requirement is designed to make sure "individually minor

but collectively significant" actions are adequately analyzed. 40 C.F.R. §1508.7.

To prevail on a cumulative effects claim, plaintiffs "need not show what

impacts would occur. To hold otherwise would require the public, rather than

the agency, to ascertain the cumulative effects of a proposed action." *Te-Moak*, 608 F. 3d at 605. "Such a requirement would thwart one of the 'twin aims' of NEPA – to 'ensure[] that the agency will inform the public that it has indeed considered environmental concerns in its decision making." *Id*. Plaintiffs, rather, "must show only the potential for cumulative impact." *Id*. This is not an onerous burden. *Id*.

Here, the EA states there are no cumulative effects concerns regarding grazing on the allotments because "there are no present or reasonably foreseeable projects or proposed actions that would meaningfully contribute to the effects" of the grazing decision. EP-AR-0002327. The Forest Service reiterated this finding in its final decision, insisting that "the potential for cumulative effects from the proposed action, and all other past, present, or reasonably foreseeable future actions has been considered and found not to result in any potentially significant effects." EP-AR-002245. But in reaching these conclusions, the agency never actually considered and analyzed the total combined or cumulative effects of the grazing decision. In other words, there is no quantified and detailed information about the overall combined effects from the project in conjunction with what is occurring on private lands in the project area or how those activities, in combination with East Paradise and other federal activities, may cumulatively affect grizzly bears.

In fact, in the EA, the Forest Service said the "past effects" were already included in the analysis and shaped the existing condition, so would not be added to the cumulative effects analysis. EP-AR-0002326. Similarly, the Forest Service insisted that the effects from any livestock grazing are already the "primary subject" of the analysis and thus do "not need repeat[ing] as 'cumulative' effects." EP-AR-0002327. This piecemeal approach misapprehends the cumulative effects analysis.

As explained by the Ninth Circuit, an "EA's analysis of cumulative impacts 'must give a sufficiently detailed catalogue of past, present, and future projects, and provide an adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Te-Moak Tribe*, 608 F.3d at 603. Some "quantified and detailed information" is required; general statements "about 'possible' effects and 'some risk' do not constitute a 'hard look' absent justification regarding why a more definitive information could not be provided." *Kern*, 284 F. 3d at 1075 (citation omitted). And the "analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F. 3d 989, 994 (9th Cir. 2004). No such useful analysis was done here.

The EA never *combines* the effects of the proposed action with the other actions occurring in the same area. This includes adjacent private land grazing,

33

private land development (and growth), mining on private lands, timber sales,

increased recreation and associated trail work, the record spike in visitation to

Yellowstone National Park and growing populations of both Gallatin and Park

Counties, wildfires in the project area, increased big game hunting pressure, and, as

previously mentioned, the alarming escalation in grizzly bear mortalities.

For example, there are roughly 7,701 acres of private land within the Mill

Creek Bear Analysis Unit ("BAU") and 4,500 acres of private land within the

Hellroaring #1 grizzly bear subunit in the project area. EP-AR-002545. Past, current

and future actions on these private lands within this area include significant

residential and recreational developments and growth, private land grazing of

livestock, and private land mining, all of which has the potential to negatively and

cumulatively impact grizzly bears. *Id.*; *see also* EP-AR-0002585 (explaining that

"[p]rivate lands in and adjacent to the Forest are being developed for residential and

business use" and that the "human population in the area has experienced growth

during the recent decade" that is expected to continue); EP-AR-002241 (describing

the "rapid increase" in recreation and subdivision development in the area); EP-AR-

0020428 (comment from local organization noting the "rapid growth and

development" occurring in this area of the Paradise Valley); EP-AR-0020909

(explaining same); EP-AR-0020161 (noting the "growing housing and ranches on the

east side of the Yellowstone River"); EP-AR-007111 (grizzly bear and private land grazing conflicts in area from 1998–2014).

Yet, the EA never analyzes cumulative effects from this private land activity on grizzly bears. There is no quantitative analysis on the amount of motorized access occurring on private lands in the project area or how this affects road densities and security for grizzly bears inside the Mill Creek BAU or Hellroaring subunit #1 (the areas used to analyze effects to grizzly bears). There is also no quantitative analysis on the nature and extent of the mining activity, i.e., what type, where, and for how long. There is no information or analysis on the number and types of livestock present on private lands (or the season of use) or the history of conflicts with grizzly bears. Evidence in the record shows a number of grizzly conflicts in the area from 1998 to 2014, EP-AR-0007111, but none of this information (or more updated information) is addressed in the EA.

