Matthew K. Bishop (Mont. Bar No. 9968)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 324-8011
bishop@westernlaw.org

Kelly E. Nokes (Mont. Bar No. 39465862)
Western Environmental Law Center
P.O. Box 218
Buena Vista, CO 81211
(575) 613-8051
nokes@westernlaw.org

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, a non-profit organization, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service, *et al.*, <br><br> Federal-Defendants. | CV 22-149-M-DLC-KLD <br><br><br> REPLY IN SUPPORT OF MOTION TO ADMIT EXTRA-RECORD EVIDENCE |

The Forest Service requests this Court deny Plaintiffs' motion to admit extra-record evidence (Doc. 25) for five reasons. The agency alleges: (1) Plaintiffs failed to comply with the case management order; (2) the record produced is sufficient and does not "frustrate judicial review;" (3) the Mattson declaration is an impermissible "substantive" attack on the decision; (4) the *Lands Council* exceptions do not apply; and (5) the Mattson declaration cannot be used for relief. None of these arguments have merit.

## ARGUMENT

**I.     The case management order pertained to the *sufficiency* of the record.**

The suggestion that Plaintiffs failed to comply with the case management order (Doc. 18) is misplaced. As outlined in the Parties' joint case management plan (Doc. 15), the Forest Service agreed to produce the record and Plaintiffs agreed to provide its concerns and objections regarding the sufficiency of *that record*, which it did (Doc. 15 at 2).[1] This Court then incorporated that provision in its case management order (Doc. 18).

Plaintiffs' agreement to raise objections and concerns over the sufficiency of the record produced, however, does not equate to an agreement to inform the Forest

---

[1] Citations are to the ECF page number.

1

Service about intentions to seek to admit extra-record evidence or evidence outside the record. The former was required by the case management order; the latter was not (as a curtesy Plaintiffs did inform the Forest Service of its intentions to file this motion, albeit later than the agency would have preferred). For support, the Forest Service relies on *Speaks v. Mazda Motor Corp.*, 2015 WL 1189520, at *3 (D. Mont. Mar. 16, 2015), but that case involved an explicit, pre-trail discovery deadline for expert disclosures, not deadlines concerning the sufficiency of a record.

*Washington v. U.S. Dep't of the Navy*, 2021 WL 8445582 at *6 (W.D. Wash. 2021), is instructive. There, the government made a similar argument claiming the motion to admit extra-record evidence was "untimely" and failed to comply with the case management order. The Court rejected this claim: "Contrary [to the government's] argument, the motion was not 'untimely' because the deadline [in the case management order] referred to … was for arguing the sufficiency of the record, not whether to allow evidence outside the record." *Id*. The same is true here.

**II.     There is no duty to demonstrate the record "will frustrate judicial review."**

The Forest Service asks that Plaintiffs' motion be denied because the agency produced a "voluminous record" that in "no way frustrates judicial review." Doc. 31 at 12. That is not the standard for admitting extra-record evidence. Instead, the standard is whether the offered evidence is necessary to determine "whether the

2

agency has considered all relevant factors." *Lands Council v. Powell*, 395 F. 3d 1019, 1030 (9th Cir. 2005). The question is whether the evidence gives the Court a "full perspective" and helps determine if the agency "fully explained its decision" and considered all relevant factors during the NEPA process. *Washington*, 2021 WL 8445582 at *6 (citing *Lands Council*, 395 F.3d at 1030). Courts must evaluate whether the evidence helps it "understand how the ... challenged decision failed to comply with NEPA." *Hausrath v. U.S. Department of the Air Force*, 491 F. Supp. 3d 770, 785 (D. Idaho 2020).

Here, this Court can rule on the NEPA claims based on the evidence (or lack thereof) in the record. In other words, judicial review of the record and the EA prepared for the East Paradise allotments by itself is sufficient to demonstrate the EA violates NEPA. Nonetheless, the Mattson declaration fills in the gaps, provides important background information, and shows how the agency overlooked relevant factors in the EA. *See infra* Section IV; Doc. 26 at 17–35; Doc. 30 at 16–35.

