TODD KIM
Assistant Attorney General

JOSEPH W. CRUSHAM, CA Bar No. 324764
Trial Attorney, Wildlife & Marine Resources Section
KRYSTAL-ROSE PEREZ, TX Bar No. 24105931
Trial Attorney, Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
(202) 307-1145 (Crusham)
(202) 305-0486 (Perez)
(202) 305-0275 (fax)
joseph.crusham@usdoj.gov
krystal-rose.perez@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al., | ) )  ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | Case No. 9:22-cv-149-DLC-KLD |
| vs. | **FEDERAL DEFENDANTS' COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| RANDY MOORE, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION......................................................................................1

LEGAL BACKGROUND.........................................................................4

FACTUAL BACKGROUND.....................................................................5

STANDARD OF REVIEW.....................................................................12

ARGUMENT ..........................................................................................13

  I.  The Forest Service took a hard look at the AMP's potential
effects..................................................................................................14

    A.  The EA properly considered baseline conditions. ....................18

    B.  The Forest Service considered the potential impacts of earlier
grazing dates................................................................................25

    C.  The Administrative Record properly addresses connectivity of
grizzly bear habitat.....................................................................28

    D.  The Forest Service adequately analyzed potential cumulative
effects. .........................................................................................32

  II.  The Forest Service's FONSI was not arbitrary or capricious. ......38

    A.  The AMP does not significantly affect ecologically critical areas.
.......................................................................................................40

    B.  The AMP's effects are not highly controversial. ......................42

    C.  The AMP's effects are not highly uncertain.............................44

    D.  The AMP does not have significant cumulative effects. ...........46

    E.  The AMP's adverse effects on the grizzly bear are not
significant. ...................................................................................47

  III. The Court should not vacate the AMP. .......................................48

CONCLUSION.......................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Savage,*
375 F. Supp. 3d 1152 (D. Mont. 2019) ......................................... 48, 49

*Am. Rivers v. F.E.R.C.,*
201 F.3d 1186 (9th Cir. 1999) .............................................. 19

*Anderson v. Evans,*
371 F.3d 475 (9th Cir. 2004) ............................................... 38

*Barnes v. FAA,*
865 F.3d 1266 (9th Cir. 2017) ............................................. 42

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,*
524 F.3d 938 (9th Cir. 2008) .............................................. 40

*Blue Mountains Biodiversity Project v. Blackwood,*
161 F.3d 1208 (9th Cir. 1998) ............................................. 42

*Cal. Comms. Against Toxics v. EPA,*
688 F.3d 989 (9th Cir. 2012) .............................................. 48

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
631 F.3d 1072 (9th Cir. 2011) ............................................. 12

*Cascadia Wildlands Project v. U.S. Forest Serv.,*
386 F. Supp. 2d 1149 (D. Or. 2005)........................................ 33

*Cascadia Wildlands v. Bureau of Indian Affairs,*
801 F.3d 1105 (9th Cir. 2015) ............................................. 34

*Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.,*
279 F. Supp. 3d 898 (D. Ariz. 2017)....................................... 19

*Conservation Cong. v. U.S. Forest Serv.,*
720 F.3d 1048 (9th Cir. 2013) ............................................. 37

*Conservation Nw. v. U.S. Forest Serv.,*
No. 05-cv-220, 2005 WL 2077807 (E.D. Wash. Aug. 26, 2005) .......... 41

*Crow Indian Tribe v. United States*,
  965 F.3d 662 (9th Cir. 2020) .................................................................1

*Ctr. for Biological Diversity v. Blank*,
  933 F. Supp. 2d 125 (D.D.C. 2013).....................................................27

*Earth Island Inst. v. U.S. Forest Serv.*,
  697 F.3d 1010 (9th Cir. 2012) ........................................................12, 24

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,
  451 F.3d 1005 (9th Cir. 2006) ...................................................5, 47, 48

*Friends of the Wild Swan v. Weber*,
  No. 12-cv-29-M-DLC-JCL, 2013 WL 12344841 (D. Mont. June 3, 2013)
  ......................................................................................................41

*Friends of Wild Swan v. Weber*,
  No.12-cv-29-M-DLC, 2015 WL 13715966 (D. Mont. Feb. 23, 2015)....41

*Friends of Wild Swan, v. Kehr*,
  321 F. Supp. 3d 1179 (D. Mont. 2018) ...................................34, 35, 38

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
  844 F.3d 1095 (9th Cir. 2016) ........................................................19, 24

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir. 1992) .........................................................44, 45

*Helena Hunter & Angerls v. Tidwell*,
  841 F. Supp. 2d 1129 (D. Mont. 2009) ................................................45

*In Def. of Animals v. United States DOI*,
  751 F.3d 1054 (9th Cir. 2014) ......................................................42, 45

*Indep. Acceptance Co. v. California*,
  204 F.3d 1247 (9th Cir. 2000) .............................................................13

*Inland Empire Pub. Lands Council v. Schultz*,
  992 F.2d 977 (9th Cir. 1993) ...............................................................21

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
  681 F.3d 1006 (9th Cir. 2012) .............................................................37

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) .............................................................................33

*Lands Council v. McNair,*
   537 F.3d 981 (9th Cir. 2008) ........................................................ 12, 13

*League of Wilderness Defs. Blue Mts. Biodiversity Project v. Allen,*
   615 F.3d 1122 (9th Cir. 2010) ..................................................... 24, 31

*Marsh v. Oregon Nat. Res. Council,*
   490 U.S. 360 (1989) ...................................................................... 39, 46

*Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................... 12

*Native Ecosystems Council v. Dombeck,*
   304 F.3d 886 (9th Cir. 2002) .............................................................. 38

*Native Ecosystems Council v. U.S. Forest Serv.,*
   428 F.3d 1233 (9th Cir. 2005) .................................................. 39, 40, 47

*Native Ecosystems Council v. U.S. Forest Serv.,*
   No. 14-cv-229-M-DLC, 2015 WL 4606392 (D. Mont. July 30, 2015)...32

*Neighbors of Cuddy Mountain v. Alexander,*
   303 F.3d 1059 (9th Cir. 2002) ............................................................ 33

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
   137 F.3d 1372 (9th Cir. 1998) ............................................................ 14

*Nw. Ecosystem All. v. FWS,*
   475 F.3d 1136 (9th Cir. 2007) ............................................................ 13

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
   402 F.3d 846 (9th Cir. 2005) .............................................................. 33

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
   523 U.S. 726 (1998) ............................................................................ 21

*Or. Nat. Desert Ass'n v. Jewell,*
   840 F.3d 562 (9th Cir. 2016) .............................................................. 19

*Perkins v. Bergland,*
   608 F.2d 803 (9th Cir. 1979) ................................................................ 2

*Plains Res. Council, Inc. v. Surface Transp. Bd.,*
   668 F.3d 1067 (9th Cir. 2011) ............................................................ 32

*River Runners for Wilderness v. Martin,*
  593 F.3d 1064 (9th Cir. 2010) .................................................. 12

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) .................................................................. 4

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
  747 F.3d 581 (9th Cir. 2014) .............................................. 13, 37

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
  671 F.3d 1113 (9th Cir. 2012) ...................................... 14, 27, 31

