Matthew K. Bishop (Mont. Bar No. 9968)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 324-8011
bishop@westernlaw.org

Kelly E. Nokes (Mont. Bar No. 39465862)
Western Environmental Law Center
P.O. Box 218
Buena Vista, CO 81211
(575) 613-8051
nokes@westernlaw.org

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, a non-profit organization, *et al.*,<br><br>    Plaintiffs,<br><br>  vs.<br><br>RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service, *et al.*,<br><br>    Federal-Defendants. | CV 22-149-M-DLC-KLD<br><br><br>REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

LIST OF ATTACHMENTS ............................................................................ v

INTODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................. 2

    I.    NEPA violations ............................................................................. 2

        A.  Escalating grizzly bear mortalities ............................................ 2

        B.  Earlier stocking dates with young calves ................................. 9

        C.  Connectivity ............................................................................ 11

        D.  Cumulative effects ................................................................... 14

        E.  An EIS is required ................................................................... 19

    II.    Remand with vacatur is appropriate ......................................... 24

CONCLUSION ............................................................................................ 24

CERTIFICATE OF COMPLIANCE ......................................................... 25

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Gassmann,*
    2023 WL 4172930 (D. Mont. 2023) ................................................................ 23

*All. for the Wild Rockies v. Savage,*
    375 F. Supp. 3d 1152 (D. Mont. 2019) .......................................................... 24

*All. for the Wild Rockies v. U.S. Forest Serv.,*
    907 F. 3d 1105 (9th Cir. 2018) ...................................................................... 24

*Bark v. United States Forest Serv.,*
    958 F.3d 865 (9th Cir. 2020) .......................................................................... 19

*Blue Mountains Biodiversity Project v. Blackwood,*
    161 F.3d 1208 (9th Cir. 1998) .................................................... 4, 10, 11, 12, 15

*Cascadia Wildlands v. U.S. Forest Serv.,*
    937 F. Supp. 2d 1271 (D. Or. 2013) .............................................................. 24

*Conservation Cong. v. U.S. Forest Serv.,*
    720 F.3d 1048 (9th Cir. 2013) ........................................................................ 18

*Crow Indian Tribe v. United States,*
    343 F. Supp. 3d 999 (D. Mont. 2018) ............................................................ 11

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.,*
    451 F.3d 1005 (9th Cir. 2006) ........................................................................ 10

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
    36 F.4th 850 (9th Cir. 2022) .......................................................................... 24

*Friends of the Wild Swan v. Kehr,*
    321 F. Supp. 3d 1179 (D. Mont. 2018) .......................................................... 17

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
  726 F. Supp. 2d 1195 (D. Mont. 2010).................................................4, 11, 12

*Grand Canyon Tr. v. Fed. Aviation Admin.*,
  290 F.3d 339 (D.C. Cir. 2002) ................................................................ 15

*Great Basin Mine Watch v. Hankins*,
  456 F.3d 955 (9th Cir. 2006) ................................................................. 15

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
  844 F.3d 1095 (9th Cir. 2016) ................................................................. 5

*Helena Hunter & Anglers v. Tidwell*,
  841 F. Supp. 2d 1129 (D. Mont. 2009)....................................................21, 22

*Idaho Sporting Cong. v. Thomas*,
  137 F.3d 1146 (9th Cir. 1998) ................................................................ 12

*I.N.S. v. Cardoza-Fonseca*,
  480 U.S. 421 (1987)............................................................................. 18

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*,
  387 F.3d 989 (9th Cir. 2004) ............................................................. 14-15

*Nat'l Parks Conservation Ass'n v. E.P.A.*,
  788 F.3d 1134 (9th Cir. 2015) ............................................................... 18

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ................................................................. 22

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
  625 F.3d 1092 (9th Cir. 2010) ............................................................... 17

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)............................................................................ 12

*W. Watersheds Project v. Rosenkrance,*
   2005 WL 1076098 (D. Idaho 2005) ............................................................... 12

