TODD KIM
Assistant Attorney General

JOSEPH W. CRUSHAM, CA Bar No. 324764
Trial Attorney, Wildlife & Marine Resources Section
KRYSTAL-ROSE PEREZ, TX Bar No. 24105931
Trial Attorney, Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
(202) 307-1145 (Crusham)
(202) 305-0486 (Perez)
(202) 305-0275 (fax)
joseph.crusham@usdoj.gov
krystal-rose.perez@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al., | ) ) ) |
| Plaintiffs, | ) Case No. 9:22-cv-149-DLC-KLD ) |
| vs. | ) **FEDERAL DEFENDANTS'** ) **REPLY IN SUPPORT OF** |
| RANDY MOORE, et al., | ) **THEIR CROSS MOTION FOR** ) **SUMMARY JUDGMENT** |
| Defendants. | ) ) |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 1

    I.    The Forest Service took a hard look at the AMP's
        potential effects ...................................................................... 3

        A.    The Forest Service properly considered existing
               conditions ...................................................................... 4

        B.    The Forest Service considered the potential
               impacts of earlier grazing dates .................................... 9

        C.    The Forest Service properly addressed connectivity
               of grizzly bear habitat ................................................. 12

        D.    The Forest Service adequately analyzed potential
               cumulative effects ........................................................ 14

    II.    The Forest Service's FONSI was not arbitrary or
         capricious ................................................................................ 16

    III.    The Court should not vacate the AMP ................................. 20

CONCLUSION .......................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies* v. Savage,
  375 F. Supp. 3d1152 (D. Mont. 2019) ................................................. 21

*Am. Rivers v. FERC*,
  201 F.3d 1186 (9th Cir. 1999) ........................................................ 9

*Conservation Cong. v. U.S. Forest Serv.*,
  720 F.3d 1048 (9th Cir. 2013) ...................................................... 19

*Ctr. for Biological Diversity v. Blank*,
  933 F. Supp. 2d 125 (D.D.C. 2013) ................................................. 11

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
  844 F.3d 1095 (9th Cir. 2016) ........................................................ 8

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir. 1992) ........................................................ 18

*League Of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*,
  615 F.3d 1122 (9th Cir. 2010) ........................................................ 2

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
  137 F.3d 1372 (9th Cir. 1998) ........................................................ 3

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) .................................................................. 8

*Tri-Valley CAREs v. U.S. Dep't Energy*,
  671 F.3d 1113 (9th 2012) ...................................................... 2, 3, 11

**Regulations**

40 C.F.R. § 1500.1(b) ................................................................ 2

## INTRODUCTION

In their attack on the Forest Service's decision to approve the East Paradise Range Allotment Management Plan (AMP) on the Custer Gallatin National Forest, Plaintiffs myopically focus on isolated incidents of livestock-grizzly bear conflicts unaffiliated with the allotments and exaggerate potential adverse effects to grizzly bears, ignoring entirely the grizzly bears' successful recovery across the Greater Yellowstone Ecosystem (GYE). Plaintiffs also misleadingly characterize the AMP as expanding livestock grazing when overall animal unit months will remain the same as before the AMP decision.

Contrary to Plaintiffs' portrayal, the Administrative Record shows that the Forest Service complied with the National Environmental Policy Act (NEPA) by taking a hard look at the AMP's potential environmental effects and in issuing its Finding of No Significant Impact (FONSI). Plaintiffs fail to establish otherwise, and the Court should deny their Motion for Summary Judgment, grant Defendants' Cross-Motion, ECF No. 30, and enter judgment in favor of Defendants.

## ARGUMENT

In their Reply, ECF No. 36, Plaintiffs continue to argue that the Forest Service failed to take a hard look at the AMP's potential effects

on grizzly bears and that the Forest Service should have prepared an
Environmental Impact Statement (EIS) instead of an Environmental
Assessment (EA).

Plaintiffs' critique largely focuses on the EA's contents, ignoring
the rest of the Administrative Record in this case. But requiring the
Forest Service to provide the type of in-depth analyses in the EA that
Plaintiffs demand goes beyond NEPA's procedural mandates. *See Tri-
Valley CAREs v. U.S. Dep't Energy*, 671 F.3d 1113, 1129 (9th 2012)
("The purpose of an EA is not to compile an exhaustive examination of
each and every tangential event that potentially could impact the local
environment. Such a task is impossible and never-ending."); *League Of
Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d
1122, 1136 (9th Cir. 2010) ("NEPA documents must concentrate on the
issues that are truly significant to the action in question, rather than
amassing needless detail." (quoting 40 C.F.R. § 1500.1(b)).

