IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al., | CV 22–149–M–DWM |
| Plaintiffs, | |
| vs. | ORDER |
| TOM SCHULTZ, in his official capacity as Chief of the U.S. Forest Service, et al., | |
| Defendants. | |

Plaintiffs are environmental organizations challenging the United States

Forest Service's (the "Forest Service") authorization of continued and expanded

commercial livestock grazing leases on six allotments in the Absaroka Beartooth

Mountains in southcentral Montana ("East Paradise Range Allotment Management

Plan," the "East Paradise Plan," or the "Decision"). (Doc. 20.) Plaintiffs' claims

are three-fold. First, Plaintiffs allege that the Forest Service and the United States

Fish and Wildlife Service ("Fish and Wildlife") violated the Endangered Species

Act ("ESA") in concluding that the East Paradise Plan would pose "no jeopardy"

to the grizzly bear. (*Id.* ¶¶ 113–27.) Second, Plaintiffs alleged that the Forest

Service violated the National Environmental Policy Act ("NEPA") by failing to

analyze the direct, indirect, and cumulative effects the East Paradise Plan would

1

have on grizzly bears. (*Id.* ¶¶ 128–33.) Finally, Plaintiffs allege that the Forest Service was required to prepare an environmental impact statement ("EIS") and failed to do so in violation of NEPA. (*Id.* ¶¶ 134–41.)

The parties' filed cross-motions for summary judgment, (Docs. 29, 35), and a motion hearing was held before United States Magistrate Judge Kathleen L. DeSoto on October 29, 2024, (*see* Doc. 47 (transcript)). Plaintiffs also moved to supplement the administrative record. (Doc. 25.) On March 27, 2025, Judge DeSoto entered Findings and Recommendations, recommending that the Plaintiffs' motion to supplement be denied, Plaintiffs' ESA claim be dismissed as waived, and Plaintiffs' NEPA claims be granted in part and denied in part. (Doc. 49) The parties filed objections, (*see* Docs. 53–56), triggering *de novo* review of the identified portions of the Findings and Recommendations, 28 U.S.C. § 636(b)(1). Those objections are addressed individually below. The Findings and Recommendations are otherwise reviewed for clear error. *See Thomas v. Arn*, 474 U.S. 140, 154 (1958); *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000) (defining "clear error"). Because Judge DeSoto provided a complete background of the Decision, (*see* Doc. 49 at 2–4), it is not restated here.

## LEGAL STANDARDS

"[NEPA] is a procedural statute that requires federal agencies to take a 'hard look' at the environmental consequences of their actions." *N. Cascades*

*Conservation Council v. U.S. Forest Serv.*, 136 F.4th 816, 821 (9th Cir. 2025)

(internal quotation marks omitted).  To satisfy the "hard look" requirement, an

agency must provide "a reasonably thorough discussion of the significant aspects

of the probable environmental consequences."  *Ctr. for Biological Diversity v.*

*Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008).  NEPA

requires agencies to prepare an EIS for "major Federal actions significantly

affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  To

determine whether an EIS is necessary, an agency "may prepare an Environmental

Assessment ("EA") first."  *N. Cascades*, 136 F.4th at 821 (citing 40 C.F.R.

§ 1508.1(j) (2024)).[1]  "[Courts] examine the EA with two purposes in mind: to

determine whether it has adequately considered and elaborated the possible

consequences of the proposed agency action when concluding that it will have no

significant impact on the environment, and whether its determination that no EIS is

required is a reasonable conclusion."  *Ctr. for Biological Diversity*, 538 F.3d at

1215.  "An EIS must be prepared if substantial questions are raised as to whether a

project may cause significant degradation of some human environmental factor."

---

[1] NEPA's implementing regulations have since been rescinded.  *See* Removal of
Nat'l Envtl. Policy Act Implementing Regs., 90 Fed. Reg. 10610 (Feb. 25, 2025).
Because the Forest Service opted to proceed under the 1978 regulations, *see*
AR_2375, those regulations are applied here.

*Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (internal quotation marks and alteration omitted).