There is also no analysis or information on the amount of housing developments being built and where, what recreational developments are occurring or planned to be occurring on such lands, the population growth occurring in Park County, or steady and significant increase in visitors to the Paradise Valley which is a gateway to Yellowstone National Park. 2021 was the busiest year on record for Yellowstone. EP-AR-0017816. Nor is this missing information then combined with

35

East Paradise and other federal or state actions and analyzed as a cumulative effect in the EA as required by NEPA. This is a major oversight.

"Cumulative effects of multiple projects can be significant in different ways." *Klamath-Siskiyou Wildlands Ctr.*, 387 F. 3d at 994. "Sometimes the total impact from a set of actions may be greater than the sum of the parts." *Id.* "For example, the addition of a small amount of sediment to a creek may have only a limited impact on salmon survival, or perhaps no impact at all. But the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact, until there comes a point where even a marginal increase will mean that no salmon survive." *Id.*

The East Paradise allotments may be the proverbial straw that breaks the camel's back and turns this area of the GYE and the Absaroka Mountains – an area important for grizzly bear dispersal and connectivity – into an ecological trap or population sink area for grizzly bears. Even a slight increase in adverse conditions that form the existing environmental milieu may sometimes threaten harm that is significant ...." *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F. 3d 339, 343 (D.C. Cir. 2002) (citation omitted). If the total impact from such small, incremental actions are not aggregated, it would be easy to "underestimate the cumulative

impacts...." *Kern*, 284 F. 3d at 1078. This is why the consideration of cumulative effects is so important.

Indeed, even if one assumes, *arguendo*, that the East Paradise grazing decision – by itself – will not significantly affect grizzly bears (no one project or action typically does), the combination of East Paradise with the other private and state and federal actions occurring in the same area may add up to something more serious, increased road densities, decreased security, and result in significant cumulative effects and possibly an "ecological trap" for grizzly bears. As Mattson explains, it is important to understand the cumulative effects of expanding livestock grazing in this area which was "already judged by Schwartz et al., (2010) to be a population sink for GYE grizzly bears – an area where modeled adult female survival was less than needed for local population persistence." Doc. 26-1 at ¶51; *see* EP-AR-0016114 (Schwartz (2010)).

Schwartz (2010) explained that grizzly bear survival in areas like East Paradise decline as road densities, the number of homes, and site developments increase. EP-AR-0016114. This is precisely what is happening here, where rural home development is negatively affecting grizzly bears. "A heavy footprint is reflected in residential densities that, when averaged within a 1-square mile moving window, compromise grizzly bear survival under existing conditions" in the lower elevations

of the East Paradise allotments. Doc. 26-1 at ¶ 51. This is particularly a concern

given the change in important food sources and the loss of whitebark pine which

forces grizzly bears to "move to lower elevations" where survival is dependent on the

"density of human-related hazards on the landscape." EP-AR-0016125. None of this

is accounted for in the EA.

Additionally, the conclusion in the EA that there are no cumulative effects

concerns for grizzly bears is contradicted by the agency's cumulative effects findings

for *the same project* in an internal biological assessment (which was prepared during

the consultation process). *Compare* EP-AR-002327 (EA) *with* EP-AR-002545

(biological assessment). There, the Forest Service explained that when East Paradise

is "combined with those of private actions, there would be a cumulative impact on

grizzly bear in the action area." EP-AR-002545; *see also* EP-AR-0020909 (same). Such

private actions include livestock grazing, residential and recreational developments,

and mining. *Id.* When these private actions are combined with expanded East

Paradise allotments, the "resulting cumulative impact would be neither beneficial,

discountable, or insignificant." *Id.* The EA and decision, however, said just the

opposite. *See* EP-AR-002327; EP-AR-002245. The Forest Service thus told its sister

agency one thing during the consultation process and another to the public in the

NEPA analysis. This is the hallmark of arbitrary action and directly undermines the cumulative effects analysis in the EA.

      **E.**    **An EIS is required.**

NEPA requires a federal agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "A plaintiff raising a NEPA claim need only raise substantial questions as to whether a project may have a significant effect to trigger the requirement for an EIS; the plaintiff need not show that significant effects will in fact occur." *All. for the Wild Rockies v. Gassmann*, 2023 WL 4172930, at *29 (D. Mont. June 26, 2023)(citing *Ocean Advocates*, 402 F.3d at 865).