The Mattson declaration, much like Dr. Noss's affidavit admitted in *National Audubon Soc'y v. U.S. Forest Serv.*, 46 F. 3d 1437,1447–48 (9th Cir. 1993), the Mills' declaration admitted in *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 760 n.5 (9th Cir. 1996), the Joslyn declaration admitted in *Hunters v. Marten*, 470 F. Supp. 3d 1151, 1166–67 (D. Mont. 2020), Dr. Barber's declaration admitted

3

in *Hausrath*, 491 F. Supp. 3d at 787, and Dr. Graecen's declaration admitted in *Washington*, 2021 WL 8445582 at *6, is focused on how the Forest Service failed to consider a number of relevant factors in the EA, *i.e.*, actual baseline conditions, connectivity, cumulative effects, and the likely effects of early stocking dates (with more vulnerable calves) and why it matters. These are precisely the types of circumstances for which such extra-record evidence is admitted. *Lands Council*, 395 F. 3d at 1030.

As explained by the Ninth Circuit, courts may admit and consider extra-record evidence "to develop a background against which it can evaluate the integrity of the agency's analysis" and to "help the court understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014). It "will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not." *Inland Empire*, 88 F.3d at 760 n.5 (citing *Asarco, Inc., v. U.S. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980)). In such situations, it is "both unrealistic and unwise to 'straightjacket' the reviewing court

with the administrative record." *Asarco, Inc.*, 616 F.2d at 1160. Courts cannot be required "to take the agency's word that it considered relevant matters." *Id.* at 1160.

For support, the Forest Service relies on *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1437 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989). But there, the Ninth Circuit recognized courts may extend their review beyond the record in NEPA cases such as this when the NEPA analysis neglects "to mention a serious environmental consequence ... or otherwise [sweeps] 'stubborn problems or serious criticism ... under the rug.'" *Id.* at 1437.

### III. The Mattson declaration is not submitted to attack the substance of the agency's decision.

The Forest Service insists the Mattson declaration is submitted solely to "attack the substantive basis" of its decision. This is incorrect. Dr. Mattson may disagree with the decision to expand livestock grazing in the GYE recovery zone, but that is not the purpose of his declaration. Nor is it being submitted for that reason.

Instead, just like the extra-record declarations submitted in *Hausrath*, *Washington*, *Inland Empire*, and *National Audubon*, Dr. Mattson's declaration focuses on the procedural errors in the NEPA analysis, namely the failure to account for baseline conditions, failure to analyze effects of early stocking dates (with young calves), failure to analyze effects on connectivity, and failure to analyze cumulative effects. *See* Doc. 26-1.

5

For support, the Forest Service points to Dr. Mattson's testimony on connectivity to demonstrate the "substantive" nature of his attacks. Yet here the focus is on how the agency "overlooked [the] importance of connectivity pathways" in the area when evaluating the effects of the action. Doc. 26-1 at ¶71. As Plaintiffs explained, the "EA fails to consider and analyze the importance of the project area in the Absaroka Mountains for grizzly bear dispersal, movement, and connectivity which is something needed for long-term viability and recovery of the species." Doc. 30 at 32. This is a procedural, not substantive, attack.

There is some evidence in the record on the importance of the project area for connectivity, including the Peck (2017) paper, and comments from grizzly bear experts. Doc. 30 at 33–35. The record also includes an email discussion on the topic. FWS-000266. The Mattson declaration is nonetheless helpful because it explains why this information should have been (but was not) included, discussed, or analyzed in the EA, where it must be found. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998). Nor was it incorporated by reference in the EA. This was a significant oversight and is precisely the type of situation for which submission of an extra-record declaration is allowed. *See National Audubon*, 46 F. 3d at 1447.

The Forest Service invokes a recent order granting a motion to strike a declaration from Dr. Mattson in *Helena Hunters & Anglers Ass'n v. Moore*, No. 22-cv-126-DWM, 2023 WL 6626158 (D. Mont. Oct. 11, 2023). But in that case, the plaintiffs sought to use the declaration only for the limited purpose of relief and, as such, never filed a motion to admit the extra-record declaration under the *Lands Council* exceptions, as they do here. The *Lands Council* exceptions were never even briefed nor argued in that case.

## IV. The *Lands Council* exceptions apply.

The Forest Service insists none of the *Lands Council* exceptions apply because to use them Plaintiffs must demonstrate that the agency failed to consider an "entirely new general subject matter." Doc. 31 at 20 (citing *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013).