*W. Org. of Res. Councils v. Bernhardt,*
  412 F. Supp. 3d 1227 (D. Mont. 2019) ....................................... 3

*Westlands Water Dist. v. U.S. Dep't of Interior,*
  376 F.3d 853 (9th Cir. 2004) ...................................................... 4

*Wild Wilderness v. Allen,*
  871 F.3d 719 (9th Cir. 2017) .................................................... 38

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ..................................................................... 12

**Statutes**

16 U.S.C. § 1607 ........................................................................... 1

16 U.S.C. § 528 ............................................................................. 1

42 U.S.C. § 4321 ........................................................................... 4

42 U.S.C. § 4331 ........................................................................... 4

42 U.S.C. § 4332(2)C) .................................................................. 4

43 U.S.C. § 1702 ........................................................................... 5

43 U.S.C. § 1702(k) ...................................................................... 6

5 U.S.C. § 706(2)(A) ................................................................... 12

**Regulations**

36 C.F.R. § 220.7(b) .................................................................... 27

36 C.F.R. § 222 ............................................................................. 5

36 C.F.R. § 222.1(b)(2) .............................................................. 5, 6

40 C.F.R. § 1500.1(b) ................................................................... 31

40 C.F.R. § 1501.1 ........................................................................ 4

40 C.F.R. § 1501.5(a) ..................................................................... 5

40 C.F.R. § 1501.6(a) ..................................................................... 5

40 C.F.R. § 1508.27(b)(3) ............................................................ 40

40 C.F.R. § 1508.27(b)(4) ............................................................ 42

40 C.F.R. § 1508.27(b)(5) ............................................................ 44

40 C.F.R. § 1508.27(b)(7) ............................................................ 46

40 C.F.R. § 1508.27(b)(9) ............................................................ 47

7 C.F.R. § 650.4(k) ...................................................................... 37

## INTRODUCTION

Grizzly bears thrive in the Greater Yellowstone Ecosystem (GYE) owing to conservation management that began in the 1970s when the grizzly bear was listed as a threatened species under the Endangered Species Act (ESA).  In the 1980s and 1990s, the grizzly bear population grew steadily.  The population growth has since slowed, indicating that grizzly bears are reaching carrying capacity in the area.  AR_2423.[1] Indeed, the "grizzly's success has been so marked in the Greater Yellowstone Ecosystem of Idaho, Montana, and Wyoming, that the agency responsible for enforcement of the ESA, the Fish and Wildlife Service ('FWS'), has for almost fifteen years been trying to delist the bears in that area."  *Crow Indian Tribe v. United States*, 965 F.3d 662, 670 (9th Cir. 2020).

The Custer Gallatin National Forest is within the GYE where the Forest must be managed for the multiple uses of "outdoor recreation, range, timber, watershed, wildlife and fish purposes."  16 U.S.C. § 528; *see also* 16 U.S.C. § 1607.  Striking the proper balance in managing

---

[1] "AR_" citations refer to the Forest Service's Supplemented Administrative Record lodged with the Court November 2, 2023, ECF No. 23.

National Forest System lands for these multiple uses requires the particular expertise and discretion of the Forest Service. *See Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979).

For over a century, the Forest Service has managed livestock grazing on the East Paradise Range Allotments, which are six allotments just east of Paradise Valley, Montana. The Forest Service manages these allotments by issuing permits that are subject to an allotment management plan. In May 2013, the Forest Service began the process of revising the allotment management plan. This multi-year process involved gathering information, soliciting public input, and analyzing the potential effects on grizzly bears. Following this extensive process, the Forest Service authorized the East Paradise Range Allotment Management Plan (the AMP), which continues to authorize grazing on three of the allotments while maintaining the other three as vacant.

The Forest Service supported the AMP with an Environmental Assessment (EA) under the National Environmental Policy Act (NEPA). The EA took a hard look at the AMP's potential environmental impacts and determined that it did not need to prepare an Environmental

Impact Statement (EIS) because the AMP would not have significant impacts on the environment.

Plaintiffs now bring this action under NEPA, claiming that the EA failed to take a hard look at the AMP's potential effects and that the Forest Service's finding of no significant impact (FONSI) was arbitrary and capricious.[2]  But Plaintiffs' claims misunderstand NEPA and the Administrative Record.  As detailed below, the Forest Service took a hard look at the AMP's potential effects by relying on proper baseline conditions, disclosing that the AMP would have few, if any, effects on grizzly bears or habitat connectivity, and addressing potential cumulative impacts.  The Forest Service further reasonably determined that an EIS was not required because grazing under the AMP would not have significant impacts.  For these reasons, the Court should grant Defendants' Cross-Motion for Summary Judgment, deny Plaintiffs' Motion for Summary Judgment, and enter judgment in favor of Defendants.

---

[2] Plaintiffs have waived their ESA claim by not pursuing it.  *See* ECF No. 30 at 2 n.1; *W. Org. of Res. Councils v. Bernhardt*, 412 F. Supp. 3d 1227, 1240 n.4 (D. Mont. 2019) (holding that failure to brief claim on summary judgment constituted waiver).

## LEGAL BACKGROUND

NEPA ensures that federal agencies consider the environmental consequences of major federal actions significantly affecting the environment.  42 U.S.C. §§ 4321, 4331; 40 C.F.R. § 1501.1.[3]  NEPA serves the twin aims of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to members of the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA itself "does not mandate particular results, but simply prescribes the necessary process." *Id.* at 350.  As a result, a "court must avoid passing judgment on the substance of an agency's decision.  Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004).

NEPA requires an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)C).  An agency may prepare an EA "for a proposed action that is

---

[3] The Council on Environmental Quality (CEQ) promulgated new NEPA-implementing regulations that became effective in 2020.  The claims in this case arise under the previous regulations.  *See* AR_2271.

not likely to have significant effects or when the significance of the effects is unknown." 40 C.F.R. § 1501.5(a). An EA is "a concise public document" to aid an agency's compliance with NEPA and support its determination of whether to prepare an EIS or a FONSI. *Id.* § 1508.1(h). If an agency concludes the proposed action has no significant effect, "it may issue a FONSI in lieu of preparing an EIS." *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *see* 40 C.F.R. § 1501.6(a).

## FACTUAL BACKGROUND

The Custer Gallatin National Forest spans over three million acres, AR_389, and has long been managed for multiple uses, including livestock grazing, AR_2379; *see* 36 C.F.R. pt. 222 (regulations governing grazing on National Forest System lands). There are approximately 173,378 acres of "suitable livestock range" on the Forest, with 140 active grazing allotments and 11 inactive allotments. AR_177. There are 164 permits on the active grazing allotments that are administered under allotment management plans. AR_177; *see* 36 C.F.R. § 222.1(b)(2) (allotment management plans specify "the program of action designated to reach a given set of objectives."); *see also* 43 U.S.C. § 1702

(defining "grazing permit").  Through an allotment management plan, the Forest Service "[p]rescribes the manner in and extent to which livestock operations will be conducted in order to meet the multiple-use, sustained yield, economic, and other needs and objectives as determined for the lands involved . . . ."  36 C.F.R. § 222.1(b)(2); *see also* 43 U.S.C. § 1702(k) (same); AR_2379.