## REGULATIONS

36 C.F.R. § 220.7(a) .......................................................................................... 10

40 C.F.R. § 1508.7 (2019) ................................................................................. 18

50 C.F.R. § 402.02 ............................................................................................. 19

50 C.F.R. § 402.14(g)(4) .................................................................................... 19

## INTRODUCTION

This is *the first* time the Forest Service ("the Service") has undertaken a NEPA analysis for the six East Paradise allotments. This is thus the first and only time the Service must take the requisite "hard look" at how its decision to authorize and now expand grazing directly, indirectly, or cumulatively affects grizzly bears.

In response, the Service downplays the effects and insists it fully complied with NEPA. But no support for this position exists in the EA itself. Nowhere in the EA does the Service analyze the existing baseline conditions, including the escalating grizzly bear conflicts occurring in the Greater Yellowstone Ecosystem ("GYE"). Nowhere in the EA does the Service analyze the effects of earlier stocking dates with younger and more vulnerable calves or the effects to grizzly bear connectivity, which is critical for recovery. Nor did the Service analyze the cumulative effects of its decision with development, grazing, and mining occurring on private lands *in the same area*. Substantial questions about the project's significant effects were also raised necessitating the need for an EIS.

# ARGUMENT

## I.     NEPA violations.

### A.     Escalating grizzly bear mortalities.

Grizzly bears in the GYE are experiencing a significant escalation in mortalities from livestock conflicts. Doc. 30 at 19–25.[1] Mortalities from "meat-related conflicts with humans" have proportionally more than doubled since 2000 and more females are dying. *Id*. at 24–25. From 1992–2000 there was an average of only 2 grizzly bear mortalities per year from livestock conflicts. EP-AR-0014891. Now, there are roughly 20. EP-AR-0017789. This spike in mortalities began in the early 2000s and peaked in 2010, following the decline in white bark pine seeds. Doc. 30 at 20–22.

None of this information, however, was discussed or analyzed in the EA. This is because, instead of evaluating existing baseline conditions in 2021 – when the decision was made – the Service arbitrarily relied on a "1998 baseline" for livestock grazing in the GYE. This metric only considers two variables: the number of allotments and the acreage available for grazing in the GYE. EP-AR-002321. But neither of these two variables tells you anything about current baseline conditions or the increased threat to grizzly bears from livestock conflicts. Indeed, even though

---

[1] Citations are to the ECF page number.

there are *fewer* grazing allotments and *less* acreage available for grazing in the GYE as compared to 1998, EP-AR-002322 (Table 20), there are now two to three times as many grizzly bears being killed due to livestock conflicts, including proportionally more females which is synchronous with a plateauing of the GYE population. Doc. 26-1 at ¶50. As explained by Dr. Mattson: "Mindless tallies of numbers and acreages of public land grazing allotments [compared to what existed in 1998] . . . provide little basis for assessing risks posed by cattle on Forest Service lands." *Id*.

In response, the Service insists the EA accounts for existing baseline conditions by estimating the current grizzly population in the GYE, quantifying conflicts, and relying on recent livestock reports. Doc. 35-1 at 36. But none of this information is in the EA. Nor is it helpful.

The Service relies on a "recent livestock report" on the number and acreage of allotments in the GYE (EP-AR-007848) but this is simply a comparison of the number of allotments and acreage available in 2016 against the 1998 baseline which, as previously explained, is unhelpful. The Service also relies on a 2021 annual report for population numbers in the GYE (EP-AR-007969) but this report does not address the escalation in mortalities from livestock conflicts.

The Service also asserts it quantified grizzly bear conflicts associated with livestock conflicts. Doc. 35-1 at 26. For support, however, the agency relies on a post-

decisional 2022 Interagency Grizzly Bear Study Team ("IGBST") report on grizzly bear mortalities from the previous year. *See* EP-AR-0017862, 63, 64-66. Yet none of this information was included or analyzed in the EA, where it must be found. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998). Nor is this information incorporated by reference or otherwise disclosed in the EA. *See Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1213 (D. Mont. 2010) (discussing standard for relying on other information not in the EA).