As discussed below, the record demonstrates that the Forest
Service took a hard look at the AMP's potential environmental
consequences and reasonably determined that the AMP would not cause
a significant impact on the environment. Plaintiffs do not meet their

burden of establishing that the Forest Service's decision was arbitrary or capricious.

## I.    The Forest Service took a hard look at the AMP's potential effects.

As explained in Defendants' opening brief, an EA satisfies NEPA's hard-look mandate if it contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998); *see also Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) ("The purpose of an EA under NEPA is not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or [FONSI].").

Here, the Forest Service met this standard by properly considering the project area's existing conditions, assessing the potential impacts of earlier stocking, evaluating the possibility that connectivity could be impacted by continued livestock grazing, and adequately analyzing the AMP's cumulative effects.

## A. The Forest Service properly considered existing conditions.

The Forest Service sufficiently described the existing conditions against which the AMP's impacts can be compared. *See* Defs.' Combined Br. in Support of Cross-Mot. for Summary J. and Opp'n to Pls.' Mot. for Summary J. (Defs. Br.) 15-16, ECF No. 35-1. As explained in Defendants' opening brief, the Forest Service established the baseline by disclosing the grizzly bear population, habitat, and grazing allotments across the recovery zones. *Id.* (citing AR_7845-46; AR_15393; AR_2426; AR_7971).

The Forest Service also included livestock-bear conflicts in the baseline. *Id.* (citing AR_2427-31; AR_7111-14). Indeed, the Forest Service disclosed the very increase in conflicts that Plaintiffs are concerned about, Pls. Reply 4, and explained that as the population continues to expand, the percentage of known and probable mortalities is increasing, which was expected due to increased conflicts with humans and livestock in these areas. AR_17468; *see also* AR_2542-44, 2579-84 (addressing the potential for increased conflict and altered foraging behavior associated with the AMP).

Plaintiffs criticize the Forest Service's description of existing conditions by arguing that "estimating the current grizzly population in the GYE, quantifying conflicts, and relying on recent livestock reports" are not helpful to assess the conditions on the ground.  Pls. Reply 3.  But Plaintiffs still offer no alternative method for evaluating the current situation.  Worse, Plaintiffs fail to explain *why* the Forest Service's description of existing conditions is supposedly unhelpful.

Plaintiffs suggest that the Forest Service's baseline omits an increase in grizzly bear mortalities since the early 2000s following a decline in white bark pine seeds.  Pls. Reply 2-3.  Not only are the recent mortalities included in the baseline, but also Plaintiffs' critique ignores that in the same timeframe the grizzly bear population has increased and spread out across the whole GYE leading to more human conflict. Defs. Br. at 23.

Plaintiffs also critique the baseline analysis by selectively choosing data to suggest that grizzly bear population growth has been outpaced by livestock conflict-based mortalities.  *See e.g.*, Pls. Reply 7 (selectively providing data in an isolated time period when conflicts outpaced growth); Pls. Reply 8 (emphasizing female population decline

in the same isolated time period).  But as the record makes clear, the stabilization of the grizzly bear population is not driven by conflict-base mortality.  To the contrary, the population has simply, and naturally, stabilized over time within the GYE: "stabilization over 13 years is strong evidence that the population is exhibiting density-dependent population regulation inside the demographic monitoring area . . . ." AR_2575; *see also* AR_17468 (explaining that increased conflicts with humans and livestock were expected as a result of the grizzly bears' continued population expansion).