The Forest Service's compliance with NEPA is reviewed under the Administrative Procedure Act ("APA"). *N. Cascades*, 136 F.4th at 824. The APA authorizes a court to "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the administrative record demonstrates that "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where an agency's administrative record is complete and constitutes the whole and undisputed facts underlying agency decisionmaking, summary judgment is appropriate. *See City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997).

## ANALYSIS

Plaintiffs argue that the Forest Service failed to take the requisite "hard look" under NEPA at the East Paradise Plan's potential effects on grizzly bears by

4

(1) relying on inadequate baseline information, (2) downplaying the effect of earlier stocking dates, (3) failing to assess potential effects to habitat connectivity, (4) not sufficiently considering cumulative effects, and (5) failing to prepare an EIS. Judge DeSoto recommends finding in favor of Plaintiffs on all but the first ground. (*See* Doc. 49.) Judge DeSoto also recommends Plaintiffs' motion to supplement the administrative record be denied and Plaintiffs' ESA claims be dismissed as waived. (*See id.*) Having reviewed the parties' objections de novo, 28 U.S.C. § 636(b)(1), and the remainder of the Findings for clear error, *Thomas*, 474 U.S. at 154, the Findings and Recommendation are adopted in full.

## I.    Plaintiffs' Objections

Plaintiffs have two objections to the Findings and Recommendations, arguing that it was error: (1) to deny their request to supplement the record and (2) to conclude that the EA adequately addressed baseline conditions for the grizzly bear. Neither objection has merit.

### A.    Supplementation

Plaintiffs first seek to supplement the administrative record with the Declaration of Dr. David Mattson. (*See* Docs. 25, 26-1.) "Review under the APA is generally limited to the administrative record that existed at the time the agency made its decision." *All. for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1196 (D. Mont. 2019). Nevertheless,

[i]n limited circumstances, district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (internal quotation marks omitted) ("*Lands* exceptions"). Here, Plaintiffs argue supplementation is appropriate under the first and third *Lands* exceptions. Neither argument is persuasive.

First, "exceptions to the normal rule regarding consideration of extra-record materials only apply to information available at the time, not post-decisional information." *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 600 (9th Cir. 2018) (internal quotation marks omitted). While Dr. Mattson's Declaration contains at least some information available at the time the agency made its decision, the Declaration itself is directly responsive to the agency's decision documents. (*See, e.g.*, Doc. 26-1 at ¶ 14 ("The EA and [Biological Opinion] fail to address an important relevant factor: . . .").) A post-decisional, substantive challenge to the administrative process is not appropriate supplementation.

Second, Plaintiffs imply that all NEPA challenges such as theirs require supplementation to ascertain "whether the agency has considered all relevant

6

factors." *Lands Council*, 395 F.3d at 1030.  But NEPA challenges are not excepted

from the administrative record rules governing review under the APA.  While there

are instances where pre-decisional, extra-record documents may show an agency

failed to consider relevant information in its decision-making process, the mere

allegation of a NEPA "relevant factors" challenge is not sufficient to meet this

exception.  Moreover, although Plaintiffs emphasize that Dr. Mattson's declaration

is not intended to challenge the substance or correctness of the Decision, (Doc. 54

at 24), their forbearance is short-lived, as they then proceed to argue that the

agency's science on cattle depredation is wrong and Dr. Mattson's analysis is

correct, (*id.* at 25–29).  This is not a valid reason for supplementation under either

the first or third *Lands* exception.

Finally, as recognized by Judge DeSoto, the contents of Dr. Mattson's

declaration is largely mirrored by his comments in response to the EA.  (Doc. 49

(citing AR_24677 *et seq.*).)  Those comments may be considered in the existing

record without admitting the declaration, which "would effectively open[] the

administrative record as a forum to debate the wisdom of [the agency's] decision."

*Cahill Ranches, Inc. v. U.S. Bureau of Land Mgm't*, 2023 WL 5022970, at *2 (D.

Or. July 6, 2023).

Plaintiffs' motion to supplement the administrative record, (Doc. 25), is

denied.