To determine whether an EIS is required, "the agency must consider the context and intensity of the project; intensity refers to the severity of the project's impact and is evaluated using ten factors." *Id.* (citing 40 C.F.R. §§ 1508.27(b)(1)– (10)(2019)). [4] These factors include, *inter alia*, the unique characteristics of the geographic area affected, such as proximity to ecologically critical areas, the degree to which the effects are likely to be "highly controversial," the degree to which the effects are "highly uncertain" or involve unique or unknow risks, whether the action is related to other actions with individually insignificant but cumulatively significant

---

[4] NEPA's regulations were updated in 2020 but the Forest Service used the pre-2020 regulations for East Paradise. EP-AR-0002243.

impacts, and the degree to which the action may adversely affect listed species. 40 C.F.R. §§ 1508.27(b)(1)–(10)(2019). "When one factor alone raises 'substantial questions' about whether an agency action will have a significant effect, an EIS is warranted." *Bark v. U.S. Forest Service*, 958 F.3d 865, 871 (9th Cir. 2020) (citation omitted). "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts were insignificant." *Gassmann*, 2023 WL 4172930 at *29 (citation omitted).

Here, the Forest Service chose not to prepare an EIS and, in so doing, failed to provide a convincing statement of reasons or fully address the relevant significance factors, five of which are implicated by the East Paradise allotments.

First, the East Paradise allotments are located in an "ecologically critical area." 40 C.F.R. § 1508.27(b)(1)(2019). This includes not just the Absaroka-Beartooth Wilderness, the North Absaroka Roadless Area, and Dome Mountain Wildlife Management Area, EP-AR-002244, but also the grizzly bear recovery zone which is a unique and ecologically critical area for the species. 82 Fed. Reg. at 30,519. Grizzly bears in the GYE persist in "an ecological setting [that is] unusual and unique for the taxon." *Id.* at 30,519.

The East Paradise allotments are also located within an ecologically critical area for connectivity. *See supra* § I.C. This area of the Absaroka Mountains is a "key

part of connective habitat potentially linking grizzly bears" from the GYE to bears in the NCDE. EP-AR-0024690; *see also* EP-AR-0020161 (noting same); Doc. 26-1 at ¶¶71–81 (explaining same). And the increase in private land development in the Paradise Valley only increases the area's "critical" ecological value. EP-AR-0020428.

Second, the East Paradise decision is "highly controversial." 40 C.F.R. § 1508.27(b)(4)(2019). A project is "highly controversial" when there is a substantial dispute about the size, nature, or effect of the action rather than the existence of opposition to a use. *Helena Hunter & Anglers v. Tidwell*, 841 F. Supp. 2d 1129, 1136 (D. Mont. 2009). That is precisely the situation here. There is a high degree of controversy over the importance of the project area as a linkage area for grizzly bears moving north out of the GYE. Much like the situation in *Helena Hunters & Anglers*, 841 F. Supp. 2d at 1137, this issue was raised in comments by grizzly bear experts like Mattson, EP-AR-0024690, and Gilbert, EP-AR-0020161, but ultimately ignored by the Forest Service in the EA. This issue, therefore, has triggered some controversy over the value of the area for grizzly bear connectivity, the resolution of which would benefit from further analysis. *Helena Hunters & Anglers*, 841 F. Supp. 2d at 1137.

There is also controversy over the Forest Service's reliance on the 1998 baseline which arbitrarily ignores the actual baseline conditions. *See supra* § I.A. The 1998 baseline fails to account for the alarming escalation in grizzly bear conflicts

41

with livestock that has continued since 1998. Indeed, there may be less allotments and less acreage of livestock grazing in the GYE now than in 1998, EP-AR-002322, but there are significantly more conflicts and grizzly bear mortalities from grazing. EP-AR-0019820; *see also supra* § I.A. There is also an alarming increase in the loss of more female bears. EP-AR-0024689; *see also* Doc. 26-1 at ¶47 (describing same). Such controversy would also benefit from further review and analysis in an EIS. *Ocean Advocates*, 402 F.3d at 865. As explained by the Ninth Circuit, "preparation of an EIS is mandated where uncertainty may be resolved by further collection of data or where the collection of such data may prevent speculation on potential effects. The purpose of an EIS is to obviate the need for speculation." *Id.* at 870 (cleaned up). That is precisely the situation here.