This standard from *Pinnacle Armor*, however, does not square with the Ninth Circuit's relevant factors test for admitting extra-record evidence in *Asarco, Inc.*, 616 F. 2d at 1160, *National Audubon*, 46 F.3d at 1447, or *Lands Council*, 395 F.3d at 1030. Nor does it square with the court's application of the *Lands Council* exceptions in *Hunters*, 470 F. Supp. 3d at 1166–67. In *Hunters*, the extra-record declaration was premised not on an "entirely new general subject matter" but on the status of existing routes in a roadless area which was central to the case. *Id.* at 1167–

7

68. The same is true in *Hausrath*, where the extra-record declaration was premised on the adequacy of an existing noise analysis in an EA. 491 F. Supp. 3d at 785–87. Likewise, in *Washington*, the extra-record declaration was premised on the EIS's failure to disclose emissions calculations above a certain level. 2021 WL 8445582 at *6. None of these cases involved "entirely new general subject matters."

Further, even if one assumes, *arguendo*, that this "entirely new general subject matter" standard is valid and in accord with the *Lands Council's* relevant factor standard, it is met here. In *Pinnacle Armor*, for instance, the court explained that extra-record evidence would be appropriate if the agency "completely failed to address some factor, consideration of which was essential to making an informed decision." 923 F. Supp. 2d at 1234 n. 5 (citation omitted). That is the situation here.

For example, nowhere does the EA address the significant escalation in grizzly bear mortalities from conflicts with livestock in the GYE since 2010 (relying instead on the 1998 baseline and insisting the past is prologue). *See* Doc. 30 at 16–27. This "general subject matter" was never considered in the EA, even though this baseline information is essential to making an informed decision. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). Likewise, nowhere does the EA address the likely effects of putting younger and more vulnerable calves on the allotments as early as June 1. The EA ignores this important "subject matter."

8

In response, the Forest Service maintains it already said early stocking dates were not a concern based on two papers – Gunther (2004) and Wells (2019) – and we should take its word for it. EP-AR-00251. Mattson's declaration, however, is helpful because it explains that none of this is in the EA and why the agency's reliance on these two studies (neither of which is mentioned in the EA) is misplaced: The data in the two papers came from allotments stocked *after* June 1. Doc. 26-1 at ¶44. This important and relevant factor is not discussed or resolved in the EA, where it must be.

Another relevant factor overlooked in the EA is how grazing will negatively affect connectivity. The EA simply does not analyze this important issue. In response, the Forest Service insists it did "address" connectivity but relies only on general and unhelpful statements made in a revised biological assessment published a year *after* the EA was finalized and after its decision had already been made. *See* Doc. 31 at 15 (citing EP-AR-0020907). The EA – where the defense of the agency's decision must be found – does not analyze or resolve the important issue of how livestock grazing on the East Paradise allotments may affect connectivity for grizzly bears. The Mattson declaration explains why this omission is significant. Doc. 26-1 at ¶¶71–77.

The EA also overlooks cumulative effects. It includes a "cumulative effects" section, EP-AR-002326, but nowhere in the EA is there an analysis of how the effects of expanding grazing *in combination* with similar grazing and residential development on private lands (and other activities) occurring in the same area may cumulatively affect grizzly bears. Instead, the EA concluded no such cumulative effects exist. EP-AR-002327; EP-AR-002245. The Mattson declaration is helpful because it reveals how various cumulative effects occurring in the same area were overlooked in the EA. Doc. 26-1 at ¶¶51–54. And much like the fuel emissions at issue in *Washington*, 2021 WL 8445582 at *6, the actual cumulative effects of the project were never disclosed in the EA. This "serious environmental consequence" was swept "under the rug." *See National Audubon Soc.*, 46 F. 3d at 1447 (discussing similar situation). Indeed, in its biological assessment, the Forest Service conceded there were likely to be significant cumulative effects concerns with the project when combined with actions on private lands in the same area. EP-AR-0020909. The EA, however, never disclosed these findings to the public. EP-AR-002327; EP-AR-002245.

For support, the Forest Service relies on *Gallatin Wildlife Ass'n v. United States Forest Serv.*, 2016 WL 6684195, at *2 (D. Mont. Mar. 9, 2016). But that case is different. There, the plaintiffs sought to supplement the record with a study on a

10

topic the agency had addressed. *Id.* at *2. The plaintiffs also sought to supplement the record with irrelevant emails and with a comment letter that was provided without context, *i.e.*, there was no information about who drafted it or when, or if it was part of a larger document. *Id.* at *3. Under these circumstances admitting the extra-record materials would thus have "muddied" (not benefited) judicial review. *Id.*