The East Paradise Range Allotments are six allotments in the Absaroka Beartooth mountains on the east side of the Paradise Valley located between Livingston, Montana and the north entrance of Yellowstone National Park.



AR_8621.

The Forest Service issued a scoping letter in May 2013 proposing to "analyze the six East Paradise Allotments to determine whether or not the allotments should remain open to livestock grazing, and if so under what conditions."  AR_18160; AR_2379.  At the time, the Elbow Creek, Pine Creek, and Sixmile North Allotments had active permits for livestock grazing; the Sixmile South, Suce Creek, and Mill Creek Allotments were vacant and were to be evaluated for "re-stocking potential, closure, combination with adjacent allotment, or continuation of vacant status to serve as a grass bank for emergency purposes."  AR_18160.

| Allotment Name | Total allotment acres | Suitable range acres | Existing structures | Allotment Status | General description |
|---|---|---|---|---|---|
| Suce Creek | 5,424 | 1,104 | 2 water systems, 2 miles of fence. | Vacant since 2002 | Three-quarters of allotment within Absaroka-Beartooth Wilderness. Much of the allotment is steep and heavily timbered. |
| Mill Creek | 2,906 | 108 | No improvements | Vacant since 2009 | Steep with heavy timber and scattered grassy parks. |
| Pine Creek | 771 (588 Federal/183 private) | 303 | No Improvements | Active | A small allotment in Pine Creek drainage, which drains into Yellowstone River. Much of allotment is steep with heavy timber. |
| Elbow Creek | 697 (430 Federal/267 private) | 214 | 1 water system supplies water to tank on private property. | Active | Steep slopes and heavy timber with steep gradient streams and limited resource concerns. |
| Sixmile North | 4,313 | 1,549 | 4 water systems. 5.5 miles fence. | Active | Steep and high elevation with open grassy meadows. |
| Sixmile South | 6,784 | 960 | 1 water system. 0.1 miles of drift fence. | Vacant since 2000 | Much of the allotment is open rolling grass and sagebrush hills. Concerns with stream bank instability, soil conditions, and weeds following 2013 Emigrant fire and subsequent runoff events. |

AR_ 2379-80.

After receiving and considering comments in response to the scoping notice, the Forest Service issued a draft EA in November 2020 that analyzed the potential impacts of a revised allotment management plan. *See* AR_2375; AR_2242. After considering comments, the Forest Service issued the final EA in April 2021. *See* AR_2267; *see also* AR_2371 (revised final EA issued in October 2021, *see* AR_2448 (errata)). The final EA analyzed the potential environmental effects of taking no action and allowing no grazing, as well as the potential effects of two alternative proposed allotment management plans. *See* AR_2375. The Forest Service issued a draft decision notice (DN) and FONSI. AR_2344-62. The Forest Service then received seven objections that were addressed at a meeting in May 2021. AR_2242.

Based on the final EA, its supporting documents, and public input, the Forest Service approved the AMP in a DN and FONSI in December 2021. AR_2235-47. As detailed in the DN, "Suce Creek, Mill Creek, and Sixmile South allotments will not be authorized for grazing and will remain in vacant status." AR_2236. "If grazing of these allotments is desired in the future or if these allotments are closed, additional

NEPA and consultation [under the ESA] would be required at that time." AR_2520. The DN authorized continued grazing using an adaptive management strategy on the Pine Creek, Elbow Creek, and Sixmile North Allotments. AR_2236.

The Pine Creek Allotment consists of two pastures that will no longer include the 183 acres of private land and will thus be reduced to 588 acres of which 185 acres are primary range. AR_2236; AR_2378; AR_3429; *see* AR_3416 ("Primary range is that part of the suitable range that livestock naturally graze under current management practices."). Only the North Pasture will be grazed annually while the Campground Pasture will be grazed once every five years after the Pine Creek Campground closes for the season. AR_2236. Fencing will exclude livestock from the campground. *Id.* The Elbow Creek Allotment consists of one pasture approximately 697 acres of which 39 acres are primary range. AR_2378; AR_3429. The Sixmile North Allotment boundary incorporates the area east and south of the Gold Prize Pasture, creating a new pasture called Trailhead Pasture. AR_2237. This new pasture adds 1,356 acres—only 146 acres are suitable for livestock grazing because the rest are too steep, rocky, or

forested—for a total 5,669 acres comprising the Sixmile North Allotment. *Id.* The new pasture will have a fence to define its boundary, and two cattle guards will be installed on a road near the Forest boundary. *Id.*

The AMP allows grazing on the three allotments from June 1 to October 15 annually. AR_2236-37. Although the season is longer than before, that does not reflect an increase in authorized grazing. AR_2381. Instead, the amount of authorized grazing is quantified by animal unit months (AUMs), which consists of "the amount of forage needed by an 'animal unit' (AU) grazing for one month." AR_3457 (defining "animal unit" as "one mature 1,000 pound cow and her suckling calf."). The AMP identifies the maximum AUMs for each of the allotmentsc, and those AUMs cannot be "exceeded regardless of how early or late cattle may be on an allotment." AR_2236-37. When allowable utilization levels are reached, livestock are moved to another area, another pasture, or off the allotment for the season. *Id.* Thus, the AMP does not increase permitted livestock numbers or AUMs. *See* AR_2236-37; AR_3429.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA) governs a court's review of NEPA compliance.  *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012).  Under the APA, agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . . "  5 U.S.C. § 706(2)(A).  The agency need only articulate a "rational connection between the facts found and choice made."  *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

The APA standard is "highly deferential" and presumes the agency action is valid.  *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011).  The Court must "not substitute [its] judgment for that of the agency."  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) (citation omitted).  The Court may not overturn an agency decision "because it disagrees with the decision or with the agency's conclusions about environmental impacts."  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).  It must "affirm[] the agency action if a

reasonable basis exists for its decision." *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)).

The Court is to be "most deferential" when, as here, "the agency is making predictions, within its area of special expertise, at the frontiers of science." *Lands Council*, 537 F.3d at 993 (simplified); *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (When examining an agency's scientific determinations, "a reviewing court must generally be at its most deferential.").

## ARGUMENT

Plaintiffs argue that the Forest Service failed to take a hard look at the AMP's potential effects on grizzly bears by relying on inadequate baseline information, downplaying the effect of earlier stocking, failing to assess potential effects to habitat connectivity, and not sufficiently considering cumulative effects. As detailed below, these claims ignore important parts of the record or otherwise demand more than NEPA requires. Plaintiffs also challenge the Forest Service's FONSI. But the Forest Service reasonably determined that no EIS was required because the AMP would not have significant effects on the environment.

In short, Plaintiffs would like to see less or no grazing in the East Paradise Valley, but Congress has vested the Forest Service with the duty and discretion to balance grazing with other uses of the Forest. Plaintiffs now attempt to undue that balance by pursuing claims under NEPA—a procedural statute that does not mandate substantive results. The Forest Service clearly met NEPA's procedural requirements by taking a hard look at the AMP's potential effects and determining that they would not be significant.  Plaintiffs' claims to the contrary fail.