Notably, much of the information included in the 2022 IGBST report is precisely the type of relevant information on escalating livestock conflicts that should have been (but was not) included in the EA. The 2022 IGBST report reveals, for instance, that there were 158 grizzly bear conflicts on grazing allotments on National Forest System lands in the GYE in 2021 alone. EP-AR-0017863.

In its response, the Service also attempts to distance itself from the 1998 baseline and claims Plaintiffs misunderstand the point of it (and are inappropriately pursuing a substantive attack against the baseline). Doc. 35-1 at 27–28. Not so.

As reflected in the EA, the Service used a 1998 baseline to minimize the effects of its decision and demonstrate and reassure the public that while it was nonetheless expanding grazing in this area it was still operating *below* the 1998 threshold. In other words, the Service leaned into the 1998 baseline as the

4

appropriate metric upon which to analyze and evaluate the effects of its action. *See* EP-AR-002321 (explaining objective to manage within 1998 baseline); EP-AR-002322 (comparing allotments with 1998 baseline); EP-AR-002325 (touting how levels remain below 1998 baseline); EP-AR-002246 (same). The Service certainly has the discretion to rely on various methods or data to evaluate the existing baseline conditions in a NEPA document. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). "But whatever method the agency uses, its assessment of baseline conditions must be based on accurate information and defensible reasoning." *Id.* The 1998 baseline utilized here does neither.

The Service also insists that, regardless of the method used to define the baseline, any concerns are undermined by the lack of recent conflicts within the allotments. Doc. 35-1 at 29. But this is misleading. There have been conflicts *in the project area*, including on adjacent and nearby private lands in the Paradise Valley. *See* EP-AR-007111–14 (conflicts from 1998–2014 in Mill Creek, Paradise Valley, Pine Creek, and Tom Miner Basin); EP-AR-0017863 (2021 conflicts in Tom Miner Basin); Doc. 26-1 at ¶¶60–61 (discussing removal of a female with a cub in 2022 near East Paradise). The 2022 IGBST report also shows three grizzly bear mortalities in or adjacent to the project area in 2021 (two natural; one human-caused). EP-AR-0017790.

The best available science also reveals the past will not be prologue when it comes to grizzly conflicts in the GYE. There will likely be more conflicts and more grizzly bear mortalities given the existing trends and expanded grazing decision (more acreage and a longer season of use). As noted in comments, the East Paradise decision will expand grazing into areas of the GYE that have been vacant for 20 years. EP-AR-0020372. This expansion in conjunction with earlier stocking dates "is a risky endeavor" for grizzly bears. *Id.*

The main point here is that the past offers "no clues regarding what the future might hold in all of these areas, at least insofar as grizzly bear depredation on cattle was concerned … Given the increasing number of grizzly bears observed in this area and the experiences of livestock producers in Tom Miner Basin, there is every reason to anticipate that grizzly bears will predate on cattle in the East Paradise area …." EP-AR-0024689. "The rapid emergence of heavy predation by grizzly bears on cow-calves in locales with comparatively long histories of sympatric cattle and bears highlights the extent to which recent histories of depredation are a poor basis for predicting a rapidly changing future …." Doc. 26-1 at ¶38. High levels of grizzly bear conflicts

6

"can rapidly emerge in areas where whitebark pine has suffered heavy mortality …

[like] the East Paradise allotments." *Id.*[2]

The Service also insists any concerns about escalating conflicts are

undermined by a growing population in the GYE. Doc. 35-1 at 29. The grizzly

population in the GYE, however, has remained largely level since the mid-2000s:



EP-AR-0017783. Yet, during this same period the population experienced a

significant spike in mortalities due to livestock conflicts which outpaced growth:

---

[2] The IGBST's 2023 report (Figure 38 (page 75)) shows more livestock conflicts are occurring in or near the project area. *See* https://igbconline.org/document/yellowstone-grizzly-bear-investigations-2022-igbst-annual-report/. This report also shows the population declined to 965 (page 1).