Plaintiffs provide no support for their assertion that the stabilized population is due to a decline in certain food sources, such as whitebark pine, and instead merely correlate the two. *See* Pls. Reply 7-8. On the other hand, the Forest Service relied on has explained that population naturally stabilized in connection with reduced survival of dependent young and lower reproduction in areas with higher grizzly bear densities, suggesting density dependent effects associated with the population approaching carrying capacity. *See* AR_16509 (no

appreciable change in the patterns of fall movements for grizzly bears

within the GYE during the decline of WBP).[1]

Finally, Plaintiffs continue to confuse the Forest Service's use of

the 1998 baseline.  Pls. Reply 5.  As detailed above and in Defendants'

opening brief, the 1998 baseline was not used by the agency as a

measure of *existing conditions*.  Defs. Br. 20-22.  To the contrary, the

1998 baseline is a benchmark incorporated into the Gallatin Forest

Plan to enable the Forest Service to measure the success of *conservation

efforts* by focusing on maintaining or improving on conditions that

existed in 1998.  *See* AR_15425; *see also* AR_7881; AR_2425; AR_17871.

While the Forest Service uses this Forest Plan metric in compliance

with NFMA, the 1998 baseline is not used for considering the existing

---

[1] Plaintiffs improperly rely on post-decisional information, citing a 2022 report issued by the Interagency Grizzly Bear Committee.  Pls. Reply 7, n.2.  Even if the Court considers this extra-record evidence, it supports the Forest Service's position, not Plaintiffs' position.  The report states that because "the GYE grizzly bear population may have reached or exceeded its biological carrying capacity in portions of the ecosystem" grizzly bears are "more likely to encounter food sources such as garbage, pet food, livestock and livestock feed, and a myriad of other attractants resulting in increased property damage and threats to human safety." *Yellowstone Grizzly Bear Investigations 2022 IGBST Annual Report*, available at https://igbconline.org/document/yellowstone-grizzly-bear-investigations-2022-igbst-annual-report/.

conditions under NEPA.  *See* Defs. Br. 19 ("The Forest Service detailed

the existing condition by disclosing the GYE grizzly bear population and

secure habitat[,]" quantifying conflicts associated with livestock

depredation, and disclosing "the number of active, vacant, and closed

allotments, along with their acreage, that are within the grizzly bears'

recovery zone.").

Plaintiffs contend their attack of the 1998 baseline is not

substantive, but their position is clear: Plaintiffs dispute the 1998

baseline as an appropriate measure of grizzly bear recovery.  Such an

attack cannot support a NEPA violation.  *See Ohio Forestry Ass'n, Inc.*

*v. Sierra Club*, 523 U.S. 726, 737 (1998) ("NEPA, unlike the NFMA,

simply guarantees a particular procedure, not a particular result.").  In

short, Plaintiffs merely disagree with the use of the 1998 baseline to

assess conservation of grizzly bears but "have not shown that this

choice rested on inaccurate information or indefensible reasoning."

*Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1102

(9th Cir. 2016).  Nor have they identified any critical information

missing from the Forest Service's description of existing conditions.

To summarize, the Forest Service properly considered the existing conditions to analyze the AMP's potential impacts. This baseline against which the Forest Service assessed the AMP's possible effects is supported by the agency's expertise and subject to judicial deference. *See Am. Rivers v. FERC*, 201 F.3d 1186, 1199 (9th Cir. 1999) ("[W]e defer to the Commission's decision to use an existing project environmental baseline."). And Plaintiffs' mere disagreement with the Forest Service's use of the 1998 baseline to comply with Forest Plan standards does not establish a NEPA violation. Therefore, Plaintiffs' claim fails.

## B. The Forest Service considered the potential impacts of earlier grazing dates.

Two of the six allotments analyzed will have an earlier turnout date than previous seasons. The Forest Service explained that it authorized June 1 as the beginning of the grazing season to "move upland vegetation toward desired conditions." AR_2296. However, the turnout date will likely vary depending on the annual conditions. AR_2382. The Forest Service considered the possibility that earlier turnout would increase the risk of depredation but reasoned that the impact would not be significant because of mitigating factors. *See e.g.*,

Defs. Br. 26-27 ("most depredations occur within the hyperphagia period"); *see also* AR_2324; AR_2542-47; AR_8389 (noting last recorded depredation on private lands within the project area was in 2011); AR_2537-42, 2575-78 (describing historic conflicts, distribution of the species, current allotment status, habitat requirements, population status, management direction, and key factors affecting the species). Plaintiffs ignore these mitigating factors and instead rely on improper extra-record and post-decisional evidence, Pls. Reply 5. The decision was well-reasoned and fully explained.