### B.    Baseline Conditions

Plaintiffs' second objection regards the Forest Service's consideration of the baseline condition of grizzly bears in the Decision area.  According to Plaintiffs, the EA fails to adequately describe the baseline condition for grizzly bears for two reasons: (1) the EA fails to recognize the escalating trend of human-bear conflict and (2) the EA relied on data that predates that decline in assessing the baseline condition.  Neither argument is persuasive.

As to Plaintiffs' first argument, the EA explicitly recognizes an increasing trend of human-bear conflict: "Due to an increased population of grizzly bears and a wider distribution throughout the Greater Yellowstone Area (GYA), the potential for grizzly bear/human conflicts has increased over the decades.  Continuation of these upward trends suggests the potential for conflict may continue to increase in the future."  AR_2427.  The EA then goes on to discuss how this trend may interact with either current or increased livestock numbers.  AR_2427.  Plaintiffs' assertion that this information is "nowhere in the EA," (Doc. 54 at 10), is therefore belied by the record.

Plaintiffs' second argument is equally unavailing.  Plaintiffs argue that both the EA and Judge DeSoto erred in relying on "data that *predated* the degraded baseline conditions at issue here."  (Doc. 54 at 11.)  In so arguing, Plaintiffs are referring to the 2016 Grizzly Bear Conservation Strategy, the 2013 Food Synthesis

8

Report, and Costello (2014), each of which Plaintiffs claim "reference data and information collected from a *2000-2011 study period*." (*Id.*) According to Plaintiffs, "[t]his 2000-2011 data and information . . . largely predated the significant and unprecedented escalation in grizzly bear mortalities from livestock grazing and human-caused conflicts that occurred in the Greater Yellowstone Ecosystem[.]" (*Id.*) But, as argued by Defendants, Plaintiffs perplexingly proceed to cite to similarly stale data, such as cutthroat trout data from between 1997 and 2007 and whitebark pine data from 2010. (*See id.* at 12–13.) While Plaintiffs also cite more recent grizzly bear mortality figures, that information merely bears out the EA's reference to an "upward trend[]" in mortality. *See* AR_2427. "An agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Resource Watch v. Bureau of Land Mgm't*, 844 F.3d 1095, 1101 (9th Cir. 2016). Because the agency engaged in such a reasonable assessment here, the Forest Service's discussion of the baseline grizzly bear conditions in the EA is sufficient under NEPA. Plaintiffs' objection is not well-taken.

## II.    Defendants' Objections

Defendants have three objections to the Findings and Recommendations, arguing that it was error to find that: (1) the Forest Service violated NEPA when it

failed to take a "hard look" at the environmental consequences of the Decision, specifically its consideration of earlier stocking dates, habitat connectivity, and cumulative effects; (2) the Forest Service violated NEPA by preparing a deficient Finding of No Significant Impact ("FONSI") and failing to prepare an EIS; and (3) vacatur is the appropriate remedy. These objections also lack merit.

### A.    "Hard Look"

An EA satisfies NEPA's "hard look" mandate if it contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). Here, Judge DeSoto determined that the EA was insufficient as it did not adequately address early stocking dates, habitat connectivity, and cumulative impacts to grizzly bears. While Defendants' objections address these three issues in turn, the crux of Defendants' argument is that the necessary information did not need to be contained in the EA because it appears in the administrative record and is properly incorporated by reference into the EA. Indeed, "an agency may incorporate data underlying an EA by reference." *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 998 (9th Cir. 2013); *see Forty Most Asked Questions Concerning CEQ's Nat'l Envtl. Policy Act Regulations*, 46 Fed. Reg. 18026, 18037 (Mar. 23, 1981) ("[T]he EA may incorporate by reference background data to support its concise discussion of the proposal and relevant

issues.").  Any material incorporated by reference must be "cited in the [EA],"
"briefly described," and "reasonably available for inspection by potentially
interested persons."  40 C.F.R. § 1502.21 (1978).  However, incorporation by
reference does not compensate for issues not identified in the EA; rather, the EA
must "[b]riefly provide sufficient evidence and analysis for determining whether
the prepare an [EIS] or a [FONSI]," *Tri-Valley CAREs v. U.S. Dep't of Energy*,
671 F.3d 1113, 1128 (9th Cir. 2012), "with a fuller discussion of the issue being
provided in the [the other record documents] that were incorporated by reference
into the EA," *Envtl. Protection Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1204
(N.D. Cal. 2004).  Because the EA at issue here is silent on the issues identified by
Plaintiffs, it cannot be saved by the mere invocation of "incorporation" as
discussed below.