Third, the effects of the East Paradise allotments on grizzly bears are "highly uncertain." 40 C.F.R. § 1508.27(b)(5)(2019). As previously mentioned, *see supra* § I.B, the effects of the earlier stocking dates – as early as June 1 when young calves are on the landscape and more vulnerable to grizzly bears – was not discussed or analyzed in the EA. The Forest Service mentions it briefly in the decision, noting that "recent studies have shown" that few grizzly depredations occur in the month of June in the GYE. EP-AR-0002247. Presumably, the agency is referring to Wells (2019) and Gunther (2004) which were cited and relied on in the biological

opinion. EP-AR-0002581. But essentially all the data used in these came from allotments stocked *after* June 1. Doc. 26-1 at ¶ 44; *see also supra* § I.B (explaining differences). In other words, there were fewer allotments grazing in early June in the GYE so there remains a significant amount of uncertainty about how this decision may affect grizzly bears that generally prey on younger and more vulnerable calves. *Id.* Again, such uncertainty would benefit from more analysis in an EIS.

Fourth, East Paradise will have cumulatively significant impacts. Under this factor, the Forest Service must evaluate whether the action "is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7)(2019). As noted, the EA's cumulative effects section is cursory at best, fails to combine various effects form past and present actions, includes only general statements about possible impacts, and fails to provide any details or analysis about how actions on the East Paradise allotments along with activities on private lands, including grazing, residential development, and mining, are cumulatively affecting grizzly bears. *See supra* § I.D. The NEPA regulations explain that "significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). It is reasonable to anticipate cumulative effects here; indeed, the Forest Service admitted as much in

the biological assessment when it said there would be cumulatively significant effects of grizzly bears. EP-AR-002545.

Finally, East Paradise will adversely affect grizzly bears, a threatened species. 40 C.F.R. § 1508.27(b)(9)(2019). The Forest Service concedes there will likely be adverse effects to grizzly bears from East Paradise, due mainly to the potential for conflicts with livestock and subsequent removals and mortalities of grizzly bears. EP-AR-002246. The Forest Service also conceded (at least in the biological assessment) that there would be cumulatively significant effects when added with private land activities. EP-AR-002545. When viewed in this context, the effects to grizzly bears thus weigh in favor of requiring an EIS. *See, e.g., Gassmann*, 2023 WL 4172930 at *31 (relying on likely to adversely affect finding and unreliable no-jeopardy finding to find factor satisfied).

For these reasons, an EIS is warranted. Substantial questions have been raised about five of the factors. Only one factor is needed for an EIS. *Ocean Advocates*, 402 F.3d at 865.

## II.    This Court should vacate and remand.

Western Watersheds requests this Court declare that the Forest Service violated NEPA, vacate the decision, and remand this matter back to the agency for a new analysis, consistent with its opinion. Vacatur normally accompanies a remand

under the APA. *Alliance for the Wild Rockies*, 907 F.3d at 1121. When equity demands, a court may elect not to vacate an illegal action, *id.*, or elect to "fashion a more limited remedy" and order partial vacatur. *Helena Hunters & Anglers Ass'n v. Marten*, 470 F. Supp. 3d 1151, 1180 (D. Mont. 2020). The court must evaluate the seriousness of the agency's errors and the disruptive consequences of an interim change. *Cal. Cmties. Against Toxics v. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012).

Here, as noted, the Forest Service's errors are serious. This includes the EA's failure to consider and analyze actual baseline conditions, the effects of early stocking dates, the effects to connectivity, the cumulative effects, and the agency's related failure to prepare an EIS. As Dr. Mattson explains, the East Paradise EA is "fundamentally flawed" because it overlooks and fails to account for "numerous important and relevant factors about how the decision may affect grizzly bears." Doc. 26-1 at ¶ 90. The decision to expand grazing in this area "will harm individual grizzly bears and adversely affect prospects for meaningful recovery" *Id.* The disruptive consequences of vacatur, by contrast, which include maintaining the status quo and not allowing for the continued and expanded grazing decision to occur pending compliance with the law – are relatively minor.

## CONCLUSION

For these reasons, this Court should grant Western Watersheds' motion for summary judgment and the relief requested.

Respectfully submitted this 8th day of December, 2023.

/s/ Matthew K. Bishop
Matthew K. Bishop

/s/ Kelly E. Nokes
Kelly E. Nokes

*Counsel for Western Watersheds et al.*

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 9,000 words in accordance with this Court's October 23, 2023 scheduling order (Doc. 22).  I relied on Microsoft Word to obtain the word count.

/s/ Matthew K. Bishop
Matthew K. Bishop

46