Finally, additional justification for admitting the Mattson declaration is also found in the third *Lands Council* exception: "when necessary to explain technical terms or complex subject matter." 395 F. 3d at 1030. The Forest Service insists this exception cannot apply because the decision "simply authorizes cattle grazing." Doc. 31 at 23. But this oversimplification of the East Paradise decision and its likely effects on grizzly bears only reiterates the need to admit the Mattson declaration. The Mattson declaration sheds light on the Forest Service's failure to consider relevant factors, some of which – like the cause of escalating conflicts following the decline in important food sources, the additional risks associated with earlier stocking dates, and the importance of connectivity – are complex and technical in nature. *See* Doc. 30 at 163–7. The Mattson declaration, much like Dr. Barber's declaration in *Hausrath*, 491 F. Supp. 3d at 785, will thus assist this Court in its understanding of how the Forest Service overlooked this information and failed to comply with NEPA.

## V. The Mattson declaration supports the request for equitable relief.

The admission of extra-record evidence is also appropriate when evaluating requests for relief, including vacatur. *Helena Hunters & Anglers Ass'n*, 2023 WL 6626158, at *10. When evaluating a request for vacatur, the court must weigh the seriousness of the agency's errors against the disruptive consequences of an interim change. *Cal. Cmties. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012).

The Forest Service insists that the first prong of this equitable balancing – the seriousness of the agency's errors – is a purely "legal issue" that depends entirely on the "Court's analysis of the merits" and thus cannot be considered with extra-record evidence. Doc. 31 at 25. This is incorrect. Whether errors were committed by the agency is a purely "legal issue" but whether those same errors were serious or significant enough to warrant vacatur is a question of degree. The court must evaluate the *magnitude* of the agency's errors and weigh them against the disruptive consequences of vacatur. This is an equitable inquiry, *Cal. Cmties Against Toxics*, 688 F.3d at 992, and one that can only be resolved with extra-record evidence. *See, e.g.*, *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855, 883 (D. Mont. 2021) (reviewing extra-record declarations to evaluate seriousness of errors and disruptive consequences of vacatur); *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1157–58 (D. Mont. 2019) (same).

For example, if this Court finds that the Forest Service violated NEPA, then it must then decide whether to "vacate" the underlying decision on remand. Requests for vacatur, however, are not automatic. *Cal. Cmties Against Toxics*, 688 F.3d at 992. Vacatur is the presumptive remedy but "when equity so requires" the underlying action may be left in place during the remand period. *Steele*, 545 F. Supp. 3d at 883 (citations omitted). The court must thus "weigh the seriousness of the agency's errors against the disruptive consequences of vacatur" and may ultimately decline to vacate the decision if it would "cause serious and irremediable harms that significantly outweigh *the magnitude* of the agency's error." *Id.* (emphasis added). In other words, not all NEPA violations will be deemed serious enough to warrant complete or partial vacatur. And, even if the errors are serious, this Court must still weigh them against the disruptive consequences of vacatur.

As explained by the Ninth Circuit, "when equity demands, the regulation can be left in place while the agency follows the necessary procedures" to correct its action. *Cal. Cmties Against Toxics*, 688 F.3d at 992 (citing *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir.1995)). "Even though the agency's error was significant in *Idaho Farm Bureau*, we didn't vacate the agency's rule because that could have wiped out a species of snail." *Id.* "Similarly, in [another case] we didn't order vacatur because doing so would have thwarted" the operation of the Clean Air

13

Act. *Id*. The salient inquiry is the magnitude of the error – *i.e.*, "how serious" the agency's errors are "and the disruptive consequences of an interim change." *Id*. The weighing on these two equitable factors can only be accomplished by submitting and considering extra-record evidence that could not (and would not) be found in the record.

Here, Dr. Mattson's declaration explains why the Forest Service's errors in the EA are so serious and why, if the decision is not vacated pending correction of those errors, the harm to grizzly bears in this part of the GYE may be significant. *See* Doc. 26-1 at ¶¶90, 92. The Forest Service responds by attacking Mattson for not also addressing the "disruptive consequences" prong of the vacatur test, but that is the agency's job, not his. *See, e.g., Steele*, 545 F. Supp. 3d at 884–85 (agency declarations on disruptive consequences).

## CONCLUSION

For these reasons, this Court should grant Plaintiffs' motion to admit extra-record evidence.

Respectfully submitted this 20th day of December, 2023.

/s/ Matthew K. Bishop
Matthew K. Bishop

/s/ Kelly E. Nokes
Kelly E. Nokes

14

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 3,250 words. I relied on Microsoft Word to obtain the word count.

/s/ Matthew K. Bishop
Matthew K. Bishop