## I.   The Forest Service took a hard look at the AMP's potential effects.

An EA satisfies NEPA's hard-look mandate if it contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998).  "The purpose of an EA under NEPA is not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or [FONSI]." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012).

The Forest Service took a hard look at the AMP's potential effects on a host of resources, focusing on "relevant and meaningful effects," and relying on numerous publicly available specialist reports. AR_2395.  In particular, the Forest Service analyzed impacts on wildlife, AR_7813-95, recreation, AR_2682-94, water, AR_3634-3761, soil, AR_2846-64, vegetation, AR_3415-81, noxious weeds, AR_3485-3514, wilderness, AR_3838-54, inventoried roadless areas, AR_3824-37, and heritage resources, AR_2644-55; *see also* AR_2510-57 (Biological Assessment).

The Forest Service extensively assessed the AMP's potential effects on grizzly bears, as detailed in the EA, Wildlife Report, and Biological Assessment.  AR_2423-31; AR_7845-49; AR_7868-70; AR_7879-81; AR_2537-47.  The Forest Service analyzed the potential effects of having cattle turnout as early as June 1 and spread across more acreage under the AMP.  AR_7879.  The Forest Service determined the "primary effect" that the AMP could have involved "the potential for human/bear encounters and conflict."  *Id*.

In assessing the potential effect of any such encounters, the Forest Service identified the existing condition of grizzly bear habitat and

population.  AR_7845-46.  The Forest Service noted that approximately 1,568 acres of one allotment are within the recovery zone (also referred to as the primary conservation area), which is "a secure area for grizzly bears, with population and habitat conditions maintained to ensure a recovered population . . . ."  AR_15393; AR_2426.  As of 2021, the grizzly bear population is estimated at 1,069 individuals within the recovery zone and its surrounding areas.  AR_7971.  As detailed in the Wildlife Report, this existing condition reflects a recovered population.

The Forest Service acknowledged that because grizzly bears are opportunistic feeders that prey or scavenge on almost any available food, they can conflict with humans, potentially resulting in the bear's removal.  AR_2427-31.  The Forest Service observed an upward trend in conflicts due to the increased population and wider distribution of grizzly bears.  *Id.*; *see also* AR_7111-14.  However, based on the AMP's low livestock numbers and the allotments' spatial separation, cattle would not serve as a concentrated food source to attract grizzly bears.  *Id.*  In addition, the Forest Service relied on its own scientific research to explain that the *size of allotments* and *livestock numbers* have a proven association with depredation, but the *grazing season length* does

not.  AR_2542; AR_14883; AR_17709.  The Forest Service further noted that "allotments with less rugged terrain experience more depredation events."  AR_2542.  While surprise encounters with forest users and livestock producers may occur, any removals would likely result in the short-term reduction of grizzly bear abundance until new bears migrate into the area.  *Id.*

The Forest Service also considered potential disturbance from road use and fence construction but concluded no significant impact would occur because of the small scale and temporary nature of any such actions under the AMP.  AR_7880; *see also* AR_2543 ("The proposed action would have no effects on the acreage of secure habitat or densities of open or total motorized routes, because no changes to motorized use of roads are proposed.").  "Grizzlies may move from habitats temporarily occupied by humans but would return" once the disturbance ends.  *Id.*

Finally, the Forest Service provided a reasonably thorough discussion of how the AMP might combine with other activities in the area to potentially affect a multitude of resources, including the grizzly bear population.  *See* AR_2430-31; AR_7884-87.  No specific projects in

the area were foreseeable at the time the Forest Service conducted its analyses, so the Forest Service examined current activities such as "mineral development, firewood gathering, and recreational activities," acknowledging their potential to disturb grizzly bears.  AR_7886.  These activities, however, "occur in areas that are already avoided by grizzly bear[s]."  *Id.*  Thus, the AMP's potential to increase livestock-related conflicts, when combined with these other activities, is minimal.  *Id.*  In addition, the AMP imposes requirements aimed at reducing the potential for conflicts, including requiring fencing and proper disposal of livestock carcasses.  *Id.*

These thorough analyses clearly show that the Forest Service took a hard look at the AMP's potential effects on the grizzly bear by providing sufficiently detailed information to promote informed decision-making and public participation.  NEPA requires nothing more, and Plaintiffs arguments to the contrary are not well founded.

### A. The EA properly considered baseline conditions.

"A baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action."

*Am. Rivers v. F.E.R.C.*, 201 F.3d 1186, 1195 (9th Cir. 1999). "An agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). "[W]hether baseline data is sufficient must be considered in practical terms and in the context of the specific project being evaluated." *Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 933 (D. Ariz. 2017) (citing *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016); *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016)).

The Forest Service detailed the existing condition by disclosing the GYE grizzly bear population and secure habitat throughout the six recovery zones established for conservation. *See e.g.*, AR_7971; AR_17872. The Forest Service also quantified grizzly bear conflicts associated with livestock depredation on all National Forests within the GYE. AR_17862; *see also* AR_17863; AR_17864-66. Relying on the most recent livestock report, the Forest Service disclosed the number of

active, vacant, and closed allotments, along with their acreage, that are within the grizzly bears' recovery zone. AR_7848.

This baseline information provided more than enough information against which the Forest Service could assess the AMP's potential effects. Rather than identifying missing information or offering an alternative baseline, Plaintiffs refer to grizzly bear conflicts in seemingly random years and in areas other than the East Paradise Range Allotments. *See* Pls. Br. 15-16. Plaintiffs' references do nothing to undermine the Forest Service's baseline information.

In arguing that the Forest Service failed to "account for the actual baseline conditions for grizzly bears[,]" Pls. Br. 10, Plaintiffs misunderstand the point of the 1998 baseline. The 1998 baseline is not a measure of existing conditions (i.e., a baseline against which to measure potential effects under NEPA). Instead, it is a standard established in the 2007 Conservation Strategy and adopted in forest plans and other agencies' planning documents to measure conservation efforts. *See* AR_15425; *see also* AR_7881; AR_2425; AR_17871. Plaintiffs' arguments misleadingly conflate the concept of *assessing the existing conditions* to analyze the AMP's potential environmental effects

with *maintaining or improving on the conditions that existed in 1998* to promote grizzly bear conservation.

Rather than a challenge to the baseline conditions relied on by the Forest Service to assess the effects of the proposed action under NEPA, Plaintiffs seem to dispute the validity of the 1998 baseline as an appropriate measure of grizzly bear recovery. But consistent application of the 1998 baseline has contributed to the recovery of the GYE grizzly bear population. *See e.g.*, AR_8098; AR_17859. More importantly, a challenge to the 1998 baseline is fundamentally a substantive attack on the Forest Service's methodology for conservation management of grizzly bears. *See e.g.*, AR_322 (Forest Plan's grizzly bear standards and guidelines advising to "maintain the percent of secure habitat . . . at or above 1998 baseline levels"). Such an attack cannot support a NEPA violation. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998) ("NEPA, unlike the NFMA, simply guarantees a particular procedure, not a particular result."); *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993) ("NEPA does not require that we decide whether an [EA] is based on the best scientific methodology available, nor does NEPA

require us to resolve disagreements among various scientists as to methodology.").