EP-AR-0024727; *see also* Doc. 30 at 20–25 (discussing same). As explained by Dr. Mattson: the growth rate "substantially declined toward stasis around 2008, concurrent with terminal declines in whitebark pine and marked increase in consumption of meat from anthropocentric sources." Doc. 26-1 at ¶48. During this same period, the grizzly bear's range greatly expanded by roughly 40 percent with an estimated 30 percent of the GYE population now residing *outside* the monitoring area. EP-AR-0021162.

In other words, the grizzly population density decreased during this period while conflicts with livestock escalated. This, in turn, likely had population-level effects. *See* Doc. 30 at 22 (explaining how mortalities pushed the population

estimates into decline from 2014–2016). This escalation is also resulting in more female deaths, which is problematic from a demographic perspective. The "proportion of female deaths doubled from around 20% prior to 2016 to nearer to 40% after 2020. Of these, roughly half were reproductive-aged females." Doc. 26-1 at ¶47. Such mortalities undermine prospects for population growth which depends on survival rates among females. *Id.* at ¶48.

But again, *none* of this relevant information on the existing baseline condition is addressed or analyzed in the EA. This is a major oversight. "Establishing appropriate baseline conditions is critical to any NEPA analysis." *Great Basin*, 844 F.3d at 1101. Without them, "there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Id.*

**B.      Earlier stocking dates with young calves.**

The Service's decision to move the stocking dates up to June 1 (with younger calves) for the East Paradise allotments raised public concern, including by grizzly bear experts. As explained by Dr. Mattson: "earlier stocking [by June 1] with cow-calves *virtually guarantees* increased depredation." EP-AR-0024683 (emphasis added); *see also* Doc. 30 at 28–29 (discussing concerns). This issue, however, was never addressed or analyzed in the EA.

9

In response, the Service insists it took the requisite hard look and "considered this potential" in the EA and ultimately determined it would not have a negative effect on grizzly bears. Doc. 35-1 at 32. Review of the documents relied on, however, reveal otherwise.

For example, the Service cites statements in the EA about cattle numbers and Animal Unit Months ("AUMs") being maintained at existing levels. Doc. 35-1 at 33–34. But managing the allotments to maintain a certain number of AUMs, i.e., the amount of forage available and consumed over the course of a month by a cow, does not address how putting out young calves during their peak age of vulnerability may increase depredation risk. Nor does it qualify as a NEPA analysis.

In fact, there is *no analysis* on the potential effects of earlier stocking dates in the EA. The Service maintains it can legally incorporate other analyses on this subject and did so by relying on a wildlife report, a biological assessment, and a vegetation report. Doc. 35-1 at 34. *Blue Mountains*, however, instructs that the EA is where the analysis and the agency's defense of its position must be found. 161 F.3d at 1214. An EA may incorporate by reference analyses that may exist in other record materials. 36 C.F.R. § 220.7(a). Findings and analyses made in these other documents need not be disregarded in the EA. *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006). But that does not mean the Service can

10

"completely ignore an issue in its NEPA documents" so long as the matter is addressed somewhere else. *Forest Serv. Emps.*, 726 F. Supp. 2d at 1213. The Service, rather, must incorporate the analysis by reference and adequately discuss and address the issue in the NEPA document. *Id.* That never occurred here.

## C.   Connectivity.

Restoring connectivity for grizzly bears between recovery zones in the lower 48 States is critical to recovery. FWS-000505, 597, 667–82; *see also Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1018–21 (D. Mont. 2018) (discussing same); Doc. 30 at 32–33 (same). An important area for connectivity is the Absaroka Mountains where the East Paradise allotments are located. *See* Doc. 30 at 33–36.