First, although the grazing season may be longer, the AMP does not expand overall grazing as Plaintiffs claim. Pls. Reply 6. As explained in Defendants' opening brief, the total animal unit months (AUMs) have not increased. Defs. Br. 26 (quoting AR_2520). Moreover, cattle grazing will not be allowed during June more than two years in a row. AR_3466; *see also* AR_2382-83.

Second, Plaintiffs argue that "managing the allotments to maintain a certain number" of AUMs still leaves young calves vulnerable. Pls. Reply 10. But Plaintiffs fail to provide any examples of increased calf predation where the turnout date was already June 1,

such as in the Pine Creek Allotment.  Plaintiffs also mischaracterize the importance of the maximum AUMs imposed.  The Forest Service does not manage the allotments to maintain AUMs but instead determines the suitability and capability (carrying capacity) of the land to determine the stocking rates and allowable or proper use that promotes maximum grazing of forage sources without damaging the vegetation. AR_3416-19.  The Forest Service relied on field studies to determine that the allotments can support the authorized amount of animal units but will adjust based on Adaptive Management strategies as described in the Decision Notice.  AR_2250, 2253, 2254.

Finally, Plaintiffs appear to concede that the specialist reports include the very analysis they complain is missing.  *See* Pls. Reply 10-11.  Plaintiffs wholly rely on a form-over-substance argument, insisting that every detail of the Forest Service's analyses must be in the EA.  *Id*. But as already explained, the Court is not confined to the "four corners of the EA" and should look to the entire record.  *Ctr. for Biological Diversity v. Blank*, 933 F. Supp. 2d 125, 151-52 (D.D.C. 2013); *Tri-Valley*, 671 F.3d at 1124.

In short, the Forest Service took a hard look at the potential impacts of the AMP's earlier stocking dates.  Plaintiffs fail to establish otherwise, and this claim fails.

### C. The Forest Service properly addressed connectivity of grizzly bear habitat.

The Forest Service reasonably determined that any disturbance to grizzly bears from human presence on the landscape during project implementation would be small in scale and temporary in nature. AR_2323.  While acknowledging the impacts of livestock grazing on grizzly bears, *see e.g.*, AR_2324 ("Commercial livestock grazing represents one of the activities associated with human use with the highest potential for negative conflict with grizzly bears."), the Forest Service recognized that grizzlies are wide ranging and mobile species that may move from habitats temporarily occupied by humans and easily return when people have vacated.  AR_2323.  Bears continue to disperse all around the GYE.  AR_7971.  The outlying dispersals do not represent occupied range; rather, they reveal the edges of expansion as dispersing grizzly bears search for new areas.  AR_2574.

Range expansion and population increases, including into eastern portions of the GYE, have occurred concurrently with livestock

grazing—suggesting that grazing has had little to no discernible effect on the GYE grizzly bear population status or achievement of GYE grizzly bear recovery goals.  *See* AR_2576.  The Forest Service has and will continue to manage the lands in the project area to allow grizzly bears to expand, survive, and reproduce.  AR_2584.

Nevertheless, Plaintiffs take issue with the Forest Service's analysis of grizzly bear movements *outside* of the GYE, claiming no discussion exists.  Pls. Reply 11; Pls. Reply 12 (citing AR_8154).  Not so. The Forest Service discussed the continued expansion of grizzly bears into range *outside* of the recovery zones.  *See* AR_2576.

Plaintiffs fail to provide any evidence that seasonal livestock grazing truncates or curtails grizzly bear movements.  Plaintiffs offer as their only support the extra-record Mattson declaration.  Pls. Reply 13. Not only is the Mattson declaration factually incorrect, *see e.g.*, AR_2588 (describing the "suboptimal habitat conditions" outside of the recovery zones), but also it is not properly before the Court and should not be considered here.  *See* Defs.' Opp'n to Pls.' Mot. to Admit Extra-Record Evid., ECF No. 31.

Finally, Plaintiffs focus their attack on the format of the Forest Service's analyses and scientific determinations. *See* Pls. Reply 11. Even though Plaintiffs acknowledge that an analysis of connectivity relates to species recovery, they fail to acknowledge that the proper place for such analysis is in the consultation documents—where the Forest Service provided it. Tellingly, Plaintiffs abandoned their Endangered Species Act (ESA) claims and chose only to argue their NEPA claims in briefing by fly-specking the Forest Service's NEPA analysis. But NEPA does not require agencies to duplicate their analyses in EAs. And here, the EA sufficiently supports the Forest Service's decision by disclosing the AMP's impacts and referring to the analyses found in the record.