### 1.    Earlier Stocking Dates

Defendants do not argue that the EA references or analyzes the impact
earlier stocking dates will have on grizzly bears.  To the contrary, Defendants rely
solely on information contained in the Terrestrial Wildlife Report and Biological
Evaluation ("Wildlife Report"), *see* AR_7879–81, the Biological Assessment, *see*
AR_2542, the agency's response to public comment, *see* AR_2250–51, and in the
Decision Notice and FONSI, *see* AR_2246–47.  They argue this information was
properly incorporated by reference into the EA based on three references.  First, in

the introduction paragraph to the section titled "Changes to existing conditions

under alternative management actions," the EA states:

> This section describes the outcomes of alternative management actions
> on resources and desired conditions in the allotments. This analysis is
> informed by technical documents and specialist reports. These
> documents are contained in the project record and are available for
> public inspection. They provide greater detail on current conditions in
> the allotments, how these conditions were identified and measured, and
> the sources of data and methodologies used.

AR_2395.  Second, in the introduction paragraph for the section titled "Effects to

terrestrial wildlife and wildlife habitat," the EA states: "The narrative below is

informed by a wildlife report, biological evaluation, and biological assessment

prepared for this project.  These reports are available in the project record."

AR_2409.  Finally, at its beginning, the EA contains a link to a website where all

the decision documents can be found.  AR_2373.  These generalized references are

insufficient to meet the agency's "hard look" mandate for the discrete issue of

earlier stocking dates.

The cases cited by Defendants reinforce this conclusion.  In *Tri-Valley

CARESs*, for example, the plaintiffs argued that the EA at issue failed to fully

disclose a single anthrax shipping incident, depriving the public of its ability to

comment on that specific shipment.  671 F.3d at 1128.  But the court rejected that

argument on the ground that the EA included a discussion of the incident, even if

that discussion was not exhaustive.  *Id.* at 1129.  Similarly, in *Center for Biological*

*Diversity v. Salazar*, the plaintiffs challenged the EA for failing to "analyze the significant foreseeable impacts of oil spills." 695 F.3d 893, 917 (9th Cir. 2012) (internal quotation marks omitted). However, the court rejected that argument because "[t]he EA discusse[d] the possible severe, even lethal, impacts of oil spills on polar bears, Pacific walruses, and their prey," and the EA's failure to include more specific data was "not arbitrary and capricious given the relatively narrow scope of the activity contemplated." *Id.* Here, however, one must look beyond the EA to even know that earlier stocking dates may impact grizzly bears. While the agency's conclusion that the risk is low may be supported by the record, *see* AR_2542, the EA as written fails to provide any information on this point to assess the significance of the environmental impact of the action, *see Tri-Valley CAREs*, 671 F.3d at 1128.

   This omission is only more problematic when one considers two additional features of the EA. First, the EA contains several references to the *positive* impacts of the earlier stocking date, particularly the impact it will have on invasive grasses and noxious weeds. *See, e.g.*, AR_2386, 2400. The EA also contains references to its *neutral* impacts, such as the fact it is unlikely to increase the possibility of *Brucella* transmission between cattle and bison. *See, e.g.*, AR_2414. By omitting the potential negative impact on grizzly bears, the EA implies that there are no negative consequences of earlier stocking dates. This is despite the

fact that the 2021 Biological Opinion issued by the Fish and Wildlife Service

explicitly states that increased grizzly bear mortality is possible "because the

grizzly bear population is increasing and their range is expanding and [] the net

acreage of active livestock grazing would increase and *the season of use is*

*expanded*." AR_2584 (emphasis added). Second, extending the stocking season is

one of the primary changes to allotment management approved under the Decision.

*Compare* AR_2381 (Table 3) *with* AR_2385 (Table 5). Thus, omitting the

potential negative consequences of this primary action from the definitive decision

document ignores an important part of the problem. *See Motor Vehicles*, 463 U.S.

at 43. Based on the foregoing, this objection is not well-taken.