Plaintiffs further argue that the Forest Service improperly relied on the 1998 baseline because a decline in cutthroat trout, ungulates, and whitebark pine have caused grizzly bears to become dependent on meat as their primary food source and suggest that as a result, grizzly bears depredate more on cattle. Pls. Br. 12-13. According to Plaintiffs, the purported "increased reliance on meat" will result in an "exponential" rise in bear-livestock conflicts. Pls. Br. 13. This argument merely continues Plaintiffs' improper substantive attack on the method by which the Forest Service measures grizzly bear recovery. But even if it were proper, Plaintiffs' speculation is unsupported for several reasons. First, Plaintiffs fail to show increasing depredations on cattle in the AMP area. In fact, the AMP allotments have not had any livestock-bear conflicts for five years leading up to the Forest Service's decision to authorize the AMP. AR_2323; *see* AR_17865.

Second, there has been no decline in the GYE population to correspond to Plaintiffs' unsubstantiated theory that grizzly bears are increasingly relying on livestock as a food source, causing more

livestock-related conflicts.  To the contrary, the grizzly bear population has increased.  AR_7971; AR_17778; AR_8083; AR_8187.

Third, while Plaintiffs offer statistics on grizzly bear conflicts in other areas, *see* Pls. Br. 15-16, they fail to acknowledge that a growing grizzly bear population coupled with a growing human population expanding into grizzly bear habitat will result in more conflicts independent of access to specific food sources.  *See* AR_16512 ("[B]ears experiencing loss of whitebark pine in their home ranges are not necessarily exposed to greater risk of conflict or mortality associated with anthropogenic areas.").  The grizzly bear population has also become more widely distributed throughout the GYE over the past 20 years.  *See* AR_2251; AR_2319 (attributing slowed population growth to "carrying capacity" in the GYE and noting that population recovery objectives have been met).  As a result, there are increased human-bear interactions.  AR_2246.  But the AMP's conservation measures will help prevent conflicts.  AR_7887; AR_7879.

Fourth, Plaintiffs cite no data or study of any dietary "dependence" on livestock.  Nor could they.  Grizzly bears consume over 266 animal and plant species in the GYE.  AR_2320.  The grizzly bears'

dietary flexibility "allows them to cope with perturbations in the abundance of their preferred foods" and will provide many food sources outside of the cattle grazing on the allotments.  AR_2251; AR_7846. The Forest Service also explained that cattle would not serve as a "concentrated food source" for attracting grizzly bears because livestock numbers would be low and because the allotments are spatially separated.  AR_2323.

In short, Plaintiffs merely disagree with the use of the 1998 baseline to assess conservation of grizzly bears but "have not shown that this choice rested on inaccurate information or indefensible reasoning."  *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1102 (9th Cir. 2016).  When presented with this type of disagreement, a court "must defer to the informed discretion of the responsible federal agencies."  *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012).  Indeed, it is in these circumstances that the APA's "highly deferential standard" of review "is highest."  *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010).  Plaintiffs' mere disagreement with the Forest Service's use of the 1998 baseline to

assess grizzly bear recovery does not establish a NEPA violation, and this claim fails.

### B. The Forest Service considered the potential impacts of earlier grazing dates.

Plaintiffs take issue with the AMP turnout dates, arguing that an earlier grazing season will result in more livestock-bear conflicts. Pls. Br. 21. The Forest Service considered this potential and determined that a longer grazing season will not have a significant effect on grizzly bears for several reasons, including that AUMs will not increase under the AMP.

Before the Forest Service authorized the AMP, turnout dates for the allotments were as follows:

| Allotment | Pastures | Use Dates | AUMs |
|---|---|---|---|
| Suce Creek | 2 cattle | July 1 – October 15 | 177 |
| Mill Creek | 1 cattle 1 horse | June 16 – September 30 | 65 cattle 8 horse |
| Pine Creek | 1 cattle | September 15 – October 15 | 13 |
| | 1 cattle | June 1 – October 15 | 7 on /238 off |
| Elbow Creek | 1 cattle | August 1 – September 15 | 16 on /24 off |
| North Six Mile | 3 cattle | July 1 – October 15 | 446 |

| South Six Mile | 4 cattle | August 1 – October 15 | 303 |

AR_2381.

Under the AMP, the turnout dates change as illustrated below:

| Allotment | Pastures | Use Dates | AUMs |
|---|---|---|---|
| Suce Creek – Vacant | | | 0 |
| Mill Creek – Vacant | | | 0 |
| Pine Creek | 2 cattle | June 1 – October 15 | 10 |
| Elbow Creek | 1 cattle | June 1 – October 15 | 16 on /24 off |
| North Six Mile | 4+ cattle | June 1 – October 15 | 446 |
| South Six Mile – Vacant | | | 0 |

AR_2236.  For one of the Pine Creek Allotment's pastures, the starting

date was already June 1.  *See* AR_2381.

The Forest Service explained that by starting grazing earlier in

the year, it aimed to "move upland vegetation toward desired

conditions."  AR_2296.  "[C]attle numbers and AUMs would be

maintained at existing levels in these allotments."  AR_2520.  The

Forest Service further explained that early stocking was not expected to

cause calf depredation because most depredations occur within the

hyperphagia period—July 16 through den entrance in the winter.  *See*

AR_2251; AR_14886 (defining the grizzly bear seasons).

Plaintiffs wrongly state that the EA "ignores" the impacts of

turnout dates.  Pls. Br. 23.  The EA explained that the AMP imposes

maximum AUMs that will "not be exceeded regardless of how early or

late cattle may be on an allotment."  AR_2386.  Record documents

incorporated in the EA by reference analyze the potential effects of the

earlier season in more detail.  *See e.g.*, AR_7879-80 (Wildlife Report);

AR_2520, 2542 (Biological Assessment); AR_3428, 3467-70 (Vegetation

Report).

By complaining that the EA lacks this same level of detail,

Plaintiffs suggest that the Forest Service ought to have reproduced

every specialist report into the EA.  *See* Pls. Br. 24.  But "[i]n ensuring

an agency's compliance with NEPA, the Court is not strictly confined to

the . . . four corners of the EA . . . ."  *Ctr. for Biological Diversity v.*

*Blank*, 933 F. Supp. 2d 125, 151-52 (D.D.C. 2013); *see also* 36 C.F.R. §

220.7(b) (2008) ("The EA may incorporate by reference information that

is reasonably available to the public."); *Tri-Valley*, 671 F.3d at 1124

(explaining that a court's hard-look inquiry looks "to the evidence the

agency has provided to support its conclusions, along with materials in the record").

Moreover, Plaintiffs' concerns about early stocking are based on unsubstantiated assumptions. For example, Plaintiffs emphasize the "vulnerability of calves" claiming that February-born calves are the "optimal size prey" by June. Pls. Br. 22. But notably absent are any examples of increased calf predation where the turnout date was already June 1, such as in the Pine Creek Allotment. Likewise, Plaintiffs manufacture hypotheticals unsupported by the record. *See e.g.*, Pls. Br. 22 ("*if* young calves are released in areas" where predation is facilitated and "*if* livestock are then left unattended for weeks" (emphasis added)). Conservation measures required under the AMP address these possibilities. *See* AR_2523.