Yet, despite receiving comments raising concerns about how livestock grazing may adversely affect grizzly bear connectivity in the area, *see, e.g.*, EP-AR-0020161, 24690, the Service neglected to analyze this aspect of its decision. Nowhere in the EA does the Service analyze let alone mention or discuss how authorizing grazing in this area may directly, indirectly, or cumulatively affect grizzly bear movement and connectivity out of the GYE. This is a violation of NEPA. *Blue Mountains*, 161 F. 3d at 1214. NEPA "guarantees that the relevant information is made available to the larger [public] audience." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). For this reason, an EA must "provide the public with a basis for

11

evaluating the impact of [the proposed action]." *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998).

In response, the Service appears to concede the EA's silence on this topic, choosing instead to refer to what the "record shows" and proffering a series of post-hoc rationalization for why no adverse effects to connectivity exist. Doc. 35-1 at 35–38. This same approach was undertaken and rejected in *Blue Mountains*. There, the Ninth Circuit explained that support for the agency's position cannot be found in a record when the EA "contains virtually no references to any material in support of or in opposition to its conclusions." 161 F. 3d at 1214. "That is where the Forest Service's defense of its position must be found." *Id.*; *see also W. Watersheds Project v. Rosenkrance*, 2005 WL 1076098, *4 (D. Idaho 2005) (explaining same).

As previously mentioned, agencies can incorporate analyses, data, and findings from other documents into the NEPA document. In *Forest Serv. Emps.*, for example, the Service did just that with respect to its analysis of native plant species. 726 F. Supp. 2d at 1213. But there was no incorporation by reference here. Connectivity is not mentioned, discussed, or analyzed in the EA.

Further, none of the information relied on includes the missing analysis on connectivity. The Service cites a grizzly bear assessment (EP-AR-008154) but the langue refers to connectivity inside the GYE (not movement outside the area) and

is not relevant to whether grazing may affect grizzly connectivity in the Absaroka Mountains. The same is true with respect to the other citations provided.

The Service also attempts to interpret Peck (2017) and suggests that connectivity likely occurs in other areas, not the project area. Doc. 35-1 at 36. Peck (2017), however, is not cited or referenced in the EA or decision so the Service's attempt to interpret it now is unhelpful and post-hoc. Regardless, Peck (2017) is entirely consistent with Dr. Mattson's and Dr. Gilbert's findings. *See* Doc. 30 at 33–36 (discussing issue). As explained by Dr. Mattson, the model-based results from Peck (2017) and a more recent study – Sell (2023a) – suggest that eastern portions of the Paradise Valley in the project area play an important "feeder" role in fueling dispersal and colonization that could result in connecting the GYE and NCDE grizzly bear populations. Doc. 26-1 at ¶72; *see also* EP-AR-0024690 (comments noting the same); EP-AR-0020161 (same).

The Service also arbitrarily suggests that managing for connectivity only requires one to focus on transportation planning. Doc. 35-1 at 37. While increased motorized access is one of the most serious threats to grizzly bears, FWS-000506, so too is livestock grazing which results in increasingly high levels of grizzly bear mortality that can and do pose an impediment to connectivity. *Id.*; *see also* FWS-00618-622 (discussing impacts to grizzly bears from grazing).

13

### D.    Cumulative effects.

The East Paradise project area includes the Mill Creek BAU and the Hellroaring #1 grizzly subunit which include over 12,000 acres of private land (and 429 acres of state land). EP-AR-002545. Residential development, livestock grazing, logging, farming and ranching, road building, and even mining is occurring on these private lands. *Id.*; EP-AR-0007885. Yet, nowhere in the EA does the Service analyze the cumulative effects to grizzly bears from these private land activities occurring in the same area.

For example, there is no information or analysis on where, when, and what types of private land development has occurred, is occurring, or is likely to occur within the project area. The same is true with respect to new roads or areas open for motorized access or mining activity on private lands and the existing amount, location, and timing of livestock grazing (or how many grizzly bear conflicts have occurred on such lands). None of this information is included in the EA and evaluated in a cumulative effects analysis as required by NEPA.