In short, the Forest Service took a hard look at potential effects to connectivity in light of the minimal potential effects the AMP may have on grizzly bear movements. This satisfied NEPA.

### D. The Forest Service adequately analyzed potential cumulative effects.

Plaintiffs' final "hard look" critique is that the Forest Service did not consider certain actions in combination with the AMP to determine the cumulative effects. Pls. Reply 14 (suggesting that activities on

private lands were not considered).  To the contrary, the record shows

that the Forest Service properly considered the cumulative impacts of

past, present, and future actions as required by NEPA.  *See* Defs. Br.

32; *see also* AR_2576-89.

For example, the Forest Service looked at increased recreation

and overall human use.  AR_2431.  The Forest Service also considered

potential projects on the Forest, including reconstructions of the Sixmile

Trailhead, which was damaged in the 2013 Emigrant Fire, and a

proposal to relocate the source of the water diversion in the Pine Creek

Allotment.  AR_2431 ("The largest threat to wildlife species continues to

be large scale land conversion in the form of changing land use or

occupancy."); AR_2326-27 (addressing timber sales); AR_7885-87

(discussing livestock grazing on federal lands, timber harvest, farming,

ranching, road construction and residential development on private

lands); AR_2545 (addressing impacts associated with grizzly bear

mortalities).

Plaintiffs contend the Forest Service should have provided more

information.  *See* Pls. Reply 14 (demanding more information about

"where, when, and what types of private land development has

occurred, is occurring, or is likely to occur"). Plaintiffs specifically refer to "new roads"; "motorized access"; and mining on private lands and insist that the Forest Service should have provided the "location, and timing of livestock grazing (or how many grizzly bear conflicts have occurred on such lands)." Pls. Reply 14. But Plaintiffs fail to identify any action allegedly not considered nor do they establish that the Forest Service had an obligation to consider these in its cumulative effects analysis.

At bottom, Plaintiffs demand information that was unnecessary for the Forest Service to determine that the AMP will not significantly affect grizzly bears because the GYE population is currently meeting all recovery criteria. AR_7971-72; AR_7887; *see also* AR_2585. Plaintiffs fail to demonstrate that the Forest Service's cumulative impacts analysis was inadequate. Therefore, Plaintiffs' claim fails.

## II.    The Forest Service's FONSI was not arbitrary or capricious.

Plaintiffs assert that the Forest Service should have prepared an EIS because of five intensity factors. *See* 40 C.F.R. §§ 1508.27(b)(3)-(5), (7). But again, Plaintiffs largely ignore important analyses in favor of

selective irrelevant data.  The Forest Service's decision to prepare an
EA was neither arbitrary nor capricious.

First, Plaintiffs fail to establish that the AMP significantly affects
ecologically critical areas.  *See* Pls. Reply 19.  The Forest Service noted
that the allotments are near the Absaroka-Beartooth Wilderness, the
North Absaroka Roadless Area, and the Dome Mountain Wildlife
Management Area but that neither active livestock grazing nor
infrastructure development would occur in these areas.  AR_2244.
Plaintiffs claim this information is wrong because "[p]arts of all six
allotments are within the North Absaroka Roadless Area" and that
"some of the allotments are in the Absaroka-Beartooth Wilderness," Pls.
Reply 19 (citing AR_2375).  Confusingly, Plaintiffs direct the Court's
attention to *vacant* allotments—where no livestock grazing will occur
without further NEPA, Pls. Reply 20; AR_2520.  And all of the
infrastructure that Plaintiffs complain about serves to lower the
impacts of livestock grazing.  AR_7887; AR_7879.

Plaintiffs only real dispute is that the Forest Service's connectivity
analysis was allegedly not sufficiently detailed in the EA.  But as
already discussed, Plaintiffs' form-over-substance argument cannot

prevail.  *See supra* section I.B.  For these reasons, Plaintiffs fail to establish that the Forest Service should have prepared an EIS because of ecologically critical areas.