### 2.    Habitat Connectivity

In regard to habitat connectivity, Defendants argue that the Forest Service's

analysis complied with NEPA because (1) a detailed analysis of connectivity is not

required considering the scale of the project and (2) deference to the agency's

rational conclusions regarding connectivity is required. Neither argument is

supported by the record.

Defendants' primary argument is "that it was reasonable for the EA to omit

detailed analysis of habitat connectivity given the agency's determination that

'[a]ny disturbance to grizzly bears from human presence on the landscape during

project implementation would be small in scale and temporary in nature.'" (Doc.

53 at 17 (quoting AR_2323).)  However, in so arguing, Defendants concede that

connectivity was not addressed in the EA.  This omission is arbitrary and

capricious in light of the fact that "connectivity" is considered one of the "six

demographic factors that are important to the resiliency" of grizzly bear.  *See*

AR_8118 (2022 Species Status Assessment).  Indeed, a discussion of connectivity

was specifically added to the revised Biological Assessment, acknowledging that

"[c]onnectivity between recovery plan ecosystem[s] was identified as a primary

justification for the 2018 remand of the 2017 delisting decision."  AR_20907.  But

that revised document was not issued until October 2022, after the final Decision

Notice was issued in December 2021.  Defendants cannot rely on this post-

decisional discussion to support the Forest Service's prior "finding of no

significant impact" under NEPA.  Contrary to Defendants' argument, failing to

address connectivity is not the same as explaining how and why agency action

does not negatively impact this important feature of grizzly bear abundance.

As it relates to Defendants' second argument, Defendants once again state

that the Forest Service reasonably "determined that the reauthorization of limited

livestock grazing on the East Paradise Allotments would not have significant (or

any) impacts on grizzly bear habitat connectivity, and thus it was unnecessary to

analyze such effects in the EA *for this project*.  No more is required under

NEPA . . . ."  (Doc. 53 at 19.)  But the EA reflects no such conclusion.  Defendants

once again conflate a reasoned explanation for omitting potentially relevant information (permissible under NEPA) with a complete absence of such information (impermissible under NEPA). Because the EA fails to provide any information on this point to assess the significance of the environmental impact of the action, it does not meet its NEPA mandate. *See Tri-Valley CAREs*, 671 F.3d at 1128. This objection is therefore not well-taken.

### 3.    Cumulative Effects

Finally, Defendants argue that the Forest Service's analysis of cumulative effects, primarily those associated with private activities, is sufficient because of the information contained in the Wildlife Report. *See* AR_7886–87. This argument is unpersuasive because "an EA [must] fully address cumulative environmental effects or cumulative impacts." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (internal quotation marks omitted); *see also Kern v. BLM*, 284 F.3d 1062, 1076 (9th Cir. 2002) ("Given that so many more EAs are prepared than EISs, *adequate consideration of cumulative effects requires that EAs address them fully*."). More specifically, "[a]n EA's analysis of cumulative impacts must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the

environment." *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 603 (internal quotation marks omitted).

But Defendants insist that because the Decision has "virtually no effect on cumulative impacts, it is unnecessary for the agency to detail other actions." (Doc. 53 at 22 (quoting *Bark v. U.S. Bureau of Land Mgm't*, 643 F. Supp. 2d 1214, 1224–25 (D. Or. 2009)). However, the Biological Assessment states the cumulative impacts of the Decision considered in conjunction with activities on private lands "would be neither beneficial, discountable, or insignificant." AR_2545; *see also* AR_2547 ("The cumulative effects associated with this project may be significant (not wholly beneficial, discountable, or insignificant)."). While Defendants are indeed correct that the "cumulative effects" standard under the ESA is distinguishable from the "cumulative impacts" standard under NEPA, *see Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054–55 (9th Cir. 2013) (discussing distinction), the existence of such effects in the ESA context rebuts the assertion that the Decision will have "virtually no effect" on the cumulative impacts to the grizzly bear in the NEPA context, *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1140 (9th Cir. 2006).