In short, the Forest Service took a hard look at the potential impacts of the AMP's earlier stocking dates. Plaintiffs fail to establish otherwise, and this claim fails.

### C. The Administrative Record properly addresses connectivity of grizzly bear habitat.

Plaintiffs complain that the EA lacks analysis of the AMP's potential impacts to connectivity between the GYE and Northern

Continental Divide Ecosystem (NCDE).  Pls. Br. 31.  But the record

shows that the Forest Service took a hard look at this issue in light of

the AMP's negligible potential effects on such connectivity.

As an initial matter, Plaintiffs cite no evidence that seasonal

livestock grazing truncates or curtails grizzly bear movements.  *See* Pls.

Br. 26-31.  Instead, Plaintiffs offer conclusory opinions about "the

importance of the project area" to connectivity and, citing no support,

suggest that continued grazing in the area will impede grizzly bear

movement.  Pls. Br. 26.  But as the record reflects, "there is no

indication that human activities are preventing grizzly bears from

moving freely" within the GYE.  AR_8154.

Moreover, even if there were evidence that grizzly bear movement

was being impeded in the GYE and that livestock grazing contributed to

such impediment, there is no evidence that grazing under the AMP has

any effect on connectivity with the NCDE.  To the contrary, as the

Forest Service explained, its research shows that the highest

probability of connectivity between the GYE and NCDE occurs farther

north and west of the East Paradise allotments through the Bridger and

Bangtail mountains.  AR_17617, 17619, 17621.  Plus, managing for

habitat connectivity has long focused on transportation planning. *See* AR_17507-08; AR_15443; AR_8153. And the Forest Service explained that the AMP would not lead to a permanent net or substantial temporary increase in motorized access. AR_7887.



AR_7970.

Plaintiffs' argument rests on the assumption that the AMP will increase livestock-bear conflicts. Pls. Br. 30 ("maximizes odds of livestock-related conflicts"). But as discussed above, the EA and

supporting documents explain that this is not the case.  *See e.g.*,

AR_2323 (livestock numbers will be low and the allotments are

spatially separated); AR_2523 (conservation measures); *see generally*

AR_7879-80 (discussing potential for increased conflicts and explaining

why the increase would not be significant).

Requiring the Forest Service to provide the type of in-depth

analyses in the EA that Plaintiffs demand goes beyond NEPA's

procedural mandates.  *See Tri-Valley CAREs*, 671 F.3d at 1129 ("The

purpose of an EA is not to compile an exhaustive examination of each

and every tangential event that potentially could impact the local

environment.  Such a task is impossible and never-ending."); *League Of*

*Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d

1122, 1136 (9th Cir. 2010) ("NEPA documents must concentrate on the

issues that are truly significant to the action in question, rather than

amassing needless detail." (quoting 40 C.F.R. § 1500.1(b)).  The Forest

Service took a hard look at potential effects to connectivity in light of

the minimal potential effects the AMP may have on grizzly bear

movements.  This satisfied NEPA.

### D. The Forest Service adequately analyzed potential cumulative effects.

Plaintiffs also argue that the Forest Service failed to take a hard look at the potential cumulative effects of the AMP, pointing generically to activities on private lands, increased visitation to Yellowstone National Park, population growth in the surrounding counties, wildfires, and hunting pressures.  Pls. Br. 34.  But the Forest Service explained why the combination of potential impacts would not be significant, as discussed above.  *See supra* 17-18; *see also* AR_7884-87.

Plaintiffs ignore that the "scope of the cumulative impacts analysis is related to the magnitude of the environmental impacts of the proposed action" and "[p]roposed actions of limited scope typically do not require as comprehensive an assessment of cumulative impacts as proposed actions that have significant impacts over a large area." *Native Ecosystems Council v. U.S. Forest Serv.*, No. 14-cv-229-M-DLC, 2015 WL 4606392, at *4 (D. Mont. July 30, 2015).  Indeed, to establish a NEPA violation based on cumulative impacts, a plaintiff must show that the agency did not provide "a useful analysis" of the cumulative effects.  *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076 (9th Cir. 2011).  And although a useful analysis includes

"some quantified or detailed information," *id.*, "general statements about possible effects and some risk" may suffice when more definitive information is unavailable, *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005); *see also Kleppe*, 427 U.S. at 414 ("[P]ractical considerations of feasibility might well necessitate restricting the scope of comprehensive statements.").

"Courts accord substantial deference to an agency's determination of the scope of its 'cumulative effects' review." *Cascadia Wildlands Project v. U.S. Forest Serv.*, 386 F. Supp. 2d 1149, 1167 (D. Or. 2005) (citing *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1071 (9th Cir. 2002)); *see also Kleppe*, 427 U.S. at 414 ("[D]etermination of the extent and effect of [cumulative environmental impacts] . . . is a task assigned to the special competency of the appropriate agencies.").

The Forest Service addressed potential cumulative effects by incorporating "past effects" into "existing conditions" because they "cannot reasonably be separated from the current environmental conditions." AR_2430. Consistent with NEPA, the Forest Service aggregated "the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a

proposed project is measured." *See Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015).

The Forest Service also took a hard look at present and foreseeable activities on the Forest as well as on private lands, such as "mineral development, firewood gathering, and recreational activities," AR_7886. It analyzed these effects to determine whether they could potentially combine with the effects of grazing authorized under the AMP and result in a significant cumulative impact specifically on grizzly bears and other resources.

While these activities potentially affect bears, the Forest Service expects the activities will occur in areas already avoided by grizzly bears. AR_7886. As a result, when these effects are combined with the AMP, the cumulative impacts on grizzly bear are not significant. *Id.* Thus, the EA "explains to the reader *why* the impact will not be significant" when combined with other actions. *Friends of Wild Swan*, 321 F. Supp. 3d at 1192. Moreover, the Forest Service took into account the conservation management for grizzly bears and concluded that the cumulative effects of continued grazing under the AMP would be "insignificant and/or discountable" if all conservation requirements are

met, especially in light of the grizzly bear's successful recovery under the conservation requirements.  AR_7887; *see also* AR_2585 ("Overall, the GYE population has continued to increase in number and distribution throughout the years" even in the presence of "highways, unsecured attractants, livestock grazing, agriculture, [and] hunting").

Even with this well-reasoned explanation, Plaintiffs argue that the EA lacks a "quantitative analysis" about development on private land, motorized access, mining activity, grazing on non-federal land, recreation, and human population growth.  Pls. Br. 35.  But this Court has rejected a similar argument in *Friends of Wild Swan*, 321 F. Supp. 3d at 1191-92.  In that case, the plaintiff demanded quantitative information about acreage impacted by the proposed action; this Court found that the agency's narrative explanation satisfied NEPA's requirements.  *Id.*  Here, the Forest Service took a hard look at these issues by providing detailed information about the AMP's potential effects and explaining the potential risk of these other activities.