"Sometimes the total impact from a set of actions may be greater than the sum of the parts." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004). "[E]ven a slight increase in adverse conditions that form an existing environmental milieu may sometimes threaten harm that is significant."

14

*Grand Canyon Tr. v. Fed. Aviation Admin.*, 290 F.3d 339, 343 (D.C. Cir. 2002).

Analyzing cumulative effects, therefore "requires some quantified or detailed

information; general statements about possible effects and some risk do not

constitute a hard look absent a justification regarding why more definitive

information could not be provided." *Great Basin Mine Watch v. Hankins*, 456 F.3d

955, 971 (9th Cir. 2006). And the "analysis must be more than perfunctory; it must

provide a useful analysis." *Id.* at 971. It is not enough to simply catalogue or briefly

mention other projects – an "adequate analysis" is required. *Id.* at 971-72.

In response, the Service insists the EA took the requisite hard look at the

cumulative effects. But again, there is no support for this position in the EA – where

the analysis must be found. *Blue Mountains*, 161 F. 3d at 1214. Nor is there support

in the record.

The Service maintains it properly incorporated all past effects into an existing

baseline condition. Doc. 35-1 at 40. Yet nowhere in the EA (or record) does the

agency explain or define what that actual baseline is (and which actions are included

within it). Nor does the Forest Service then incorporate that information into a

cumulative effect analysis and evaluate how the effects of the proposed action *when*

*added* to past actions and other future actions may cumulatively affect grizzly bears.

*See* EP-AR-002326.

The Service also insists it analyzed the cumulative effects of all private activities in the EA but the agency provides no citations, analysis, or discussion from the EA itself. Doc. 35-1 at 41. Instead, the Service cites a few sentences from a wildlife report, the majority of which is focused on Canada lynx. *See* EP-AR-0007886. The wildlife report does conclude that mining, firewood gathering, and some recreational activities on private lands would not result in a significant cumulative effect because bears already avoid such areas. *Id.* But no analysis is provided, and nowhere does the agency analyze the two most serious concerns regarding private land use in the area: the increase in housing developments and livestock grazing.

Both of these activities are problematic for grizzly bears because they "may have attractants (including livestock carcasses) or other items that bears may investigate, potentially resulting in habituation, food conditioning, or conditioning." EP-AR-002545. "Grazing activities on private lands have the potential to result in conflicts due to depredations or human-bear encounters." *Id.* Mining activities on private lands also "may potentially modify potential foraging habitat for grizzly bears, have attractants or other items that can lead to conflicts, and cause disturbance that may result in avoidance of these areas by bears." *Id.* But again, none of these issues

16

or effects were discussed, considered, or analyzed in a cumulative effects analysis in the EA (or the internal wildlife report relied on by the agency).

The Service maintains this case is like *Friends of the Wild Swan v. Kehr*, 321 F. Supp. 3d 1179 (D. Mont. 2018). There, however, the EA included the very information – including information on other projects in the same grizzly subunits, an analysis, and explanation – that is missing from this case. *See id.* at 1191–93.

The Service also maintains that cumulative effects concerns are undermined by population estimates for grizzly bears in the GYE. Doc. 35-1 at 42–43. Population numbers, however, are irrelevant to whether cumulative effects were sufficiently analyzed here, when approving the East Paradise allotments. In other words, the number of bears in the GYE – which has remained largely static since the early 2000s and most recently dipped to 965, *see supra* note 2 – tells you nothing about whether the grazing decision, in combination with private land development, grazing, mining, and other activities may cumulatively affect grizzly bears in this area (and possibly create a population sink or ecological trap).

The Service asks for deference but there is no useful cumulative effects analysis in the EA to defer to. This Court "cannot defer to a void." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010). Deference is also not appropriate here, given the competing and inconsistent positions the agency has

17

taken on cumulative effects. *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n. 30 (1987).