Second, nothing about continuing to authorize livestock grazing in the project area is controversial.  Plaintiffs argue the contrary, merely relying on their arguments about the 1998 baseline and earlier stocking dates.  Pls. Reply 21.  Plaintiffs' argument clearly indicates they mean to substantively challenge the 1998 baseline itself.  But as explained in Defendants' opening brief, the Ninth Circuit requires more than a mere "dispute" over the science supporting the agency action to establish a controversy under the NEPA regulations.  *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992).

Third, despite the well-established livestock grazing practices in the project area, Plaintiffs claim that the AMP's effects are highly uncertain.  Pls. Reply 21.  But Plaintiffs simply refer to their arguments about earlier stocking dates without adding anything new.  *See* Pls. Reply 21-22.  And as discussed about in Section I.B, the Forest Service adequately considered the potential impacts of starting the grazing season earlier, especially considering one of the allotments already had

a June 1 season start.  Because Plaintiffs fail to establish that the AMP's potential effects are "highly uncertain," they cannot show that an EIS was warranted.

Fourth, Plaintiffs provide no basis on which to find that the AMP combines with other actions to significantly affect the environment. Pls. Reply 23.  Instead, Plaintiffs rely on a single statement in the Forest Service's Biological Assessment—a document prepared in accordance with the ESA.[2]  Pls. Reply 22-23.  However, Plaintiffs also concede that the ESA has a different standard than NEPA.  *See* Pls. Reply 18.  Thus, Plaintiffs' claim does not withstand scrutiny.  *See Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1055 (9th Cir. 2013) (noting that ESA's definition of "cumulative effects" applies only "to ESA section 7 analyses and should not be conflated with NEPA's broader term 'cumulative impact'").

Finally, Plaintiffs continue to conflate the ESA and NEPA— distinct statutes with different standards—to argue that the AMP may

---

[2] The BA concluded that "the resulting cumulative impact would be neither beneficial, discountable, or insignificant." AR_2545.  Plaintiffs point to this conclusion to claim that the EA failed to take a hard look at the AMP's potential cumulative effects.

have significant impacts on grizzly bears.  Pls. Reply 23.  But again,

Plaintiffs concede that the Forest Service's findings under the ESA do

not equate to a finding of significance under NEPA.  *See id.*  Plaintiffs

vaguely refer to "a number of relevant factors" that the Forest Service

should have considered in its analysis.  However, as discussed in

Section I, the Forest Service took a hard look at the AMP's potential

effects.  Therefore, Plaintiffs fail to demonstrate that the AMP may

have significant impacts on grizzly bears.

### III.    The Court should not vacate the AMP.

As Defendants requested supplemental briefing regarding

whether vacatur is an appropriate remedy here, Defendants did not

address in its opening summary judgment brief the considerations that

the Court should take into account if the issue of remedy is reached.  If

the Court finds that reaching this issue is unnecessary, as it should

because the Forest Service complied with NEPA, then providing any

briefing would be a waste of resources at this juncture.  Instead, those

issues should be addressed only after the Court has decided the merits

of this case and has had the benefit of the parties' supplemental briefs.

*See All. for the Wild Rockies*, 375 F. Supp. 3d at 1154 (declining to

vacate the challenged agency action based on supplemental briefing).

## CONCLUSION

The Forest Service carefully analyzed and documented its analyses of the AMP before issuing its decision.  Plaintiffs fail to establish that the AMP violates NEPA, and they have abandoned their claims under the ESA.  The Court should therefore deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.[3]


Respectfully submitted this 5th day of April 2024,


TODD KIM
Assistant Attorney General

 /s/ Krystal-Rose Perez
JOSEPH W. CRUSHAM
Trial Attorney, CA Bar No. 324764
Wildlife & Marine Resources Section
KRYSTAL-ROSE PEREZ
Trial Attorney, TX Bar No. 24105931
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
150 M Street, N.E.
Washington, D.C. 20002

---

[3] This brief complies with the Court's November 22, 2022, Order limiting the word count to 5,000.  ECF No. 10.

(202) 307-1145 (Crusham)
(202) 305-0486 (Perez)
(202) 305-0275 (fax)
joseph.crusham@usdoj.gov
krystal-rose.perez@usdoj.gov

*Counsel for Defendants*