Finally, while the Biological Assessment contains at least a cursory discussion of the potential impacts, the Ninth Circuit has held that an inadequate EA cannot be remedied by analysis contained in a Biological Assessment: "while a

17

[Biological Assessment] analyzes the impacts of a proposed action upon endangered species, an EA analyzes the impact of the proposed action on all facets of the environment.  Thus, if only a BA is prepared there may be gaps in the agency's environmental analysis." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 649 (9th Cir. 2014) (internal quotation marks and alteration omitted) (discussing the differences between the purposes and mandates of the statutes).  Accordingly, this objection is not well-taken.

## B.     EIS

Defendants further argue that the Forest Service met its burden of providing a "convincing statement of reasons to explain why . . . [the Decision]'s impacts are insignificant" and therefore is not required to prepare an EIS.  *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1111 (9th Cir. 2015) (internal quotation marks omitted).  More specifically, Judge DeSoto found that Plaintiffs raised substantial question as to three of the ten "intensity" factors identified in 40 C.F.R. § 1508.27(b).  Defendants object to all three findings.  Those objections lack merit.

### 1.     Ecologically Critical Area, 40 C.F.R. § 1508.27(b)(3)

Subsection (3) to § 1508.27(b) requires consideration of "[u]nique characteristics of the geographic area such as proximity to . . . ecologically critical areas."  Here, Plaintiffs argue that the Forest Service failed to consider the effect the Decision may have on the "ecologically critical area" necessary for grizzly bear

connectivity.  Indeed, public comments specifically identified this issue: "[t]he Absorkas have repeatedly been identified as a key part of the connective habitat potentially linking grizzly bears in the Greater Yellowstone Ecosystem through the Crazy, Castle, and Little Belt Mountains.  Which is to say that the costs to long-term recovery entailed by grizzly bear[] deaths in the Absaroka Mountains are proportionately greater than costs entailed by deaths closer to the center of the ecosystem."  AR_24690; *see also* AR_20161 ("All of the allotments have been or will be used by the expanding population of [Greater Yellowstone Ecosystem] grizzly bears.  The Beartooth Absaroka wilderness to the east is an important zone of linkage for grizzly bears to move north, thus avoiding genetic isolation in current populations.").  As recognized in the EA, the project area encompasses 8,524 acres within the Hellroaring-Bear #1 Recovery Zone within the Greater Yellowstone Ecosystem.  AR_2426.  While the 2021 Biological Opinion issued by the Fish and Wildlife Service specifically notes that "inter-ecosystem connectivity" between the Greater Yellowstone Ecosystem and other bear recovery zones is currently "functionally extirpated," AR_2574, the 2022 Revised Biological Assessment states that the distance between Greater Yellowstone Ecosystem bears and bears occupying the Northern Continental Divide Ecosystem are decreasing and "it is likely that natural connectivity will occur in the near future," AR_8074.

Defendants nonetheless argue that further discussion of the mere presence of ecologically significant areas in the project area is not enough, rather, the project must significantly impact those characteristics and the East Paradise Plan does not. While this conclusion may be supported by the record, Defendants' argument suffers from the same flaw identified above: it is not stated in either the EA, the Decision Notice, or the FONSI. If there is no impact on connectivity, the EA should state that conclusion. As discussed above, including such analysis in a Biological Assessment is not sufficient. *See San Luis*, 747 F.3d at 649. And if there is uncertainty as to the impacts the Decision will have on connectivity, which the record indicates there may be, "[p]reparation of an EIS is mandated where uncertainty may be resolved by further collection of data or where the collection of such data may prevent speculation on potential effects. The purpose of an EIS is to obviate the need for speculation." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 870 (9th Cir. 2005) (internal quotation marks and alteration omitted). Ultimately, Plaintiffs have raised "substantial questions" whether the Decision area is located in an area ecologically critical to connectivity. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 868 (9th Cir. 2020).

### 2.    Cumulatively Significant Impacts, 40 C.F.R. § 1508.27(b)(7)

Subsection (7) to § 1508.27(b) requires consideration of "[w]hether the action is related to other actions with individually insignificant but cumulatively

significant impacts." Plaintiffs argue that there are substantial questions about the

likely cumulative effects from private land activities and how they will combine

with the grazing allotments to adversely affect grizzly bears in the Decision area.