Plaintiffs' suggestion that "a slight increase in adverse conditions" would spell doom for grizzly bears, Pls. Br. 36-37, is directly contradicted by the record.  *See e.g.*, AR_7971; AR_17778; AR_8083;

AR_8187.  As already explained, the GYE population has successfully

recovered despite increased development.  *See* AR_2585.  By all metrics

the GYE population represents a stable growing population and is not

in danger of collapsing into an "ecological trap or population sink" as

Plaintiffs claim, Pls. Br. 36.  *See* AR_8023; AR_7971-72; *see also*

AR_2425 (noting that Schwartz et al. identified the amount of secure

habitat and road densities outside of secure habitat as having "the

greatest effect on grizzly bear survival").  Likewise, the Forest Service

explained why the availability of food sources is not a valid concern, Pls.

Br. 38.  *See* AR_2424.

Finally, Plaintiffs accuse the Forest Service of disclosing

contradictory conclusions to the public and the Fish and Wildlife

Service.  Pls. Br. 38.  The BA concluded that "the resulting cumulative

impact would be neither beneficial, discountable, or insignificant."

AR_2545.  Plaintiffs point to this conclusion to claim that the EA failed

to take a hard look at the AMP's potential cumulative effects.  But

Plaintiffs conflate two different standards.  NEPA and the ESA are

distinct statutes—they "evaluate different types of environmental

impacts through processes that involve varying degrees of public

participation." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 650 (9th Cir. 2014).  Indeed, the Ninth Circuit has cautioned against conflating the standards in each statute for analyzing cumulative effects, which is just what Plaintiffs attempt here.  *See Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1055 (9th Cir. 2013) (noting that ESA's definition of "cumulative effects" applies only "to ESA section 7 analyses and should not be conflated with NEPA's broader term 'cumulative impact'").  Moreover, the threshold for finding an "effect" under the ESA, and thus to trigger Section 7 consultation, is very low: "[a]ny possible effect, whether beneficial, benign, adverse or of an undetermined character" qualifies.  *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012).  Accordingly, the Forest Service's determination in the Biological Assessment does not conflict with the agency's determination in the EA that the cumulative impacts of the AMP were not significant under NEPA.  *See e.g.*, 7 C.F.R. § 650.4(k) ("'Significantly' *as used in NEPA* requires considerations of both context and intensity.") (emphasis added).

Far from missing analyses, the Forest Service adequately explained its rationale that the AMP will not have significant

cumulative effects.  Plaintiffs only disagree with that finding.  But "[w]hether a given resource will be [a]ffected by activities in its surrounding is a scientific determination within the agency's expertise." *Friends of Wild Swan* 321 F. Supp. 3d at 1190.  Therefore, Plaintiffs' claim fails.

## II.   The Forest Service's FONSI was not arbitrary or capricious.

"Whether an action 'significantly' affects the environment requires analyzing both 'context' and 'intensity.'" *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (citing 40 CFR § 1508.27 (2018)).  An agency's finding of no significant impact "may be overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004) (quoting *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002)).

Examining the context and intensity of the AMP in light of the extensive analyses contained in the EA and various specialist reports, the Forest Service reasonably found that preparation of an EIS was not necessary because the decision to allow continued grazing under modified conditions will not have a significant effect on the

environment.  AR_2243-47.  This conclusion was entirely reasonable
and should be upheld.  *See Marsh v. Oregon Nat. Res. Council*, 490 U.S.
360, 378 (1989) ("When specialists express conflicting views, an agency
must have discretion to rely on the reasonable opinions of its own
qualified experts even if, as an original matter, a court might find
contrary views more persuasive.").

Plaintiffs nevertheless insist that five of the intensity factors
render the Forest Service's FONSI arbitrary.  Plaintiffs claim that the
AMP (1) significantly affects "ecologically critical areas"; (2) has "highly
controversial" effects; (3) has "highly uncertain" effects; (4) has
cumulatively significant impacts; and (5) may adversely affect a listed
species in a significant manner.  Pls. Br. 39-40.

All of these significance criteria, however, are by their terms
matters of *degree*: nothing in the language of the regulation suggests
that some potential negative effects of a project renders a FONSI
arbitrary or capricious.  *Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233, 1240 (9th Cir. 2005) (declining to require "preparation of
an EIS any time that a federal agency discloses adverse impacts on
wildlife species or their habitat").  Instead, as long as the FONSI and its

supporting documents provide a "convincing statement of reasons" as to why a project's impacts are insignificant, the FONSI should be upheld. *Id.* at 1239; *see also Bering Strait Citizens for Resp. Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 956-57 (9th Cir. 2008) (upholding agency's "reasonable approach" to assessing significance).

### A. The AMP does not significantly affect ecologically critical areas.

In assessing whether a proposed action is significant, agencies consider the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). The Forest Service noted that the allotments are near the Absaroka-Beartooth Wilderness, the North Absaroka Roadless Area, and the Dome Mountain Wildlife Management Area but that neither active livestock grazing nor infrastructure development would occur in these areas. AR_2244. Thus, the Forest Service reasonably determined that the AMP's proximity to these areas would not create significant impacts.

Plaintiffs claim that the unique characteristics of the "Absaroka Mountains" as an area with "critical ecological value" for grizzly bear

connectivity supports a finding of significance.  Pls. Br. 40-41.  But the

inquiry is not whether there are unique characteristics of the

geographic area; instead, the inquiry is whether the AMP would

*significantly* affect any such characteristics.  Plaintiffs rely on their

argument about connectivity to suggest that the AMP would have a

significant impact.  *See id.*  As discussed above in Section I.C, however,

the Forest Service explained that any potential increase in livestock-

bear conflicts or effect on grizzly bear movements caused by the AMP

would not be significant.  *Supra* at 28-31.

In short, the Forest Service properly "articulated a sufficient

rational connection between the facts found and the conclusion that no

significant impact will occur in the [Project area]."  *Conservation Nw. v.*

*U.S. Forest Serv.*, No. 05-cv-0220-EFS, 2005 WL 2077807, at *4−5 (E.D.

Wash. Aug. 26, 2005); *Friends of the Wild Swan v. Weber*, No. 12-cv-29-

M-DLC-JCL, 2013 WL 12344841, at *8 (D. Mont. June 3, 2013), *report*

*and recommendation adopted*, No. 12-cv-29-M-DLC, 2015 WL 13715966

(D. Mont. Feb. 23, 2015) ("Plaintiffs neither present any argument, nor

identify any evidence in the record that raises a substantial question as

to the severity or significance of any impact the project may have due to that close proximity.").

### B. The AMP's effects are not highly controversial.

To determine whether a proposed action is significant, an agency may consider the "degree to which the effects . . . are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4).  Effects are likely to be highly controversial only if there is "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Barnes v. FAA*, 865 F.3d 1266, 1275 (9th Cir. 2017) (quoting *Blue Mountains Biodiversity Project*, 161 F.3d at 1212).  "A substantial dispute exists when evidence . . . casts serious doubt upon the reasonableness of an agency's conclusions." *In Def. of Animals*, 751 F.3d at 1069.

The Forest Service did not find any "controversial evidence or disputes related to the cause-effect relationship between domestic livestock and project area resources." AR_2244.  As discussed above in Section I, the Forest Service noted the scientific literature that evidences adverse effects from grazing but explained that these effects

would not be significant, most notably because the AUMs would not increase.  AR_2430.