In its biological assessment, for instance, the Service explained in detail why there were cumulative effects concerns from private land development, grazing, and mining in the same area. EP-AR-002545. In the EA, however, the Service excluded such information and analysis and told the public just the opposite. EP-AR-0002327. Such inconsistencies are the hallmark of arbitrary action. *Nat'l Parks Conservation Ass'n v. E.P.A.*, 788 F.3d 1134, 1141 (9th Cir. 2015).

The Service insists these findings are not in conflict because NEPA and the ESA are "two different standards" under distinct and different statutes. Doc. 35-1 at 43. This is accurate: NEPA and the ESA are different statutes with a different focus, and the meaning of the term "cumulative effects" under NEPA should not be conflated with the same term in the ESA. *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1055 (9th Cir. 2013). But this distinction is not helpful here, where the issue is the agency's failure to analyze the cumulative effects from *private land* activities. NEPA defines "cumulative effects" broadly to include the proposed action when added to "all other past, present, and reasonably foreseeable future actions," including private actions. 40 C.F.R. § 1508.7 (2019). The ESA defines the term "cumulative effects" more narrowly to only include the effects of "future State or

18

private activities." 50 C.F.R. § 402.02. This is because, under the ESA, past or present private and state actions and other federal actions are already accounted for in the "environmental baseline." 50 C.F.R. § 402.02. Under the ESA, the agency then *adds* the effects of the action and cumulative effects to the environmental baseline for its jeopardy finding. 50 C.F.R. § 402.14(g)(4). Under both NEPA and the ESA, therefore, the Service must account for and analyze the cumulative effects from private actions, which it failed to do here.

### E.    An EIS is required.

An EIS is required if there are "substantial questions" about whether the project may have significant effects. *Bark v. United States Forest Serv.*, 958 F.3d 865, 868 (9th Cir. 2020). This standard is met. Doc. 30 at 46–50. The Service argues otherwise but none of the arguments made have merit. Nor are they supported by the record.

First, the Service insists there is no grazing or infrastructure in designated wilderness or roadless areas. Doc. 35-1 at 47. But this is incorrect. Parts of all six allotments are within the North Absaroka Roadless Area, EP-AR-002375, and some of the allotments are in the Absaroka-Beartooth Wilderness:



EP-AR-002447. Most of the Suce Creek allotment, which contains existing water

developments and livestock fencing, is in wilderness. EP-AR-002274. This allotment

will remain vacant (with existing developments) but not closed and still available for

future use. EP-AR-0002241. Portions of the Sixmile South allotment are also in

wilderness. This allotment burned in 2013 so it will remain vacant "for the time

being" until it is recovered. EP-AR-0002241. The Service also maintains there will be no adverse effects to grizzly bear connectivity in the area but, as previously mentioned, this determination is merely post-hoc – it was never made in the EA.

Second, the Service maintains there are no "highly controversial" effects because AUM levels in the six allotments would not increase. Doc. 35-1 at 50. This, however, is *the first and only* NEPA analysis ever conducted for all six East Paradise allotments and while AUM levels may be retained, significant changes that expand grazing in the area were made. This includes new fencing and water developments, a longer grazing season with earlier stocking dates (with younger and more vulnerable calves), and expansion of the area available for livestock grazing by over 1,300 acres (including within portions of the GYE that have been vacant for 20 years). EP-AR-002237. The Service's reliance on the 1998 baseline as its existing baseline condition is also highly controversial. The 1998 baseline tells you nothing about the effects of the grazing decision issued here, in 2021. *See supra* § I.A.