Defendants maintain, however, that there is no record evidence for Plaintiffs'

assertion that the Decision "together with other actions, may have significant

cumulative effects within the meaning of NEPA." (Doc. 53 at 29–30.) In so

arguing, Defendants once again ignore the fact that the Biological Assessment

specifically states that the cumulative effects on grizzly bears "would be neither

beneficial, discountable, or insignificant." AR_2545. The fact that both "impacts"

and "significance" have different meanings under the ESA does not obviate the

fact that the Forest Service's NEPA conclusions are, inexplicably, directly contrary

to those findings. Because Plaintiffs have raised a "substantial question" as to this

issue, *Bark*, 958 F.3d at 868, Defendants' objection is not well-taken.

### 3.    Threatened Species, 40 C.F.R. § 1508.27(b)(9)

Subsection (9) to § 1508.27(b) requires consideration of "[t]he degree to

which the action may adversely affect an endangered or threatened species . . . ."

As recognized by Defendants, the Forest Service's inadequate analysis of this issue

is tied directly to the omitted information discussed above. While the agency may

ultimately conclude that the degree of adverse effects is minimal, that conclusion is

not a "convincing statement" so long as it does not address the issues identified

above. *Cascadia Wildlands*, 801 F.3d at 1111. Thus, this objection is not well-taken.

## C.    Remedy

Finally, Defendants argue that the Decision should not be vacated because the NEPA errors identified are minor "and to vacate [the East Paradise Plan] would cause great disruption to the many benefits [it] offers for the landscape." (Doc. 53 at 31.) The APA directs that "[t]he reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Vacatur is the presumed remedy where an agency has acted unlawfully, *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018), but the district court "is not required to set aside every unlawful agency action," *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995); *see Cal. Cmtys. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) ("A flawed rule need not be vacated."). "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys.*, 688 F.3d at 992 (internal quotation marks omitted).

In assessing the seriousness of the error, courts "consider whether vacating a faulty [decision] could result in possible environmental harm." *Pollinator*

*Stewardship Council v. Env't Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015).

Another consideration is "whether the agency would likely be able to offer better

reasoning or whether by complying with procedural rules, it could adopt the same

[decision] on remand, or whether such fundamental flaws in the agency's decision

make it unlikely that the same [decision] would be adopted on remand." *Id.*

Additionally, courts consider whether the errors are "limited in scope." *All. for the*

*Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019).

Here, while the Forest Service may be able to offer better reasoning on

remand and adopt the same decision it has, the errors identified above specifically

and directly impact grizzly bear recovery. Indeed, although many of the same

environmental advantages that exist under the Decision can be realized even if

vacatur occurs, (*see* Doc. 55 at 34–35 (summarizing protections available in the

absence of agency action)), the threat to grizzly bears posed by earlier stocking

dates and expansion of the Sixmile North allotment into the Hellroaring-Bear #1

Recovery Zone exist solely under the proposed action. Vacatur is therefore the

appropriate remedy.

## III. Conclusion

Based on the foregoing and finding no clear error in the remaining portions

of Judge DeSoto's Findings and Recommendations,

IT IS ORDERED that:

(1)  The Findings and Recommendation, (Doc. 49), is ADOPTED IN FULL.

(2)  Plaintiffs' motion to supplement, (Doc. 25), is DENIED.

(3)  The parties' cross-motions for summary judgment, (Docs. 29, 35), are GRANTED in PART and DENIED in PART.  Summary judgment is granted in favor of Defendants as to Plaintiffs' NEPA claims insofar as the Forest Service adequately set the project baseline.  Summary judgment is otherwise granted in favor of Plaintiffs on their NEPA claims.

(4)  Plaintiffs' ESA claims are DISMISSED as waived.

(5)  The East Paradise Allotment EA and Decision Notice are VACATED and REMANDED to the agency to address the deficiencies identified in both the Findings and Recommendation and this Order.

(6)  The Clerk is directed to enter judgment consistent with this Order and close the case file.

DATED this ___ day of September, 2025.

Donald W. Molloy, District Judge
United States District Court