Plaintiffs fabricate a controversy over the "importance of the project area as a linkage area for grizzly bears moving north out of the GYE."  Pls. 41.  Whether the AMP area is "important" to connectivity is irrelevant without Plaintiffs first establishing that the AMP would significantly increase livestock-related conflicts and that livestock grazing itself significantly impedes the grizzly bear's movements.  Thus, the Forest Service's finding that the AMP's effects on grizzly bear connectivity are not highly controversial was not arbitrary or capricious.

Nor does the 1998 baseline establish a substantial dispute as to the size, nature, or effect of the AMP.  To the contrary, as explained above in Section I.A, the EA and supporting materials fully detailed the scope of the grazing authorized under the AMP and the potential effect of that grazing on grizzly bears.  The 1998 baseline is a benchmark to assess Forest Plan compliance and in no way established a substantial dispute about authorized grazing and its potential effects.  Although Plaintiffs may disagree with how the Forest Service applied its

extensive scientific expertise in assessing those potential effects, such disagreement does not render the FONSI arbitrary or capricious. *See, e.g., Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992) ("Although Greenpeace has demonstrated that some scientists dispute the [agency's] analyses and conclusions, such a showing is not a sufficient basis for us to conclude that the [agency's] action was arbitrary or capricious.").

### C. The AMP's effects are not highly uncertain.

To determine whether a proposed action has significant effects, agencies consider the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). "The cause-effect relationship between domestic livestock and project area resources is well understood." AR_2244. The Forest Service relied on dozens of studies to analyze the AMP's potential effects and lacked no information necessary to reach its conclusions. *Id.*

Still, Plaintiffs contend that the extended grazing season has "highly uncertain" effects on grizzly bears because the studies on which the Forest Service relied did not consider allotments with June stocking

dates.  Pls. Br. 42-43.  But the Forest Service did consider depredations that occurred at the Pine Creek Allotment, which had a June 1 turnout date.  *See* AR_7111; AR_2381.  Thus, this case is easily distinguishable from *Helena Hunter & Angerls v. Tidwell*, 841 F. Supp. 2d 1129, 1137 (D. Mont. 2009), in which the court found that the agency relied largely on the absence of information.

Moreover, an EIS is not required "anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain." *In Def. of Animals*, 751 F.3d at 1070 (quotation omitted).  To find otherwise would seemingly always require an EIS for livestock grazing allotments.  *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1992) ("If this type of disagreement were all that was necessary to mandate an EIS, the environmental assessment process would be meaningless.").

In short, the Forest Service relied on technical expertise and scientific research to conclude that most depredations occur later in summer as grizzly bears prepare for hibernation.  AR_17710; AR_2251. Based on this technical finding, the Forest Service reasonably determined that the AMP's effects are not highly uncertain, and the

Court should "defer to the informed discretion" of the Forest Service.

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989).

### D. The AMP does not have significant cumulative effects.

"Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). Thus, an agency considers "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* Here, the Forest Service explained that because the allotments are in small, isolated areas, "there is little overlap of potential effects with other Forest Service activities." AR_2245. The Forest Service also explained that other past and present activities such as recreation were already considered by incorporation into the existing conditions analyzed. *Id.* The Forest Service thus concluded that the AMP would not result in significant cumulative effects. *Id.*

Plaintiffs rehash their arguments regarding the Forest Service's assessment of cumulative effects. Pls. Br. 43-44. But as discussed above, the EA took a hard look at cumulative effects and reasonably found that there would be no significant cumulative effects. Plaintiffs also continue to rely on the Biological Assessment's cumulative effects

finding to assert that the AMP will have significant cumulative effects warranting an EIS under NEPA. *Id.* But as discussed above in Section I.D, Plaintiffs' arguments fail.

### E. The AMP's adverse effects on the grizzly bear are not significant.

Finally, agencies consider the "degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27(b)(9). "No critical habitat has been designated for grizzly bears." AR_2573. The Forest Service determined that "while there is a potential risk to *individual* bears[,]" the AMP would "not affect the *species* in a potentially significant manner." AR_2247. As the EA explains, the AMP would not change the number of active livestock allotments or AUMs. AR_2429-30.

Plaintiffs' argument ignores that it is not the presence of ESA-listed species that determines a project's significance; it is the *degree of any effect* of a project on the species. *See EPIC*, 451 F.3d at 1012; *see also Native Ecosys. Council*, 428 F.3d at 1240 ("We decline to interpret NEPA as requiring the preparation of an EIS any time that a federal agency discloses adverse impacts on wildlife species or their habitat or

acknowledges information favorable to a party that would prefer a different outcome."). And it is not enough to show potential effects to individuals of a species. The relevant inquiry is what effect a project will have on the species as a whole. *See EPIC*, 451 F.3d at 1010.

Plaintiffs again rely on the Forest Service's ESA determination about adverse effects to grizzly bears to assert that NEPA requires preparation of an EIS. But as explained above, the standard for finding a significant impact under NEPA differs from the standard for finding effects to a species under the ESA. And it is clear that the AMP will have little to no effect on grizzly bears as a species. The Forest Service's finding was not arbitrary or capricious.

### III.    The Court should not vacate the AMP.

Finally, Plaintiffs ask the Court to vacate and remand the AMP. Pls. Br. 44-45. Vacatur is a form of equitable relief, and courts are not mechanically obligated to vacate an agency decision. *See Cal. Comms. Against Toxics v. EPA*, 688 F.3d 989, 992-94 (9th Cir. 2012). "In determining the appropriate remedy, the Court must 'weigh the seriousness of the agency's errors against 'the disruptive consequences' of vacatur." *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152,

1155-56 (D. Mont. 2019).  For the reasons discussed above, the Forest

Service complied with NEPA, and the Court need not consider remedy.

But if the Court reaches the issue of remedy, it would be premature to

address the seriousness of any errors or the disruptive consequences of

vacatur.  Instead, those issues should be addressed only after the

opportunity for supplemental briefing.  *See All. for the Wild Rockies*,

375 F. Supp. 3d at 1154 (declining to vacate the challenged agency

action based on supplemental briefing).

## CONCLUSION

The Forest Service carefully analyzed and documented its

analyses of the AMP before issuing its decision.  Plaintiffs fail to

establish that the AMP violates NEPA, and they have abandoned their

claims under the ESA.  The Court should therefore deny Plaintiffs'

Motion for Summary Judgment and grant Defendants' Cross-Motion for

Summary Judgment.[4]


Respectfully submitted this 9th day of February 2024,

---

[4] This brief complies with the Court's November 22, 2022, Order
limiting the word count to 9,000.  ECF No. 10.

TODD KIM
Assistant Attorney General

*/s/ Krystal-Rose Perez*
JOSEPH W. CRUSHAM
Trial Attorney, CA Bar No. 324764
Wildlife & Marine Resources Section
KRYSTAL-ROSE PEREZ
Trial Attorney, TX Bar No. 24105931
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
(202) 307-1145 (Crusham)
(202) 305-0486 (Perez)
(202) 305-0275 (fax)
joseph.crusham@usdoj.gov
krystal-rose.perez@usdoj.gov

*Counsel for Defendants*