Third, the Service insists there are no "highly uncertain" effects, including regarding the earlier stocking dates with younger calves. Doc. 35-1 at 52. The agency also maintains it adequately considered and addressed that aspect of its decision so there is no "absence of information" like there was in *Helena Hunter & Anglers v. Tidwell*, 841 F. Supp. 2d 1129, 1137 (D. Mont. 2009). But this is incorrect. Earlier

stocking dates are not addressed in the EA. In the decision, the Service does explain
that "recent studies" have shown "that few depredations have occurred in the month
of June" so increases in depredation are unlikely. EP-AR-002247. The Service's
reliance on those recent studies (Wells (2019) and Gunther (2004)), however, is
misleading because the data used came from allotments stocked *after* June 1. Doc.
26-1 at ¶44. Further, over 90 percent of all allotments in the GYE are stocked after
July 1. *Id.*

Notably, this early stocking date issue – along with the escalating grizzly
conflicts with livestock and the area's importance for connectivity – is precisely the
type of uncertain or controversial issue that would benefit from further analysis in
an EIS. *See, e.g., Helena Hunter & Anglers*, 841 F. Supp. 2d at 1138 (explaining how
uncertainty over whether an area is important for connectivity and the lack of
analysis on that issued warranted an EIS). "Preparation of an EIS is mandated where
uncertainty may be resolved by further collection of data or where the collection of
such data may prevent speculation on potential effects. The purpose of an EIS is to
obviate the need for speculation." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402
F.3d 846, 870 (9th Cir. 2005).

Fourth, the Service asserts it is not reasonable to anticipate any cumulatively
significant impacts to grizzly bears. Doc. 35-1 at 53. Yet, as previously mentioned, the

agency never analyzed the cumulative effects from other actions on private lands in the same area. *See supra* § I.D. And, in this case, it is reasonable to anticipate cumulatively significant effects to grizzly bears based the Service's *own admission* in the biological assessment. *See* EP-AR-002545.

Finally, the Service maintains the East Paradise allotments will have "little to no effect" on grizzly bears. Doc. 35-1 at 55. But, as previously explained, this finding is based on the agency's failure to consider a number of relevant factors. This finding is also contradicted by the agency's own conclusion. *See* EP-AR-0002545. While a "likely to adversely affect" finding under the ESA, by itself, does not automatically trigger significance under NEPA, it is one of many factors that when combined with others does raise substantial questions. *See, e.g., All. for the Wild Rockies v. Gassmann*, 2023 WL 4172930, *31 (D. Mont. 2023) (weighing multiple factors).

The Service also insists that "species" level effects are required to trigger an EIS. Doc. 35-1 at 54. But this raises the bar too high. Under this approach – which presumably would require significant effects to grizzly bears in the lower 48 States (the listed entity), i.e., the equivalent of a species-level jeopardy finding – no individual project would likely qualify for an EIS. While a jeopardy finding would certainly support the need for an EIS, *see, e.g., Forest Serv. Emp.*, 726 F. Supp. 2d at

1218, it should not be a prerequisite for one. *See Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1282 (D. Or. 2013) (jeopardy finding not required). The Ninth Circuit, for example, recently recognized that a "likely to adversely affect" determination was "prima facie evidence that an EIS should have been prepared." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 (9th Cir. 2022).

## II.    Remand with vacatur is appropriate.

Plaintiffs respectfully request this Court declare the Service violated NEPA, vacate the decision, and remand this matter for a new analysis. Vacatur normally accompanies remand in these types of cases, *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F. 3d 1105, 1121 (9th Cir. 2018), except when rare equity considerations demand otherwise, *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019). No rare equity considerations exist here. Nor did the Forest Service allege any in its response.

## CONCLUSION

For these reasons, this Court should grant Plaintiffs' motion and the relief requested.

Respectfully submitted this 8th day of March, 2024.

/s/ Matthew K. Bishop
Matthew K. Bishop

24

<u>/s/ Kelly E. Nokes</u>
Kelly E. Nokes

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 5,000 words in accordance with this Court's October 23, 2023 scheduling order (Doc. 22). I relied on Microsoft Word to obtain the word count.

<u>/s/ Matthew K. Bishop</u>
Matthew K. Bishop